**UNITED STATES of America,**
**Plaintiff,**

v.

**AMR CORPORATION, American Airlines, Inc., and AMR Eagle Holding Corporation, Defendants.**

**No. 99–1180–JTM.**

United States District Court,
D. Kansas.

April 27, 2001.

Jackie N Williams, Office of U.S. Atty., Wichita, KS, Christopher Dusseault, Gibson, Dunn & Crutcher, L.L.P., Los Angeles, CA, Joel I Klein, A Douglas Melamed, John M Nannes, Rebecca P Dick, Roger W. Fones, Donna N Kooperstein, Robert D Young, J Richard Doidge, Nina B Hale, Rebekah J French, Matthew O Schad, Darren D Bush, Craig W Conrath, Karl D Knutsen, Jennifer L. Cihon, Renata B Hesse, U.S. Dept. of Justice, Antitrust Div., Washington, DC, Max R Huffman, Mark J Niefer, U.S. Dept. of Justice, Antitrust Div., Washington, DC, for U.S.

Stephen E. Robison, Fleeson, Gooing, Coulson & Kitch, L.L.C., Wichita, KS, Joseph M. Rebein, Shook, Hardy & Bacon L.L.P., Kansas City, MO, William R.

Sampson, David A. Rameden, Matthew J. Wiltanger, Shook, Hardy & Bacon L.L.P., Overland Park, KS, Helene D. Jaffe, Debra J. Pearlstein, Peter A Antonucci, Alan J. Weinschel, Weil, Gotshal & Manges LLP, New York, NY, Robert E. Cooper, Mark E. Weber, Daniel G. Swanson, Samuel G Liversidge, Rodney Stone, Gibson, Dunn & Crutcher L.L.P., Los Angeles, CA, Edward Soto, Weil, Gotshal & Manges LLP, Miami, FL, Melanie Gray, Weil, Gotshal & Manges LLP, Houston, TX, D Jarrett Arp, Gibson, Dunn & Crutcher, Washington, DC, for AMR Corp., American Airlines Inc., AMR Eagle Holding Corp.

MEMORANDUM AND ORDER

MARTEN, District Judge.

## TABLE OF CONTENTS

A. INTRODUCTION ......................................................1144

B. FINDINGS OF FACT ................................................1144
 1. SUMMARY JUDGMENT STANDARD ............................1144
 2. THE PLAINTIFF'S ALLEGATIONS .............................1145
 3. COMPETITION IN THE DALLAS—FORT WORTH AREA..............1146
 4. LCC COSTS ............................................1151
 5. NEW ENTRANT AIRLINE COMPETITION .........................1151
 6. AMERICAN'S COMPETITIVE EXPERIENCE WITH LCCs............1152
 7. HOW AMERICAN COMPETED ON THE ROUTES AT ISSUE ......1155
 a. DFW–MCI ............................................1155
 b. DFW–ICT (Wichita) ..................................1157
 c. DFW–COS ...........................................1161
 d. DFW–LGB (Long Beach) .............................1164
 e. DFW–EWR (Newark) ................................1166
 f. DFW–TPA (Tampa) .................................1167
 g. DFW–OAK (Oakland) ...............................1168
 h. DFW–PHX (Phoenix)................................1168
 i. OTHER ALLEGED MARKETS........................1168
 8. LCCs AND PRICE COMPETITION ...........................1169
 9. ALLEGED PREDATORY PRICING ...........................1173
 10. COMPETITIVE PRACTICES ...............................1181
 11. REPUTATION ISSUES ..................................1183
 12. SPECIFIC CARRIERS ..................................1183
 a. Air Tran Airlines ..................................1183
 b. American Trans Air ...............................1184
 c. Big Sky Airlines ..................................1184
 d. Braniff Airlines ..................................1184
 e. Frontier (DFW–DEN) ...............................1184
 f. Great Plains (DFW–ICT)............................1185
 g. JetBlue (DFW–JFK) ...............................1185
 h. Legend Airlines ..................................1186
 i. National Airlines (DFW–LAS) .......................1186
 j. Ryan International Air (DFW–ICT) ..................1187
 k. Ozark Airlines ..................................1187
 l. Sun Country Airlines .............................1188
 m. Vanguard (DFW–CVG) ............................1188
 13. NEW ENTRY AT DFW ................................1188
 14. FACTS RELEVANT TO MEETING COMPETITION .............1188
 15. IN-MARKET RECOUPMENT ..............................1188

C. CONCLUSIONS OF LAW ...........................................1192
 1. THE GOVERNMENT'S ALLEGATIONS ........................1192
 2. ELEMENTS OF LIABILITY ...............................1193

3. AMERICAN'S COSTS ...............................................1196
4. MEETING COMPETITION..........................................1204
5. RECOUPMENT .....................................................1208
6. MONOPOLIZATION BY REPUTATION ...............................1215
7. ADDITIONAL ROUTES.............................................1217
8. CONCLUSION ....................................................1218

APPENDIX ................................................................1219

## A. INTRODUCTION

The present action arises from competition between American Airlines and several smaller low cost carriers on various airline routes centered on Dallas—Fort Worth Airport (DFW) from 1995 to 1997. During this period, these low cost carriers created a new market dynamic, charging markedly lower fares on certain routes. For a certain period (of differing length in each market) consumers of air travel on these routes enjoyed lower prices. The number of passengers also substantially increased. American responded to the low cost carriers by reducing some of its own fares, and increasing the number of flights serving the routes. In each instance, the low fare carrier failed to establish itself as a durable market presence, and eventually moved its operations, or ceased its separate existence entirely. After the low fare carrier ceased operations, American generally resumed its prior marketing strategy, and in certain markets reduced the number of flights and raised its prices, roughly to levels comparable to those prior to the period of low fare competition.

In the present action the plaintiff United States alleges that the defendants AMR Corporation, American Airlines, Inc., and AMR Eagle Holding Company, (all hereafter "American"), participated in a scheme of predatory pricing against the low cost

carriers in violation of Section 2 of the Sherman Act. The government alleges that American's pricing and capacity decisions on the routes in question resulted in pricing its product below cost, and that it intended to subsequently recoup these costs by supra-competitive pricing by monopolizing or attempting to monopolize these routes. It further alleges that, in addition to these routes, American has violated Section 2 in a large number of additional airline routes, contending that American has monopolized or attempted to monopolize by means of the "reputation for predation" it allegedly gained in its successful competition against low fare carriers in the core markets.

American has moved for summary judgment on the outstanding claims, arguing that its competition against the low cost carriers was competition on the merits, and not conduct unlawful within the terms of the Sherman Act. Having reviewed the arguments of the parties and the evidence submitted in connection with the motion for summary judgment, the court finds that summary judgment is appropriate.[1]

## B. FINDINGS OF FACT

## 1. SUMMARY JUDGMENT STANDARD

Summary judgment is proper where the pleadings, depositions, answers to inter-

---

**1.** In light of the extensive argument and documentary exhibits surrounding the present motion, a motion for reconsideration is discouraged. If such a motion is filed, the motion shall not repeat any argument previously made to the court, and cite only evidence newly acquired but which was not previously discoverable through due diligence. Such motion and accompanying memoranda may not exceed ten double-spaced pages in length, including supporting arguments and authorities, regardless of the number of points raised. A response shall also be limited to ten pages. No replies may be filed.

rogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir.1988). The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir.1985). The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs. Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts. "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct.

1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)) (emphasis in *Matsushita*). One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).[2]

## 2. THE PLAINTIFF'S ALLEGATIONS

The plaintiff alleges that American monopolized or attempted to monopolize through predatory pricing and by the resulting reputation for predatory pricing in the following seven markets: DFW–MCI (Kansas City), DFW–ICT (Wichita), DFW–COS (Colorado Springs), DFW–LGB (Long Beach), DFW–PHX (Phoenix), DFW–TPA (Tampa), and DFW–OAK (Oakland).

In addition, the plaintiff alleges that American monopolized or attempted to monopolize the following markets through the reputation that it earned for predatory pricing on other routes: DFW–BDL (Hartford), DFW–BHM (Birmingham), DFW–BNA (Nashville), DFW–BOS (Boston), DFW–BWI (Baltimore), DFW–CLE (Cleveland), DFW–CMH (Columbus), DFW–DCA (DC Reagan), DFW–FLL (Ft. Lauderdale), DFW–HSV (Hunstville, AL), DFW–IAD (DC Dulles), DFW–IND (Indianapolis), DFW–LAX (Los Angeles), DFW–LGA (N.Y. LaGuardia), DFW–MIA (Miami), DFW–OMA (Omaha), DFW–ONT (Ontario, California), DFW–ORD (Chicago O'Hare), DFW–PDX (Portland, Washington), DFW–PHL (Philadelphia), DFW–RDU (Raleigh Durham), DFW–SAN (San

---

**2.** In the following sections, the court makes findings of uncontroverted fact, based upon the pleadings submitted by the parties, and the accompanying exhibits. Where requested fact findings are excluded, it is because the

court finds that the contentions are irrelevant, unsupported consistent with the requirements of D.Kan. Rule 56.1, or corroborated only by inadmissible evidence.

Diego), DFW–SEA (Seattle), DFW–SFO (San Francisco International), DFW–SGF (Springfield, Missouri), DFW–SJC (San Jose, California), DFW–SJU (San Juan, Puerto Rico), DFW–SNA (Orange City, California), and DFW–TUS (Tucson).

The plaintiff alleges that the following five markets felt effects from American's actions, without alleging that American monopolized or attempted to monopolize the markets: DFW–CLT (Charlotte, NC), DFW–DTW (Detroit), DFW–MCO (Orlando), DFW–MEM (Memphis International), and DFW–PIT (Pittsburgh). The plaintiff alleges that, without monopolizing or attempting to monopolize them, American engaged in predatory conduct in the following four markets: DFW–ATL (Atlanta), DFW–CVG (Cincinnati), DFW–DEN (Denver), DFW–EWR (Newark), DFW–MDW (Chicago Midway).

Finally, in addition to the preceding airport pair markets, the plaintiff also alleges that American monopolized or attempted to monopolize through its reputation for predatory pricing, the ten markets for airline service between DFW and the following metropolitan areas: metropolitan Chicago (reflecting DFW service to both ORD and Midway Airports), the District of Columbia (service to IAD and DCA), the DC–Baltimore area (BWI, DCA, and IAD), metropolitan Los Angeles (LAX, LGB, Burbank, Orange City, Ontario), metropolitan New York (JFK, LGA), metropolitan New York–New Jersey (JFK, LGA, EWR), metropolitan Miami (MIA, FLL), metropolitan Tampa (TPA, St. Petersburg), metropolitan San Francisco (SFO, OAK), and the greater Bay area (SFO, OAK, SJC).

## 3. COMPETITION IN THE DALLAS—FORT WORTH AREA

The predominant form of organization among airlines is a hub and spoke system, where many passengers leave their origin city for an intermediate hub airport. At the hub, passengers switch to different planes that take them to their desired destination city. This system puts "local" passengers (who specifically desire to travel to or from the hub) on the same plane with connecting or "flow" passengers (who are only passing through the hub).

Economists have noted that passengers tend to pay higher fares on average on routes from concentrated hubs than on otherwise comparable routes that do not include a concentrated hub as an endpoint. This is called the hub premium. The hub premium exists in part because the economies of scale enjoyed by the hubbing carrier drive marginal costs of service down, while the product differentiation advantages available to the hubbing carrier increase prices.

American's operation of its large Dallas/Fort Worth International Airport ("DFW") hub provides significant economies of scope and scale on DFW routes. Operation of a hub, like American's at DFW, provides economies of traffic density that lowers the costs on a per-passenger basis and/or permits the hub operator to increase frequency.

Entrants considering entry into hub routes have to anticipate operating losses during initial periods of operation. None of the hubbing major airlines, other than Delta and American, provide non-stop service from DFW to any point that is not one of its own hubs.

DFW is located between the cities of Dallas and Fort Worth, Texas. American's total market share at DFW has decreased over the last three years due to a dramatic increase in low-fare carriers, DFW's success in attracting foreign flag airlines, and dramatic growth by other major airlines at DFW.

The plaintiff challenges this portrait of increased low fare competition at DFW by evidence that, in May 2000, American's share of all passengers boarded at DFW increased (by 3.1%) over that for May of 1999. There are several problems with this. First, the cited evidence looks at all DFW passengers, including those merely passing through the airport. As a result, it directly overstates the market share of American, which operates at DFW as a hub. Second, while American's market share may have increased over this time period, the number of passengers carried by low fare airlines at DFW increased even faster (30.7%).

Delta Air Lines also maintains a hub operation at DFW, although its hub is smaller than American's. Delta reduced its flights during the mid–1990s at DFW, but in the last year has increased them again. As of the end of 2000, Delta (along with its affiliated carrier, Atlantic Southeast Airlines) offered scheduled nonstop service from DFW to 62 destinations with 209 daily flights. According to U.S. Department of Transportation T–100 data, Delta boarded more passengers at DFW in 1999 (4.6 million) than many hub airlines boarded at hubs where they were the primary hub airline (such as Northwest at Memphis or Continental at Cleveland). All major domestic airlines serve DFW, including Northwest Airlines, U.S. Airways, Delta Air Lines, United Airlines, Continental Airlines, America West, and TWA.

New entrant airlines serving DFW as of mid–2000 include Frontier, AirTran, National, Vanguard, American Trans Air, Ozark, and Sun Country. DFW, with seven low fare airlines, has more low fare airlines than any other hub airport. Low fare airlines serve at least 31 of DFW's top 50 destinations on either a nonstop or connecting basis.

A DFW official has stated that new entrant airlines "continue to thrive" at DFW, with a 25% year-over-year increase in passenger share in May 2000. The airport's Carrier Support program provides cooperative advertising funds to new entrants. Five new low cost airlines have started service at DFW in the last three years (American Trans Air, Frontier, National, Sun Country, and Ozark). There are gates and other ground facilities available at DFW for entry by low fare or other domestic airlines. Airport authorities control eight gates at DFW which are "common use" gates that DFW makes available to new entrants and other airlines.

As of the third quarter of 2000, American served 79 domestic U.S. destinations non-stop from DFW, with 467 daily flights. Delta served 40 destinations non-stop from DFW with 120 daily flights. American's commuter airline affiliate, American Eagle, served 40 destinations non-stop with 237 daily flights and Delta's commuter airline affiliate, Atlantic Southeast Airways, served 19 destinations with 72 daily flights.

Delta had attempted to enlarge its DFW hub in the early 1990s but was unsuccessful and instead decreased its DFW presence. American had responded vigorously to Delta's attempt to grow at DFW. Delta suffered operating losses of approximately $560 million at DFW during the period from 1992–1994. From July 1993 to July 1996, Delta reduced its daily jet departures from DFW from 249 to 145 and its commuter affiliate reduced its turboprop departures from DFW from 97 to 88, while American increased its jet departures from 499 to 518 and increased its commuter affiliate turboprop departures from 169 to 257. In 1995, Delta's and its commuter affiliate, Atlantic Southwest Airways', total spokes decreased by 14 to 65, with 223 flights per day between the carriers.

Delta's DFW market share, measured by passengers boarded, decreased over the period July 1993 to July 1996 from 28.4% to 19.2%, while American's increased over the same period from 64.7% to 71.8%. After its downsizing at DFW, Delta's primary remaining strength was in hub-to-hub routes (from DFW–ATL, DFW–CVG, and DFW–SLC (Salt Lake City)) and in Florida and leisure markets. In 1999, Delta's DFW hub ranked 21st of 23 in a ranking of the number of passengers boarded by major airlines at their domestic hubs. By comparison, American's DFW hub ranked third; American's Chicago hub ranked 10th, and American's Miami hub ranked 18th. In June 1996, American flew 67% of the total available seat miles ("ASMs") flown by airlines operating to and from DFW Airport and Dallas–Love Field Airport. From 1993 to 2000, American's share of DFW ASMs increased from 61.7% to 69.8%, while Delta's share of DFW ASMs decreased from 31.5% to 18.1%.

In 1998, Delta felt that there was limited potential for growth at DFW. However, it has recently increased its presence there. Avenues for Delta growth include regional jet use, Gulf Coast flying, and adding capacity in existing flow markets.

Love Field is an airport located within the Dallas city limits that is therefore closer geographically to the origin or destination point of many Dallas travelers than DFW. From the time the "Wright Amendment" was passed in 1979 until October 1997, jet operations at Love Field were legally restricted to service within Texas and between Texas and New Mexico, Oklahoma, Arkansas, and Louisiana. Beginning in October 1997, when the "Wright Amendment" was amended by the "Shelby Amendment," jet operations at Love Field were permitted within Texas and between Texas and New Mexico, Oklahoma, Arkansas, Kansas, Alabama, Mississippi, and Louisiana. Beginning in February 2000, legal challenges to Love Field service to any destination by aircraft (jet or propeller) configured to carry 56 passengers or less were set aside. International Air Transportation Competition Act of 1979, Pub.L. No. 96–192, 94 Stat. 36 (1980); Department of Transportation & Related Agencies Appropriations Act of 1998, Pub.L. No. 105–66, 111 Stat. 1425 (1997); *American Airlines, Inc. v. Dep't of Transportation,* 202 F.3d 788, 793–95 (5th Cir. 2000), *cert. denied,* 530 U.S. 1274, 1284, 120 S.Ct. 2740, 2762, 147 L.Ed.2d 1005, 1022 (2000).

Since late 1997, federal law permits scheduled airline passenger service from Love Field as follows:

1. Non-stop scheduled passenger service using aircraft with a seating capacity of greater than 56 seats may only be provided within the Wright Amendment Territory plus the states of Kansas, Alabama and Mississippi (the "Shelby Amendment Territory").

2. Airlines operating from Love Field with aircraft having a seating capacity of greater than 56 seats are prohibited from holding out non-stop or connecting air transportation to points beyond the Shelby Amendment Territory.

3. Scheduled passenger service may be provided between Love Field and points beyond the Shelby Amendment Territory, but only so long as such service is provided on aircraft with fewer than 57 seats.

Love Field is a major base of operations for Southwest Airlines, which currently serves 13 nonstop destinations from that airport with 139 daily flights. Southwest is a large and successful low cost carrier. Southwest is prohibited by statute from expanding its service from Love Field to points beyond a limited geographical area, and there is no likelihood that Southwest

will begin service from DFW Airport. Southwest does not operate any aircraft with fewer than 57 seats and has no plans to acquire any such aircraft. Southwest is unlikely to enter the DFW–Wichita market.

On a number of nonstop routes from DFW, American had market shares ranging from 60% to 100%, based on shares of non-stop origin and destination ("O & D") revenue, for the period from 1990 to 1999. It had market shares ranging from 61% to 100% for these routes for the year 1999. The United States' expert Professor Berry determined that on these non-stop routes, the Herfindahl–Hirschman Index[3] ranged from 5150 to 9939, for the year 1999.

On other routes for all airline service, American had market shares ranging from 60% to 95%, based on share of O & D revenue, for the period from 1990 to 1999. In 1999, American's market share for these routes ranged from 61% to 92%. Professor Berry determined that the Herfindahl–Hirschman Index on these routes ranged from 4368 to 8539 for the year 1999.

According to data maintained by the DFW airport, American's share of passengers boarded at the DFW airport was 70.2% as of May 2000, while the LCC share as of the same date was 2.4%.

American's prices in Southwest and LCC-competitive markets may be used as proxies for competitive prices that still permit American to earn a profit and maintain service on the routes.

The government compares the price of tickets on four sets of two routes, one in which American faces competition from Southwest Airlines or another LCC, and one in which American is free from such competition. The comparison is illustrated

in the following table, which lists DFW routes to various cities, with American's average one-way fare to that city. In each case, the first of the listed cities is a route in which American faces LCC competition.

| City | Fare $ |
|---|---|
| Amarillo | 62 |
| Wichita | 112 |
| El Paso | 92 |
| St. Louis | 192 |
| Albuquerque | 97 |
| Omaha | 215 |
| Atlanta | 117 |
| Indianapolis | 225 |

The court finds such comparisons of limited usefulness, based as they are on an absence of any accompanying evidence that the cities being compared are indeed equal in terms of distance, costs, and market density.

As the airline with the largest scope of operations at DFW, American has significant advantages over other competitors or potential competitors in DFW routes in attracting passengers and charging higher prices. This advantage has variously been called "origin point presence" advantage, "OPP" advantage, "origin point dominance" or "frequency dominance" by American, and has been described by American as follows: "a carrier which achieves substantial advantage over its competition in terms of frequency and scope of service at any airport, hub or spoke, ... will invariably obtain a disproportionate share of the traffic and revenues for the flights originating at that airport."

Frequency dominance or origin point presence advantages are reinforced by marketing programs including frequent flyer programs and travel agent commission overrides. American's investment in establishing its DFW hub involved a large

**3.** The Herfindahl Hirschman Index (HHI) measures market concentration levels, and is calculated as the sum of the squared market share percentages for each market participant.

sunk investment, and another airline with similar cost structure would also have to make large investments to build a similar hub at DFW.

American generally enjoys higher margins where it does not face low fare competition. American's internal analyses recognize that fares and yields in Southwest and LCC-competitive markets are significantly lower than fares and yields where American does not compete with Southwest or other LCCs. Thus, American calculated that its revenue per available seat mile in DFW–ATL increased by 14% after the 1996 ValuJet crash caused that LCC to exit.

The government alleges that American "conducted itself in a manner demonstrating that it believed it could set prices without considering the existence of potential competitors." (Plf. SOF, at 3.1). However, the only evidence cited in support of this generalization is an internal American memo stating that, following Midway Airlines' departure from the DFW–MDW route, American should raise prices slowly to avoid "sticker shock," but did not worry about competitor reactions. In fact, the same document (Plf.Exh.189) expresses concern about such a reaction, stating that "connect carriers continue to offer discounted fares, and our experience during the past year has demonstrated that these carriers possess strong potential to capture share in markets where large fare differentials exist."

During 1996, flights to and from American's DFW hub for the previous 12 months made up between 40% to 58% of American's total domestic capacity (ASMs), but accounted for between 60% to 86% of its domestic fully allocated earnings.

As noted earlier, American's price-average variable cost margins are higher on its flights to and from DFW than on other flights in its system. The company's internal documents recognize that this higher market share correlates to higher local yields. Fares on routes where American competes with other hubbing major airlines are generally higher than on comparable routes where American competes with LCCs or Southwest.

Over the time period 1994–1999, American has maintained higher price-average variable cost margins for local passengers in routes the government claims as monopolized than it has maintained in routes which are competitive with Southwest Airlines or LCCs. In routes for all airline service from DFW in which United States' expert Professor Berry claims are American monopolies, American earned price-cost margins ranging from 24% to 57% for the period from 1994 through 1999. In 1999, for these routes American earned price-cost margins ranging from 28% to 59%. In non-stop routes so characterized by Berry, American earned price-cost margins ranging from 28% to 60% for the year 1999.

Considering all non-stop routes from DFW (whether or not these have been claimed as monopolies by Berry) in which it does not compete with Southwest Airlines or an LCC, American earned a price-cost margin of 44.3% in 1994, 46.6% in 1996, and 50.7% in 1998. In all non-stop routes from DFW in which American competes with Southwest Airlines or an LCC, American earned a price-cost margin of 9.7% in 1994, 19.1% in 1996, and 20.5% in 1998, calculated in the same manner as the price-cost margins in Berry Exh. 1.

In the 36 airport pairs from DFW in which United States' expert Professor Berry has claimed American has monopoly power over non-stop service, there were seven episodes of entry by LCCs during the 10–year period from 1990 through 1999, and 14 episodes of entry by major airlines. In the 26 airport pairs from DFW in which United States' expert Pro-

fessor Berry has claimed that American has monopoly power over all airline service, there were six episodes of entry by LCCs during this period, and 11 episodes of entry by major airlines.

There were 44 total episodes of entry by any airline into any route from DFW during the 10–year period from 1990 through 1999. That number of entry episodes translates into 4.7% of DFW routes being entered per year, on average.

Routes from major airline hub airports other than DFW were entered by any airline at a rate of 7.7% of the hub routes per year during the 10–year period from 1990 through 1999. DFW routes were entered by LCCs, from their own hubs, at a rate of 1.0% per year during the 10–year period from 1990 through 1999. Routes from major airline hub airports other than DFW were entered by an LCC from its hub at a rate of 2.2% of the hub routes per year during the 10 year period from 1990 through 1999. Such figures, however, tend to unfairly minimize the market presence of LCCs, since they focus only on nonstop service from DFW and fail to consider LCC connecting service.

The government notes that New York, including LGA, JFK, and EWR, was served by nine LCCs with 9.7% market share, as of the third quarter of 2000. Chicago, including ORD and MDW, was served by six LCCs and Southwest, for a total LCC market share of 12.3%, as of the third quarter of 2000. Denver had an LCC market share of 15.3%; Atlanta had an LCC market share of 16.8%; and Detroit had an LCC market share of 9.19%, as of the third quarter of 2000. LCC's market share for all Dallas (both Dallas Love Field and DFW Airport,) with service from all LCCs (including Southwest) was 26.4%.

In 1995, Midway Airlines exited DFW–MDW after a period of price cutting by American, and American's prices increased quickly. After the entry of American Trans Air in 1998, average fares on the route decreased by 20%.

On average, for local passengers on the DFW–ICT, DFW–LGB, and DFW–COS routes, American's price cost margins were 28%, 41%, and 36% respectively in 1999.

## 4. LCC COSTS

In 1994, American calculated ValuJet's stage length adjusted cost per ASM to be 4.32 cents, and American's cost per available seat mile to be 8.54 cents.

American's Executive Vice President of Marketing and Planning, Michael Gunn, testified that Southwest's costs were 30% lower than American's.

An internal American document discussed the cost advantages of low cost airlines, stating that one of the "fundamental problems in the [airline] industry" in 1994 was that "consumer values (price) and the high cost structures of incumbent airlines have encouraged new competitors," that in 1993 Southwest's labor costs/ASM were 45.8% lower than American's, and that "today's low-cost airlines have a cost advantage primarily because they are not burdened with inefficient work rules."

## 5. NEW ENTRANT AIRLINE COMPETITION

It is uncontroverted that new entrant airlines with low fare strategies, including Vanguard, Western Pacific, Frontier, National, and JetBlue, expect existing competitors to match those fares. Officers of these airlines do not believe matching another carrier's fare is anti-competitive conduct, so long as the pricing is not below cost. Further, an airline that does not match fares is likely to lose business to its lower-priced rivals.

## 6. AMERICAN'S COMPETITIVE EXPERIENCE WITH LCCs

In the early 1990s, several LCCs were affecting a significant portion of the ASMs of each of the seven major airlines (defined to be AA, CO, DL, NW, UA, US, and TWA). LCCs by definition charge lower airfares, in part because they may have low operating costs, and in some cases provided less than the full service quality offered by the major hub carriers.

As of May 1994, MarkAir flew 10 non-stop spokes out of United's Denver hub, affecting 35.9% of the Denver hub ASMs. American observed ValuJet establishing a successful hub in Atlanta. American specifically noted ValuJet's success, and used ValuJet as an example of a hubbing LCC that could do very well at DFW. In just over its first two years of operation, ValuJet had grown, by February 1996, to an operation with 41 aircraft, serving 28 cities, including a hub and spoke operation at Atlanta with 22 spokes. American observed that ValuJet expanded while Delta was pursuing a short term, non-aggressive pricing strategy.

In a March 3, 1995, document entitled "Financial Impact of Low Cost Carriers," American made an assessment of the degree to which its routes, system-wide, were "at risk" to additional incursion by low cost carriers, and concluded that LCC entry into American's DFW markets posed a serious threat to American's revenues. American studied the impact of ValuJet's Atlanta hub on Delta, stating that "[f]or the 2nd Q93, on a pure share basis, DL has lost $232M in annual revenue. Clearly we don't want this to happen to AA at DFW." In other words, American calculated that ValuJet's success in forming an ATL hub cost Delta $232 million per year in revenues.

American believed that Delta encouraged ValuJet's development of an ATL hub through its lack of response to ValuJet's entry. A second study conducted by American, entitled "DFW Vulnerability to Low Cost Carrier Competition" ("DFW Vulnerability Study"), considered the attractiveness of DFW markets to entry by a hubbing low cost carrier and the negative effects on American's fares and traffic that would result if such entry occurred at DFW.

American believed that it had the ability to compete with LCC service from DFW by implementing strategies of capacity additions in select markets and strong matching on price and availability. In a document dated May 23, 1995, American discussed its strategy of matching price and availability against Midway Airlines in DFW–MDW, which enabled American to capture more than the share lost when Midway first entered the market. American observed that "it is very difficult to say exactly what strategy on AA's part translates into a new entrant's inability to achieve their QSI share—that strategy would definitely be very expensive in terms of AA's short term profitability." Delta and Southwest had both also lost share to Midway but did not regain their lost share by May of 1995.

As noted above, American thought that lack of responses by Delta was the reason for success of ValuJet, and that "ced[ing] parts of the market to [the LCC] . . . was not the proper way to respond." American also observed that when Delta did begin more aggressive matching of ValuJet in July 1995, erosion of Delta's market share stopped.

Shortly after the DFW Vulnerability Study was completed, in mid 1995, American formed a working group to develop a strategy for dealing with LCCs at DFW ("Strategy Working Group"). Barbara Caldas, at the time a senior analyst in American's Yield Management Department, was the coordinator of the Strategy

Working Group. The DFW LCC Strategy Working Group involved representatives from American's Pricing and Yield Management Department, Capacity Planning Department, Sales Planning Department, Marketing Planning Department, Airline Profitability Analysis Department, and Eagle Pricing and Yield Management Department. In a document memorializing notes from a January 31, 1996, meeting, called the "DFW LCC Meeting," an American employee wrote that a strategic objective should be formed regarding an LCC response. The employee also wrote expressing the need to "[d]emonstrate that a failure to defend our business versus LCC could be very damaging."

American asked Tom Cook, at the time the President of Sabre Decision Technologies ("Sabre"), then a subsidiary of American, to analyze how American could more effectively operate by integrating Pricing, Yield Management and Capacity Planning. American's then-President, Donald Carty, and American's then-CEO, Robert Crandall, were involved in Sabre's project. The goal of the Sabre project was to "[i]dentify profit improvement for AA through the integrations of Capacity Planning, Pricing, and Yield Management." The Sabre project was coordinated by a steering committee, formed in late 1995, and made up of Mr. Cook and American executives Mel Olsen, Tom Bacon, and Craig Kreeger. Sabre employees interviewed employees of American in American's Finance, Capacity Planning, Pricing and Yield Management departments, including high-level American executives. At the interviews, American executives discussed American's coordinated project for dealing with LCCs, including discussing the Strategy Working Group, referred to as the "DFW Strategy Task Force."

American produced a document, entitled "DFW Low Cost Carrier Strategy," ("LCC Strategy Package") which was presented to American's senior management at a February 27, 1996, meeting. At the February 27 meeting where the LCC Strategy Package was presented, Diana Block, at the time a manager of Domestic Yield Management at American, and a member of the Strategy Working Group, took notes on a copy of the document. Ms. Block recorded a statement made by American's then-CEO, Robert Crandall to the effect that: "If you are not going to get them out then no point to diminish profit."

Ms. Block used two colors of handwriting on her copy of the LCC Strategy Package: notes written in blue ink were written at the February 27, 1996, meeting, and notes in red handwriting were written before the meeting. The note reflecting Mr. Crandall's statement is written in blue.

At the February 27 meeting, Ms. Caldas took notes of comments made at the meeting on a copy of the LCC Strategy Package. The presentation was met with approval by American's senior officers.

In developing recommendations for its DFW LCC Strategy, American considered the effect of the strategy on the profitability of both American and the LCCs. American's planners sought to use American's capacity planning models to "simulate effect of pricing/capacity actions to estimate impact on AA and LCC performance" and to research the financial condition, "balance sheets," break-even load factors, and "tolerance" of the LCCs.

In the LCC Strategy Package, the American analysts calculated the costs of two different strategy "scenarios" for responses to SunJet. American has generally studied competitors' break-even load factors and balance sheets. In implementing its plans with regard to LCCs, American reviewed LCC profitability, load factors, and market share.

American had meetings "approximately once per month" over the period of at least two years after the LCC Strategy Meeting, attended by representatives from American's Domestic Yield Management, Sales, Pricing, Capacity Planning, and Finance departments, to discuss markets with low cost carrier competition. American also measured the effects of its responses on its competitor, including producing a report entitled "Impact of LCC Response on DFW Rev/ASM," which considered the year-over-year effect on American's RASM, Yield, and Load Factor, of American's implementation of its LCC Strategy.

The DFW LCC Strategy Working Group used American's experience competing against Midway Airlines in DFW–Midway as a case study for understanding the magnitude of the investment that would result from taking action against LCCs at DFW.

In late May 1994, American operated 21 daily flights between DFW and Chicago's O'Hare Airport. Midway Airlines, a low cost carrier, operated only three daily flights between DFW and Chicago's Midway Airport.

In late May 1994, American adopted an inventory parity strategy against Midway Airlines' service in DFW–Midway Airport. The strategy involved tracking the availability of Midway's fares on computer reservation systems and keeping the comparable American fares available for sale so long as Midway's fare remained available. In September 1994 American offered matching fares on more of its flights. Midway Airlines exited DFW–Chicago in March 1995.

The government stresses that American examined the balance sheets and break-even load factors of several LCCs, and infers that the purpose of this was to drive them out of business. But the evidence does nothing more than indicate American monitored how its LCC competitors were performing. The evidence establishes that American monitors the financial performance of all its competitors, generally.

From an early point, American's planners did pay particular attention to LCCs which might develop hubbing operations at DFW. Early in the LCC Strategy discussion, American perceived SunJet as one of its biggest LCC concerns because of SunJet's potential for hubbing at DFW. After considering possible responses to SunJet's service from DFW, American decided not to escalate its response at the time because the cost would outweigh the benefit. American's staff recommended continuing the company's "moderate" approach, but reevaluating it if "[SunJet] adds frequencies on existing routes or adds new DFW spokes."

American viewed its DFW LCC Strategy as an investment. In response to a December 1994 memorandum by Tom Bacon concerning responses to poor profitability in the ORD–SFO market and Bacon's comment that stronger American pricing action would not fix the problem caused by LCC competition from American Trans Air, American's then-CEO Robert Crandall responded to a comment that "more aggressive pricing [by American] probably would not fix [American's] profitability problem on the route [ORD–SFO]," by observing: "It will when [American Trans Air] is gone!" and that this was "a clear example of a place where we should match straight up to get them out."

American believes its long-term profit success depends on defending its DFW hub and defending its network out of DFW. Its concern that an LCC could hub successfully at DFW was plausible. AirTran in Atlanta and Frontier in Denver are successful in routes from their respective hubs that compare in the amount of traffic to many routes from DFW.

In other circumstances where American has considered aggressive responses to competitors that entered DFW routes, it has weighed the cost of short-term profit loss against "benefits" that include both reduction of competition from current competitors and discouragement of future entrants.

## 7. HOW AMERICAN COMPETED ON THE ROUTES AT ISSUE

### a. DFW–MCI

Vanguard Airlines began flying in December of 1994. In choosing its routes, Vanguard chose to stay away from routes that Southwest was serving because in those markets fares were already low and another low cost carrier would not have much to offer.

Vanguard initiated nonstop DFW–MCI jet service with three daily round trips on January 30, 1995. Vanguard reported in its business plan that entry with low fares and a simple fare structure increases demand dramatically on a route, even doubling or tripling it, and it assumed that it would typically fill its seats "primarily with travelers who cannot be accommodated on the traditional airline," particularly "business travelers [who] often plan their trips at the last minute."

Vanguard carried approximately 25% of DFW–MCI origin and destination passengers in the first quarter of 1995. As of January 1995, American was serving DFW–MCI with eight daily nonstop flights each way and Delta with six daily nonstop flights each way. After Vanguard's entry, the total daily nonstop DFW–MCI service totaled 17 daily round trips.

After Vanguard filed fares in anticipation of its commencement of DFW–MCI service in January 1995, American matched Vanguard's regular low, unrestricted fares with fares at the same fare level but with a penalty for refunds. In keeping with its strategy to "capture the best revenue mix possible with limited capacity," American limited the number of low fare tickets it made available on those flights. However, American's Domestic Yield Management Department studied ramp count data suggesting that Vanguard was "making headway" in DFW–MCI with load factors between 58% and 62%.

By February 1995, Delta had announced its intention to cease DFW–MCI nonstop service on May 1, 1995. In March, Vanguard announced that it would increase its frequency of service on DFW–MCI from three to five daily nonstop flights each way and in fact increased to four during that month. In April, Vanguard began two daily one-stop DFW–MCI flights through Wichita. However, Vanguard decreased its nonstop DFW–MCI flights to three daily flights each way in April 1995 and to one by May 1995. In the second quarter of 1995, as Vanguard was reducing its nonstop DFW–MCI schedule, it had approximately 27% of origin and destination passengers on the route. Meanwhile, American determined that it would have to choose between a "share" strategy versus a "revenue" strategy. For the revenue strategy, one (among several) of the listed "pros" was "short term revenue gain," with one con being "Share loss in a dominant market." American added four DFW–MCI daily nonstop flights each way in June of 1995 and two more on July 1, 1995, in order to "stand up against Vanguard's service in the market."

American realized that its June and July 1995 capacity additions in DFW–MCI could have a negative impact on profitability. In the fall of 1995, American's prediction that the capacity added in DFW–MCI in June and July might impact profitability proved to be correct.

American's 14 daily nonstop flights and Vanguard's one daily nonstop flight during the second half of 1995 were, at 15 daily

flights, fewer than the 17 daily flights that had served DFW–MCI earlier in 1995.

Vanguard ceased nonstop DFW–MCI service in December 1995, but continued to serve the route with two one-stop flights daily through Wichita. In the fourth quarter of 1995, Vanguard carried approximately 16% of the origin and destination DFW–MCI passengers.

After Vanguard ceased its nonstop DFW–MCI service, American's service dropped to ten daily flights.

During the first six months of 1996, Vanguard's share of origin and destination passengers on DFW–MCI was approximately 17%.

By March 1996, American found that Vanguard's one-stop DFW–MCI service (via Wichita) was carrying significant traffic. At the end of April 1996, American lowered some of its DFW–MCI fares to respond to Vanguard's one-stop fares.

In August, 1996, American decided to add two daily DFW–MCI round trips as of November 1996. Vanguard announced on September 9, 1996 that it was resuming nonstop DFW–MCI service as of October with two daily nonstop flights each way and "low fares."

American accelerated the two already planned additional DFW–MCI flights scheduled to begin in November so that they would start as of October 1, 1996. American was able to advance the commencement of these DFW–MCI flights in the fall of 1996 due to the availability of pilot hours.

American decided to add a third additional DFW–MCI round trip effective November 1, 1996. After Vanguard filed fares in anticipation of its re-commencing DFW–MCI nonstop service in October 1996, American went to a full availability yield management strategy and responded to Vanguard's fare levels on all American flights.

Vanguard increased its daily DFW–MCI flights from two to three in April 1997, and from three to four in September 1997. By the end of 2000, Vanguard served DFW–MCI with three nonstop flights daily; by the fourth quarter of 1999, it had approximately an 18% share of origin and destination passengers.

American at the end of 2000 offered 12 flights daily on DFW–MCI, one fewer than in November 1996.

The government does not contend that American is currently monopolizing DFW–MCI:

> I excluded the DFW/MCI route from those in which I conclude that American currently has monopoly power, because Vanguard has continued to operate in this market.... Eventually, both American and Vanguard increased their prices in late 1998 ..., so that the prices ceased to be predatory and became more like those that American maintains in routes where it competes with Southwest. Accordingly, I believe that the DFW MCI market is one in which American had monopoly power at one time, and which it attempted to monopolize but did not succeed.

(Defs.' Exh. 8, Berry Final Report ¶ 182 & n. 95.)

Nor has the plaintiff identified any instances in which American undercut the published DFW–MCI fare of Vanguard with a published American fare during the relevant time periods. American's average fares throughout the period of Vanguard's DFW–MCI service were higher than Vanguard's average fares.

The government contends that American engaged in unlawful below-cost pricing on DFW–MCI during the periods July December 1995 and October 1996–May 1998.

## b. DFW–ICT (Wichita)

As of May 1993, American served the DFW–ICT route with five daily nonstop jet flights each way. American began converting its jet service to turboprop service on DFW–ICT during the 1992–94 period when, as part of its "transition plan" during financial difficulties, it was discontinuing service to many cities and substituting turboprop service for jet service in nearby cities.

When Delta removed the last of its DFW–ICT jet service in favor of turboprop aircraft service in September 1993, American did so as well, removing the final jet trip in June 1994. Prior to October 1996, American's Eagle subsidiary was serving DFW–ICT with nine daily nonstop turboprop flights each way.

On March 24, 1995, Vanguard announced it would initiate nonstop DFW–ICT service on April 11, 1995 with two nonstop jet flights each way. Vanguard converted two of its daily non-stop DFW–MCI flights into one-stops through Wichita, which it would be serving on a nonstop basis from DFW, giving it two nonstops DFW–MCI and two one-stops DFW–MCI over Wichita. When Vanguard began DFW–ICT service, it was the only airline offering nonstop jet service. At this time, Delta's commuter affiliate was offering six daily turboprop DFW–ICT flights each way. Vanguard's management felt that there was a "primary opportunity" to serve DFW–ICT because no other airline offered jet service.

When it began service, Vanguard's one-way DFW–ICT unrestricted fares (that is, without advance purchase, round trip purchase, or minimum stay) were $69 for peak period travel, and $39 off-peak.

Previously, after American had announced that it would be canceling jet service, the City of Wichita had approached American about continuing to fly jets on DFW–ICT. In February 1994, American had told the Wichita Airport Authority that it would provide three daily jet flights only if the Authority provided a minimum revenue guarantee to American of $13,500 per round-trip. The Minimum Revenue Guarantee is a contract by which American Airlines serves cities that are a profitability risk. Wichita rejected the minimum revenue guarantee program with American. In early 1995, the City of Wichita, the Wichita Airport Authority, and Wichita's business leaders had approached Vanguard to introduce jet service from Wichita to DFW in April 1995.

After Vanguard initiated DFW–ICT service in April 1995, American responded with one-way fares at a $20 premium over Vanguard's one-way fares, and round trip fares equal to twice Vanguard's one-way fares. American initially made no changes to its standard yield management response for DFW–ICT after Vanguard entered the route in the spring of 1995.

After Vanguard started serving DFW–Wichita, the number of people who flew that route nearly doubled, and the average price for the trip went from $105 in 1994 to $70 in 1995. By the second quarter of 1995, Vanguard had gone from a zero share to a 46% share of DFW–ICT origin and destination passengers. In contrast, American's share of origin and destination passengers on this route dropped from approximately 70% in the first quarter of 1995 to approximately 44% in the second quarter of 1995.

Vanguard announced in September 1995 that it was adding a third daily jet flight on DFW–ICT effective October 3, 1995.

After Vanguard's December 1995 exit from the DFW–MCI non-stop market, American began to reduce its service to ten flights per day. Local average fares on the route increased $75 to $100. The DFW–MCI market went from being one of American's worst-performing routes dur-

ing the first predation period to the "best in the West" in early 1996, after Vanguard's exit from non-stop service in the market. By May 1996, American had eliminated the $20 premium on its one-way DFW–ICT fares.

Vanguard announced on July 16, 1996 that it was increasing its daily DFW–ICT jet service from three flights to four, effective August 9, 1996. In August, Vanguard's chief executive characterized Vanguard's DFW–ICT position as "dominant" because Vanguard "ha[d] the only jets."

By the fall of 1996, American's yield management strategy on DFW–ICT was to ensure that, in light of the low fare environment, its yield management computer system was not assuming more high fare demand than there was likely to be. Although Vanguard was no longer serving DFW–MCI on a non-stop basis, in the spring of 1996, American noticed that Vanguard was nevertheless carrying a significant share of DFW–MCI passengers on a connect basis over Wichita. American believed that the reason for Vanguard's significant share, despite its "inferior service," was that American had raised fares, restricted lower bucket availability, and cut capacity.

At an earlier meeting of senior management, American staff cited the response to Vanguard in DFW–MCI as a model of a successful strategy against an LCC. Subsequently, American began to match Vanguard's fares on DFW–ICT flights with an "open availability" yield management strategy, which significantly expanded the number of low fare seats available. In May 1996, American began matching Vanguard's zero to seven-day advance purchase one-way fares on all of its DFW–MCI non-stop flights and matched Vanguard's fourteen-day advance purchase one-way fares on five of its ten non-stop flights. Over the next few months, American monitored the impact of this match to assess whether to step up its fare, capacity and availability responses on DFW–MCI as necessary. By August of 1996, American can determined that it needed additional capacity in DFW–Kansas City to address what it termed "competitive issues," and decided to increase frequency from ten to twelve round-trips effective November 1996.

American had found in a previous (1993) experiment with low "Southwest-type fares" on this route had caused it to "lose money" with fares that were "below variable cost." In a letter dated March 16, 1993, American's CEO Robert Crandall had written to Congressman Dan Glickman, "We really do not want to deny our friends in Kansas low fares—on the other hand, when we sell tickets at Southwest's prices, we lose lots of money." In a letter dated April 5, 1993, American's Senior Vice President for Marketing, Michael Gunn, had written to Congressman Dan Glickman and explained that American's 1992–1993 "low-fare pricing test in the Dallas/Fort Worth–Wichita market" caused "revenues in this market [then $93 or $94 per passenger] [to] drop below variable costs."

From October 1995 to September 1996, American Eagle's turboprop service in DFW–ICT had been performing positively. American's Managing Director of Capacity Planning could recall no other instance where American made a decision to add capacity as rapidly as it did in Wichita, Kansas City, and Phoenix during this time period. American's re-introduction of five daily jet flights to the DFW Wichita route expanded its seating capacity by 35%, in addition to making many more seats available at the lowest fares.

On September 11, 1996, American decided to respond to Vanguard's route restructure by accelerating the dates of its planned addition of capacity in DFW–

Phoenix from November to October 1, 1996. In response to Vanguard entry into DFW–PHX, American matched Vanguard's fares on five of its DFW–PHX flights and opened up seat availability. Its average fare in DFW–PHX fell from $193.90 in September 1996 to $137.38 in November 1996.

In September 1996, Vanguard announced a route restructuring that would considerably expand its DFW service, including the reintroduction of DFW–Kansas City non-stop service, and the introduction of service from DFW to Phoenix and from DFW to Cincinnati. Vanguard's then-CEO, Robert McAdoo, modeled the route restructuring on a strategy that had been effective for Morris Air, a successful LCC that had operated out of Salt Lake City, which was to enter relatively large markets on a modest scale (one flight a day) so that the major airlines would not react in some extremely vigorous manner. On September 9, 1996, Vanguard announced that it would begin daily service between Kansas City and Cincinnati (CVG), with continuing service to DFW, among other destinations. Vanguard also announced that it would be serving DFW–Phoenix (PHX) with one daily flight to commence on October 1, 1996.

On September 10, 1996, American began gathering data on Vanguard and the DFW–MCI market in order to determine "what we should do in response." The next day, it decided to move up to October its planned November addition of two round-trips and to add a third new frequency to begin in November for a total of 13 daily flights. It decided that it would substitute five jet trips daily for four of the existing DFW–ICT turboprop flights. The new jet service for DFW–ICT in the fall of 1996 was funded with aircraft sitting idle due to pilot actions. It also began matching Vanguard's fares on all of its ten daily DFW–MCI flights, and decided to return jets to Wichita.

On September 27, 1996, three days after American learned that Vanguard was planning to serve Cincinnati–DFW–Phoenix, American decided to re-initiate service on DFW Cincinnati with three daily flights effective December 2. In 1994, American had abandoned the DFW–Cincinnati (CVG) market as unprofitable. And in August 1996, American had reviewed the DFW–CVG market and decided not to add service in that market at that time, delaying the decision until the spring of 1997. The desire to respond to Vanguard's entry was a major reason for American's entry into DFW–CVG. American's Decision FAUDNC[4] was negative in DFW–CVG for December 1996 through March 1997.

In September of 1996, American also began to compete in markets where Vanguard offered through or connect service against American's non-stop service, for example in DFW CHI (Chicago), where American matched Vanguard on three flights with expanded availability, and DFW–DSM, where American matched Vanguard on two flight with full availability.

Thus, as of the fall of 1996, American's five DFW–ICT jet trips competed with Vanguard's four jet trips. Once American substituted five jet flights for four turboprop flights on DFW–ICT, its total non-stop daily service was ten flights.

American returned jets to Wichita to respond to Vanguard's announcement of its expansion. This return of jet service to Wichita in September of 1996 was not pursuant to a minimum revenue guarantee program with the City of Wichita. This increase of capacity from ten to twelve round-trips effective November 1996 required an override of its capacity planning

---

**4.** For a full discussion of American's Decision Accounting terminology, see page 1175 below.

model. American continued to match Vanguard's fares and maintained full availability with its restored jet service on DFW–ICT.

Vanguard's share of Dallas/Fort Worth–Wichita origin and destination passengers in the fourth quarter of 1996 was approximately 29%.

In the face of American's actions between DFW and both Wichita and Kansas City, Vanguard decided to retreat somewhat by pulling its new southbound Kansas City–DFW non-stop flight and one of its existing northbound DFW–Wichita non-stops, leaving its existing southbound one-stop flight (via Wichita) and two northbound non-stop flights between Kansas City and DFW.

Mr. McAdoo concluded that his limited entry strategy had not succeeded in the context of the competitive environment. Vanguard believed that it was virtually impossible to generate the loads and revenue required to achieve profitability on the DFW–ICT route in light of American's competition.

After asking Robert McAdoo to resign, Vanguard's board of directors hired a new CEO, John Tague, who took over on November 1, 1996. Tague assessed Vanguard's existing route structure, which included an evaluation of competitive conditions in each of the routes and of the potential reactions of those competitors. Tague observed that in many respects, Vanguard was "functioning pretty well." However, he also felt that Vanguard's route structure when he took over was "excessively dissipated," "lacked focus," and, given the size of its fleet, "needed to be in a more concentrated geographic area."

Tague restructured Vanguard's routes into a Kansas City hub and spoke system in November, 1996, and canceled Vanguard's service from Phoenix and Cincinnati that had been introduced as part of Mr. McAdoo's strategy (including the routes to DFW), along with the DFW–ICT route.

On November 8, 1996, Vanguard announced that it was leaving the DFW–CVG route after only eight trips. At the same time, it announced that it was leaving the DFW–PHX route altogether, and that it would be leaving the DFW–Wichita route altogether in December. Vanguard ceased DFW–ICT service in December 1996. By April 1997, Vanguard had eliminated all non-Kansas City hub service except for a profitable Midway–Minneapolis route. Vanguard continued to deploy its aircraft after April 1997 primarily on routes from Kansas City.

American's FAUDNC performance in DFW–PHX declined significantly in November 1996. However, as American notes, while FAUDNC *declined*, it nonetheless remained *positive*. Moreover, FAUDNC increased three-fold between October, 1996 and January, 1997, even after further increases in seat capacity.

In mid-December of 1996, Senator Brownback of Kansas complained to American's then-CEO, Robert Crandall about the recent fare increases on DFW–ICT. On January 2, 1997, Mr. Crandall drafted a response to Senator Brownback that included the point "[i]n recent weeks, fares between Wichita and DFW have been below cost." The letter American actually sent to Senator Brownback contained the following language: "fares were too low . . . to allow us to earn a reasonable rate of return."

After Vanguard's November exit, American's fares increased, although they remained below the fare charged prior to Vanguard's market entry. American eliminated three turboprop flights in April of 1997, thereby bringing the monthly seat capacity back to American's September 1996 level. American as of the end of 2000

served DFW–ICT with five jet trips and four turboprop trips daily. Delta as of the end of 2000 was serving DFW–ICT with five daily turboprop nonstops.

After Vanguard's exit, fares on the DFW–Wichita rose from $70 to $117, higher than the period when Vanguard operated in Wichita, but lower than the period 1990 to 1992. The number of passengers who traveled on the route rose from 60,000 in 1993, to 147,000 in 1996, and fell to approximately 76,000 in 1999.

Vanguard has maintained DFW service out of its Kansas City hub, and continues to serve the route to this day. Kansas City is Vanguard's only non-stop destination served from DFW. Eventually, fares of both American and Vanguard increased on the DFW–MCI route. In 1997 and 1998, American continued to monitor and take actions, such as fare matching on a flight specific basis or flight bracketing, of Vanguard's through or connect service, which included at various times DFW–Chicago, DFW–Minneapolis, DFW–Des Moines, DFW–Denver, DFW–New York (JFK) and DFW–San Francisco.

The government has not identified any instances in which American undercut the published DFW–ICT fare of Vanguard with a published American fare during the relevant time periods.

American's average fares throughout the period of Vanguard's nonstop DFW–ICT service were equal to or higher than Vanguard's average fares.

The government and its expert witnesses contend that American engaged in unlawful below-cost pricing in DFW–ICT during the October–December 1996 period—that is, between the time that American re-introduced jet service to DFW–ICT and Vanguard withdrew its service.

## c. DFW–COS

The plaintiff and its experts contend that American engaged in unlawful below-cost pricing during the September 1996–October 1997 period.

Western Pacific opened a hub at COS in April 1995, and began DFW–COS service in June 1995 with two daily nonstop 737 flights each way. In the second quarter of 1995 Western Pacific had approximately a 28% share of DFW–COS origin and destination passengers. When Western Pacific began DFW–COS service, that route was the only nonstop route on which Western Pacific and American competed against one another.

DFW–COS is a seasonal route, with typically higher service in the summer. In 1994, American had added a fifth F–100 jet to the route, and continued to serve the route with five flights through the end of the summer season. In May of 1995, it had added yet another flight to the route. Thus, at the time Western Pacific began DFW–COS service, American had five DFW–COS round trips. Delta had three round trips.

For the first month after Western Pacific began DFW–COS service, American did not add more flights but reduced prices, responding to Western Pacific's low, unrestricted fares with ones of the same dollar value, but with advance purchase and round trip ticketing requirements that Western Pacific's fares did not have. During this time, American's average revenue fell from about $124 to about $106.

In July 1995, American added two DFW–COS flights. After American's fare reductions and capacity increases, average revenue fell below $100, in contrast to its Summer 1994 average revenue of approximately $120. In the fourth quarter of 1995, Western Pacific's share of DFW–COS passengers was approximately 38% and American's was approximately 45%.

In December 1995, American briefly withdrew one F–100 flight per day from

DFW–COS. In part because of the reduction of service on DFW–COS in December 1995, American's profits for the month increased.

In November 1995, Western Pacific announced that it was reducing service on DFW–COS to one round-trip per day. On January 8, 1996, it did so to redeploy the airplane to commence COS–ATL (Atlanta) service. Western Pacific's general strategy was to redeploy aircraft to commence service on new routes, due to inadequate aircraft availability and to make more money. In May 1996, its single DFW–COS route was one of Western Pacific's top five contributing routes.

Notes taken during a February 1996 DFW LCC strategy meeting indicated that a recommendation was made by some person that American should get Western Pacific "out" of DFW before Western Pacific added back the second flight it had withdrawn. In March 1996, American made plans to "protect DFW" by adding one round-trip flight to DFW–COS and upgrading all round trips to MD 80s. A month later, it broadened availability of low fares on DFW–COS. Between May and July 1996, American replaced its seven F 100 flights per day on DFW–COS with eight MD–80s, causing a 43% increase in capacity over June 1996 and more than a 100% increase in capacity over the five F–100s that American flew during the summer of 1994 (before Western Pacific entered). After the end of the 1996 peak summer season, American's Capacity Planning Department planned to make a normal seasonal frequency reduction on DFW–COS. However, American's Yield Management Department intervened and American continued to deploy eight MD–80 round-trips. From September 1996 through October 1997, American increased its capacity on DFW–COS.

From September 1996 to October 1997, American's capacity additions and associated price and yield management actions caused American's profitability on the DFW–Colorado Springs route, as measured by American's FAUDNC, to decline substantially, and indeed to become negative. However, VAUDNS, VAUDNC and VAUDNC–AC [5] were all positive during throughout this period.

Western Pacific's one flight garnered from 16 to 23% of the DFW–COS traffic in the first three quarters of 1996.

American monitored Western Pacific's beyond service from at least early 1996. In March, 1996, American notes that Western Pacific's bookings in DFW–SEA have decreased, prompting it to state: "It appears our strategy towards Western Pacific may be working." In the Spring of 1996, American's LCC team undertook the task of determining whether American should match Western Pacific in additional DFW flow markets.

In May, 1996, American's LCC team had concluded that Western Pacific's reduction to one flight in January resulted in poor connections over COS and did not present a viable threat to American. American subsequently canceled the matching fare on its DFW–SEA non-stop. In October 1996, American stated that it "will continue to monitor W7 flow traffic over COS." In late 1996, Western Pacific changed chief executives and the new management shifted Western Pacific's strategy to high frequency service on a more limited number of routes. At the end of December 1996, Western Pacific added a second DFW–COS round trip daily and announced that it would add a third as of February 1997.

In January 1997, American decided to add a ninth DFW–COS round trip and to upgrade three aircraft to Boeing 757s ef-

**5.** See, generally, pages 1174–75 of this opin- ion.

fective March 1997. It also began a "massive incentive program" which increased the number of travel agencies in Colorado Springs eligible for special incentives to book their clients on American. It also provided free first class upgrades to MCI corporate customers and frequent fliers on the DFW–COS route. American noted that Western Pacific's additional DFW–COS flights produced for Western Pacific "a substantial increase in market share for many of its flow markets." In early 1997, American's list of "wait and see" markets expanded to include 14 total Western Pacific markets. During the Spring and Summer of 1997, American continued to monitor closely Western Pacific's activities in its flow markets.

In March 1997, American added three 757s and withdrew two MD–80s, increasing service to four MD–80s, three 757s, and two F–100s flights per day on DFW–COS.

At times during the period of June to December 1996, American used inefficient banking operations on some flights, and flights from Colorado Springs to DFW sometimes met outgoing west-bound banks taking passengers west of DFW. It is unusual that American used 757 aircraft on DFW–COS.

As American and other airlines increased their capacity, it became increasingly difficult for Western Pacific to stimulate additional demand at acceptable fare levels in Colorado Springs.

At the end of April 1997, Western Pacific announced that it was moving more than half of its flights from COS to Denver (DEN), effective at the end of June. Colorado Springs and Denver are approximately 50 miles apart. In the second quarter of 1997, when Western Pacific moved significant operations from COS to DEN, it carried approximately 21% of the DFW–COS passengers.

Western Pacific's new DFW–Denver service was met with strong pricing and yield management initiatives by American. Company memos show that, in the summer of 1997, American contemplated a response including matching fares and providing full availability on 6 of 12 flights.

In June 1997, Western Pacific announced that it would merge with Frontier Airlines. Frontier Airlines is an LCC that operates a hub in Denver. On June 29, 1997, Western Pacific withdrew two 737 flights from DFW–COS, reducing service to one flight per day. On July 1, 1997, American down-gauged the 757 aircraft on the DFW–COS route.

In July 1997, Western Pacific reduced daily service on DFW COS to one-half round-trip per day. In August, American withdrew two daily MD–80s flights from DFW–COS and added one F–100, serving DFW–COS with four MD–80s and three F–100s round-trips per day. The same month, Western Pacific resumed daily service on DFW–COS with two 737 flights per day.

On September 9, 1997, American conducted a financial analysis of Western Pacific that calculated its break-even load factor. During this same period, American "add[ed] back" two additional flights per day on DFW–COS, and decided to change its strategy from matching on 6 of 12 flights on DFW–DEN, to fully matching on all 12 daily round-trip flights.

An October 1997 System Results package shows that DFW–DEN (along with DFW–ATL) "posted the largest FAUDNC declines." "Both are low cost carrier competitive markets. In DFW DEN, AA was at 13 RT in October and W7 at 4." The same month, American planned to adjust its winter schedule to add two additional DC–10 aircraft to DFW–DEN, in part by downgrading LAX–EWR to "fund" the additional aircraft.

The Western Pacific/Frontier merger was called off in late September, 1997. Frontier withdrew from the proposed merger with Western Pacific because of concerns about the valuation of Western Pacific stock. In October, Western Pacific ceased all nonstop DFW–COS service, but continued to serve DFW–DEN with four flights per day with connecting service to COS.

Western Pacific filed for bankruptcy on October 5, 1997 and ceased all operations in February 1998.

American's average local fare in DFW–DEN decreased from $180 in June 1997 to $129 in July 1997 and then decreased further in October 1997 to $108. After Western Pacific's withdrawal from DFW–Colorado Springs, American reduced capacity. Average revenue rose to $119.

In 1998, American continued to monitor Western Pacific's flow markets and to match Western Pacific on a flight-specific basis in numerous flow markets.

At the end of 2000, American offered six daily nonstop DFW–COS flights, while Delta offered two daily nonstop flights. United, Frontier, American, and Delta also offered nonstop DFW–DEN service as of the end of 2000.

The government has not identified any instances in which American undercut the published DFW–COS fare of Western Pacific with a published American fare during the relevant time periods. American's average fares were higher than Western Pacific's average fares during the entire period that Western Pacific was offering DFW–COS service.

#### d. DFW–LGB (Long Beach)

The plaintiff and its experts contend that American engaged in unlawful below-cost pricing in DFW–LGB during the January 1997 January 1998 period—that is, from the start of American's service until its LCC competitor withdrew its service.

In August 1993, SunJet International received DOT authorization to operate as a "supplemental" carrier. By October 1993, SunJet commenced operation with two MD–80 jets, one flying between Fort Lauderdale and Newark, one between Newark and St. Petersburg. SunJet intended to serve the Tampa Bay area by offering service out of the St. Petersburg/Clearwater International Airport (PIE). SunJet, by setting its prices lower than fares regularly offered by major carriers, attracted price-sensitive passengers who might otherwise have chosen not to fly.

Although SunJet was not a "scheduled carrier," as that term is used in the airline industry, SunJet offered regularly scheduled flights on the city-pairs it served. SunJet entered into agreements with contractors to provide certain services, including reservations and ticketing, marketing, aircraft maintenance, and baggage handling. SunJet also entered into an agreement with World Technology Systems (WTS) under which WTS provided financial backing and reservation and revenue accounting support for SunJet. WTS also selected routes for SunJet.

In June of 1994, American had "abandoned" its efforts to serve DFW–Long Beach due to lack of traffic. In the same month, SunJet entered DFW with limited service to Newark (EWR) and Long Beach (LGB), resulting in one-stop service between Newark and Long Beach. SunJet added non-stop service between DFW and St. Petersburg, and one-stop service between St. Petersburg and Long Beach in February of 1995. SunJet wanted to serve the Los Angeles market from its service cities (EWR and PIE) on the east coast. The company viewed the Long Beach airport as an ancillary or secondary airport serving the Los Angeles area, the use of which provided significant cost savings in

landing fees compared to Los Angeles International (LAX). SunJet learned about American's withdrawal of DFW–LGB service after it had decided to start serving DFW–LGB.

No scheduled airline offered DFW–LGB nonstop service from June 1994 to January 1997. America West had offered connecting DFW–LGB service (through its Phoenix hub) since 1994.

SunJet offered a third DFW–LGB nonstop flight daily from September 26–December 6, 1996.

American referenced SunJet's DFW–EWR/LGB service in a June 1994 presentation entitled "Start-up/Low Cost Carriers." It also noted that SunJet's entry into the DFW–DWR market in June 1994 "resulted in $198 round-trip DFW–EWR fares and the first instance of a low-cost carrier connecting passengers in DFW." American reduced fares in the DFW–FPA market in December 1994.

By December of 1995, American recognized that SunJet's route structure presented opportunities for SunJet to create a DFW hub. American noted that SunJet enplaned more passengers per day than any other LCC at DFW in September of 1995, and was a major concern for American. SunJet's initiation of DFW–LGB service was one factor which led American to consider re-entering the DFW–LGB route as early as December of 1995. American anticipated capital start-up expenditures of from $100,000 to $120,000, with "worst-case" start-up costs of $171,000.

In February of 1996, American decided to continue its strategy of matching SunJet on a limited basis and not to pursue a stronger approach unless SunJet increased its frequency or added additional DFW routes. In late 1995 or early 1996, American expanded its limited match of SunJet fares to four flights into EWR and three flights into TPA. As of May 16, 1996, American matched SunJet's fares on six DFW–EWR flights, and three flights in PIE (TPA).

David Banmiller became CEO and President of SunJet in May of 1996. He was hired by John Mansour, who purchased SunJet from its original owner in September of 1995. SunJet's new management made plans to add an additional DFW–LGB flight in August of 1996. WTS and SunJet personnel advised SunJet management against adding the third DFW–LGB flight, recognizing that SunJet was currently flying below the "radar" and that adding capacity might lead to a strong response from American.

SunJet's former management had avoided flying more than two frequencies on any single route to assist in avoiding a response by major carriers. However, SunJet initiated a third DFW–LGB nonstop daily flight on September 26, 1996. In November, it began advertising plans to begin DFW–OAK service.

American responded to SunJet's announcements of new and expanded DFW service with a variety of actions. On November 25, 1996, American announced it would enter DFW–LGB and increase frequency in DFW–OAK. SunJet discontinued its third DFW–LGB flight in December of 1996.

SunJet canceled plans to enter DFW–OAK. There is a fact dispute as to the reason for the cancellation. WTS felt that it was due to insufficient customer response. There is other evidence that the cancellation occurred because SunJet failed to secure the necessary aircraft.

On January 3, 1997, American announced that it was resuming nonstop DFW–LGB service effective January 31, 1997 with three daily round trips. American began DFW–LGB service in January 1997 with fares of an equal value to what it believed were SunJet's lowest fares, but

with greater restrictions than SunJet's, specifically a 3–day advance purchase requirement and round trip ticketing only.

SunJet had financial difficulties for at least nine months prior to March 1997. WTS, which provided marketing services to SunJet, assumed control of all financial risk related to passenger sales and Sun-Jet's sales and route selection functions in March 1997. Prior to this, SunJet decided where and when it would fly, and WTS provided reservation and revenue accounting support. After "reviewing conditions within [its] industry, including competitive factors and [its] internal challenges, Sun-Jet agreed to turn over all scheduling, pricing and marketing functions to WTS." SunJet retained financial responsibility for aircraft, crew, maintenance and insurance, and WTS assumed financial responsibility for and direct supervision of other aspects of flight operations. WTS discontinued its PIE–DFW service and reduced DFW–LGB service to one flight in March 1997 in order to use the second airplane on another route. SunJet suspended all flight operations on June 17, 1997 and filed for bankruptcy protection the next day, telling its shareholders that this failure was due to "significant aircraft down time as a result of non-routine maintenance issues."

After SunJet's bankruptcy, WTS contracted with other carriers to continue operating SunJet's routes (doing business as SunJet). WTS added a second DFW–LGB round trip from July to September 1997. WTS' profits on its DFW–LGB route went from $175,040 in July 1997 to $41,284 in September 1997, after American added a fourth DFW–LGB flight in August 1997. Overall, during the period that WTS operated the DFW–LGB route, it earned more than $1 million in profits on it.

American added a fourth DFW–LGB flight in August 1997. WTS discontinued SunJet's DFW–LGB service in January 1998, stating that it was having difficulty obtaining a long term commitment for aircraft which would meet LGB's noise ordinances, and it was unable to secure replacement lift services. WTS personnel have subsequently also attributed this decision to other reasons, including competition by American. WTS ceased operations in June 1999.

After SunJet exited DFW–EWR, American withdrew capacity.

As of the end of 2000, American was continuing to offer four DFW–LGB nonstop flights daily. United was offering nonstop DFW–LAX service as well as of the end of 2000. Delta as of the end of 2000 offered nonstop DFW–LAX service, as well as nonstop service between DFW and Orange County (SNA) and Ontario (ONT) airports in the Los Angeles Basin. According to DOT data, Southwest as of the end of 2000 carried connect traffic between Dallas Love Field and the Los Angeles Basin. Other airlines, including Frontier and National, offered service between Dallas/Fort Worth and the Los Angeles Basin on a connecting basis as of the end of 2000. The government has failed to identify any instances in which American undercut the published DFW–LGB fare of SunJet with a published American fare during the relevant time periods.

American frequently experiences negative results for the first few months of service on a new route. The plaintiff's expert Professor Berry agrees that "losses often accompany entry of a new route." (Defs.' Exh. 8, Berry Final Report ¶ 318.)

**e. DFW–EWR (Newark)**

The government alleges that American engaged in predatory conduct on DFW–EWR against SunJet by adding flights in May 1996 and removing some restrictions from its SunJet responsive fares in November 1996. The government's expert,

Professor Berry, does not list DFW–EWR as a route on which American currently has monopoly power. The government has contended that American monopolized and attempted to monopolize DFW–EWR only during the June 1994 December 1997 period when the route was served by Sun-Jet or WTS.

SunJet began DFW–EWR service in June 1994 with low, unrestricted (no advance or round trip purchase requirement) fares. American and Delta were offering nonstop DFW–EWR service in June 1994. In May 1995, American began offering a DFW–EWR fare designed to respond to (but not undercut) SunJet's, but with advance purchase and round trip travel requirements that SunJet did not impose, and offered its responsive fare only on a limited number of American flights.

Continental Airlines, which operates a hub at Newark, began DFW–EWR service effective May 1, 1996.

American increased its DFW–EWR service by three flights by June 1996, after Continental began DFW–EWR service with three daily flights.

In November 1996, American removed a Saturday night stay requirement on its "matching" SunJet DFW–EWR fares but continued to maintain the advance purchase and round trip restriction, and offer its "matching" fares only on a limited number of its flights.

SunJet ceased operations in June 1997; WTS ceased serving DFW–EWR at the end of 1997.

At the end of 2000, American (ten daily flights) and Continental (seven daily flights) continued to offer nonstop DFW–EWR service; Delta offered nonstop service to the New York Metropolitan area at LGA and JFK; and other airlines (including Vanguard and AirTran) offered connecting service between DFW and EWR, and numerous other airlines were offering connecting service between DFW and LGA and JFK.

### f. DFW–TPA (Tampa)

The government has alleged that American engaged in predatory conduct on DFW–TPA against SunJet by becoming more aggressive against SunJet in November 1996 by removing restrictions from its "matching" fares.

SunJet began DFW–PIE (St. Petersburg) service in early 1995 with low, unrestricted (no advanced purchase or round trip required) fares.

American has never served PIE, but served (and still serves) Tampa International Airport, 15 miles from PIE. In January 1995, American responded to (but did not undercut) what it believed to be SunJet's lowest DFW–PIE fares on DFW–TPA on a round-trip basis, and with a 7-day advance purchase requirement that SunJet did not impose, and only on a limited number of its DFW–TPA flights.

In November 1996, American reduced the advance purchase requirement on its responding DFW–TPA fares to three days and removed a Saturday night stay requirement but continued to maintain the round-trip restriction, and to offer these fares on only some of its DFW–TPA flights. In March, 1997, SunJet assigned route decisions to WTS, which decided to exit this route. In sworn responses to a Department of Justice Civil Investigative Demand dated April 23, 1998, WTS attributed its decision to stop DFW–PIE service to "lack of passenger demand and aircraft unavailability," and did not mention any American conduct.

American (six daily flights) and Delta (three daily flights) offered nonstop DFW–TPA service as of the end of 2000; connecting service was provided by AirTran and others.

### g. DFW–OAK (Oakland)

The government has alleged that American engaged in predatory conduct in DFW–OAK by "substantially matching" SunJet's DFW–OAK fares.

Sun Jet announced in November 1996 that it would initiate DFW–OAK service in December with low, unrestricted (no advance purchase or round trip purchase required) fares. When SunJet made this announcement in November 1996, American and Delta were already offering nonstop DFW–OAK service.

American filed DFW–OAK fares in November 1996 effective on SunJet's starting date responding to (but not undercutting) SunJet's fare levels, but with a round trip and three-day advance purchase requirement that SunJet did not impose.

SunJet did not begin DFW–OAK, in part because it was unable to secure the additional aircraft necessary to operate the route. As of the end of 2000, American (four daily flights) and Delta (three daily flights) served DFW–OAK nonstop, while other airlines offered service between Dallas/Fort Worth and Oakland, San Francisco, and San Jose on a nonstop or connecting basis.

### h. DFW–PHX (Phoenix)

The government contends that American engaged in unlawful below-cost pricing from October 1996 through November 1996. The government's expert, Professor Berry, contends that American now has monopoly power in DFW–PHX only for nonstop flights.

Vanguard announced on September 9, 1996 that it would introduce DFW–PHX service on October 1, 1996 at "low fares." On September 24 and October 9, 1996, Vanguard announced service between Phoenix and Cincinnati, Denver, Wichita, and Minneapolis beginning in October or November.

At the time Vanguard announced DFW–PHX service, DFW–PHX was already served by Delta, American and America West on a nonstop basis. Phoenix is a hub for America West airlines and has been since 1994. Vanguard began one daily round trip DFW–PHX service in October 1996.

Prior to Vanguard announcing its DFW–PHX service, American had published its plan to add four DFW–PHX flights (in addition to American's then nine daily round trips) over the September–December 1996 period.

After Vanguard's announcement of DFW–PHX service, American accelerated the start dates on some of its four additional flights. American matched Vanguard's fare level and offered the matching fares on five of American's DFW–PHX flights.

After Vanguard hired a new CEO, Vanguard announced on November 8, 1996 that it was canceling DFW–PHX (and other PHX) service, eliminating PHX entirely from its route structure. Vanguard's DFW–PHX service operated only from October to November 1996.

At the end of 2000, American continued to serve DFW–PHX (with 11 daily nonstop flights constituting more service than it offered during 1996), as did America West (five daily flights) and Delta (three daily flights) on a nonstop basis. Moreover, according to DOT data, as of the end of 2000, Southwest carried connect traffic between Dallas Love Field and Phoenix.

### i. OTHER ALLEGED MARKETS

The government does not contend that American monopolized or attempted to monopolize DFW–CLT (Charlotte), DFW–DTW (Detroit), DFW–MEM (Memphis), DFW–MCO (Orlando), and DFW–PIT (Pittsburgh), but that the effects of Ameri-

can's alleged predatory conduct in certain other markets were "felt" there. Nor does the government contend that American monopolized or attempted to monopolize DFW–ATL (Atlanta), DFW–CVG (Cincinnati), DFW–MDW (Midway, Chicago), or DFW–DEN (Denver), but that American engaged in anti-competitive conduct in these city-pairs as part of its alleged scheme of predation. The government contends that American has market power, but not monopoly power, in DFW–CLT (Charlotte), DFW–DTW (Detroit), DFW–MEM (Memphis), DFW–MCO (Orlando), and DFW–PIT (Pittsburgh). The government contends that American monopolized and attempted to monopolize DFW–CHI (Chicago, consisting of Midway and O'Hare airports) during certain periods, but not that American currently possesses monopoly power in that city-pair.

## 8. LCCs AND PRICE COMPETITION

During the twelve months preceding Vanguard's April 1995 entry into the DFW–ICT market (April 1994 March 1995), American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$99–$108

American local passengers

3,932–5,557

American seats

21,314–32,109

During the four quarters preceding Vanguard's April 1995 entry into the DFW–ICT market (2Q 1994–1Q 1995), the total number of local passengers traveling in that market ranged from 16,420 to 19,390 per quarter. The average market fare ranged from $105 to $115 during that period.

During the period from June 1995 through September 1996, while Vanguard served the DFW–ICT market but before the United States alleges that American engaged in predatory acts in that market, American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$52–$75

American local passengers

5,166–7,578

American seats

30,528–34,664

During that same period, the total number of local passengers traveling in that market ranged from 35,140 to 37,460 per quarter. The average market fare ranged from $60 to $68.

During the period from October 1996 through December 1996, when the United States alleges that American engaged in predatory acts in the DFW–ICT market, American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$58–$61

American local passengers

10,076–11,041

American seats

44,798–47,588

During that same October 1996 through December 1996 period, the total number of local passengers traveling in that market 38,650 for the quarter. The average market fare was $55.

During the twelve-month period beginning six months after Vanguard's exit (July 1997–June 1998) from the DFW–ICT

market, American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$88–$102

American local passengers

7,019–8,373

American seats

29,939–33,790

During the same twelve-month period, the total number of local passengers traveling in that market ranged from 20,840 to 24,590 per quarter. The average market fare ranged from $94 to $99.

During the second twelve-month period beginning six months after Vanguard's exit (July 1998–June 1999) from the DFW–ICT market, American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$100–$123

American local passengers

5,744–8,257

American seats

25,891–33,651

During the same twelve-month period, the total number of local passengers traveling in that market ranged from 19,610 to 23,200 per quarter. The average market fare ranged from $105 to $120.

During the period from January 1994 to December 1994, before Vanguard entered the DFW–MCI market, American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$107–$117

American local passengers

14,831–19,306

American seats

61,489–69,092

During the same period, the total number of local passengers traveling in that market ranged from 66,190 to 71,860 per quarter. The average market fare ranged from $108 to $115.

During the period from February 1995 through December 1995, while Vanguard served the DFW–MCI market on a non-stop basis, American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$77–$98

American local passengers

19,269–34,528

American seats

58,903–106,996

During the same February 1995 through December 1995 time period, the total number of local passengers traveling in that market ranged from 94,520 to 103,610 per quarter. The average market fare ranged from $79 to $88.

During the period from January 1996 to September 1996, when Vanguard did not serve the DFW–MCI market on a non-stop basis, American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$108–$147

American local passengers

24,435–31,568

American seats

74,404–92,534

During the same January 1996 to September 1996 period, the total number of local passengers traveling in that market ranged from 83,740 to 98,900 per quarter. The average market fare ranged from $110 to $128.

During the period from October 1996 to May 1998, while Vanguard served the DFW–MCI market and the United States claims American was engaged in predation in that market, American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$76–$102

American local passengers

29,312–43,303

American seats

85,890–106,992

During that same October 1996 to May 1998 time period, the total number of local passengers traveling in that market ranged from 104,870 to 128,850 per quarter. The average market fare ranged from $74 to $96.

After the end of the period when the United States claims American engaged in predation in DFW–MCI, from June 1998 through September 1999, American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$93–$126

American local passengers

27,222–40,026

American seats

72,644–100,503

After the end of the same period, the total number of local passengers traveling in that market ranged from 110,690 to 126,430 per quarter. The average market fare ranged from $96 to $113.

During the period from June 1994 to May 1995, the one-year period preceding Western Pacific's entry into the DFW–COS market, American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$141–$178

American local passengers

2,740–4,373

American seats

21,533–29,479

During the period from June 1994 to May 1995 (3Q 1994–2Q 1995), the one-year period preceding Western Pacific's entry into the DFW–COS market, the total number of local passengers traveling in that market ranged from 11,490 to 22,310 per quarter. The average market fare ranged from $114 to $158.

During the period from July 1995 through October 1997, while Western Pacific served the DFW–COS market, American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$73–$110

American local passengers

9,088–24,673

American seats

36,385–80,304

During the period from July 1995 through October 1997 (3Q 1995–3Q 1997), while Western Pacific served the DFW–COS market, the total number of local passengers traveling in that market ranged from 45,800 to 86,090 per quarter. The average market fare ranged from $75 to $102.

During the period from during the twelve-month period beginning six months after Western Pacific's exit from the DFW COS market (April 1998 through March 1999), American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$120–$156

American local passengers

7,536–12,487

American seats

32,607–41,334

During that same period, the total number of local passengers traveling in that market ranged from 25,550 to 40,120 per quarter. The average market fare ranged from $131 to $139.

During the period from February 1997 through January 1998, while both American and SunJet served the DFW–LGB market, American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$83–$118

American local passengers

6,615–24,997

American seats

21,128–34,472

During the same February 1997 through January 1998 period, the total number of local passengers traveling in that market ranged from 59,210–75,000 per quarter, excluding passengers carried by SunJet. The average market fare ranged from $94 to $107.

During the twelve-month period beginning six months after SunJet's exit (July 1998 through June 1999), American's average fare, local passengers carried, and total seats, on a monthly basis, were within the following ranges:

American Average Fare

$142–$177

American local passengers

13,513–25,309

American seats

21,866–33,739

During the same twelve-month period, the total number of local passengers traveling in that market ranged from 60,200–77,360 per quarter. The average market fare ranged from $141 to $164.

The following table shows the monthly ranges for American's monthly average fare, the local passengers carried, and the total number of seats allocated to various routes. In addition, the table shows the total number of passengers in the market (shown per quarter rather than by month) and the average fare during the period. The first section, dealing with the Dallas–Wichita route, uses five time periods: the

12 months preceding Vanguard's market entry, the period after entry but before any "predation," the period of the alleged predation, and the two successive 12–month periods following Vanguard's departure from the market. The second Dallas–Kansas City, uses periods representing the period prior to Vanguard's entry, the period of Vanguard's non-stop service, the period of Vanguard's connect-only service, the period of the alleged predation, and the subsequent 16 months. The third sec-tion, Dallas–Colorado Springs, shows three periods: the year prior to Western Pacific's entry in the market, the period Western Pacific operated in the market, and the twelve month period commencing six months after Western Pacific's departure from the market. The final section, Dallas–Long Beach, has two periods: that during which American and SunJet were both in the market, and the twelve-month period commencing six months after Sun-Jet's exit.

### American Market

| | Average Fare | Local Passengers | Total Seats | Average Fare | Passengers/ Quarter |
|---|---|---|---|---|---|
| **DFW–ICT** | | | | | |
| 06/1994–05/1995 | $ 99–108 | 3,932–5,557 | 21,314–32,109 | $ 105–115 | 16,420–19,390 |
| 06/1995–09/1996 | 52–75 | 5,166–7,578 | 30,528–34,664 | 60–68 | 35,140–37,460 |
| 10/1996–12/1996 | 58–61 | 10,076–11,041 | 44,798–47,588 | 55 | 38,650 |
| 07/1997–06/1998 | 88–102 | 7,019–8,373 | 29,939–33,790 | 94–99 | 20,840–24,590 |
| 07/1998–06/1999 | 100–123 | 5,744–8,257 | 25,891–33,651 | 105–120 | 19,610–23,200 |
| | | | | | |
| **DFW–MCI** | | | | | |
| 01/1994–12/1994 | 107–117 | 14,831–19,306 | 61,489–69,092 | 108–115 | 66,190–71,860 |
| 02/1995–12/1995 | 77–98 | 19,269–34,528 | 58,903–106,996 | 79–88 | 94,520–103,610 |
| 01/1996–09/1996 | 108–147 | 24,435–31,568 | 74,404–92,534 | 110–128 | 83,740–98,900 |
| 10/1996–05/1998 | 76–102 | 29,312–43,303 | 85,890–106,992 | 74–96 | 104,870–128,580 |
| 06/1998–09/1999 | 93–126 | 27,222–40,026 | 72,644–100,503 | 96–113 | 110,690–126,430 |
| | | | | | |
| **DFW–COS** | | | | | |
| 06/1994–05/1995 | 141–178 | 2,740–4,373 | 21,533–29,479 | 114–158 | 11,490–22,310 |
| 07/1995–10/1997 | 73–110 | 9,088–24,673 | 36,385–80,304 | 75–102 | 45,800–86,090 |
| 04/1998–03/1999 | 120–156 | 7,536–12,487 | 32,607–41,334 | 131–139 | 25,550–40,120 |
| | | | | | |
| **DFW–LGB** | | | | | |
| 02/1997–01/1998 | 83–118 | 6,615–24,997 | 21,128–34,472 | 94–107 | 59,210–75,000 |
| 07/1998–06/1999 | 142–177 | 13,513–25,309 | 21,866–33,739 | 141–164 | 60,200–77,360 |

## 9. ALLEGED PREDATORY PRICING

**American's Performance Measures And Related Facts**

Marginal cost is the incremental cost of a very small change in output. Marginal cost is difficult to measure directly. Incremental cost is the amount by which costs change when output changes. Incremental cost is an extension of the concept of marginal cost.

In its memorandum submitted to Magistrate Judge Humphreys on May 4, 2000, the government asserted that "the core of American's monopolistic strategy was that American deployed additional capacity and took pricing and yield management actions in DFW routes in response to LCC competition; the cost of these actions was greater than the revenues that came from carrying additional passengers." (Defs.' Exh. 113). In the same memorandum, the gov-

ernment agreed that in judging the legality of American's core "monopolistic strategy," the court must conduct the cost and recoupment inquiries outlined in the predatory pricing standards of *Brooke Group Ltd. v. Brown & Williamson Tobacco*, 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). The government alleges that "American pursued its strategy [of adding capacity and lowering fares], however, because it knew that once LCCs were driven out of DFW routes, it could reduce its service and raise its fares, thereby recouping its short-term losses through future supracompetitive fares." (Complaint ¶¶ 5, 6.)

The government's expert, Professor Stiglitz, states that "output and pricing decisions should be viewed as occurring simultaneously." (Stiglitz Final Report ¶¶ 66, 144.)

American has developed a number of internal measures that address, among other things, route performance. Some of these measures are referred to as "decision measures" because they are used for decision making rather than financial reporting. Certain of American's decision measures, such as Decision FAUDNC, primarily measure the relative performance of routes. The company employs two basic categories of flight and route performance measures: fully allocated earnings measures (including the Decision FAUDNC and Decision FAUDNC measures) and variable earnings measures (including the Decision VAUDNC and Decision VAUDNS measures).

American's fully-allocated earnings measures, such as Decision FAUDNC, reflect revenues minus all categories of costs within American's decision accounting system, including variable expenses, aircraft ownership, fixed overhead, interest, equity and income taxes.

American's variable earnings measures of flight and route performance, such as Decision VAUDNC, reflect revenues minus the variable expense categories of costs within American's decision accounting system. The company's variable earnings measures of flight and route performance are known as "Decision VAUDNC" and "Decision VAUDNS." VAUDNC refers to VAriable earnings plus Upline/Downline contribution Net of Costs. Decision VAUDNC attempts to capture the net upline/downline revenues generated from connecting passengers and then subtracts the variable costs associated with those passengers as well as an estimated incremental flight cost assigned to every connecting passenger.

VAUDNS refers to VAriable earnings plus Upline/Downline contribution Net of Spill. Decision VAUDNS attempts to capture the upline/downline revenues from connecting passengers net of spill. "Spill" reflects the likelihood that accommodating an additional passenger on an upline/downline flight would result in the loss of some other passenger that was "spilled" to a competitor's flight.

VAUDNC and VAUDNS are calculated using costs categorized as variable over an 18 month planning horizon. The costs included in the VAUDNC/VAUDNS measures represent more than 72% of the total costs included in American's decision accounting system for the DFW–MCI, DFW–ICT, DFW–COS, and DFW–LGB routes over the relevant time periods. VAUDNC reflects onboard revenues minus the categories of expense labeled by American as "decision variable expense" and adds the incremental contribution of upline/downline passengers. VAUDNC and VAUDNS are measures of variable earnings of a route within American's 18–month planning horizon.

The government has proposed its own measure of American's variable earnings (which it has labeled "VAUDNC–AC").

The cost component of VAUDNC–AC includes American's VAUDNC costs plus costs of aircraft ownership. Thus, VAUDNC–AC treats aircraft ownership costs as a variable expense, thereby reducing the apparent performance of the route. VAUDNC–AC includes over 79% of the total costs included in American's decision accounting system for the DFW–MCI, DFW–ICT, DFW–COS, and DFW–LGB routes over the relevant time periods.

Aircraft ownership costs are properly considered fixed costs in the industry, and are not an avoidable cost of changing capacity in a route.

The government's expert, Professor Berry, testified that the cost component of VAUDNC–AC is a measure of "short run average variable cost at the route level." Another government expert, Professor Stiglitz, testified that VAUDNC–AC is a measure of short run average variable cost. Professor Stiglitz testified that a rival will want to continue operating in the market so long as its price exceeds average variable cost.

Under each of the VAUDNC, VAUDNS, and VAUDNC–AC measures, over the alleged predation periods, American's revenues exceeded its average variable costs at the route level on the following routes: DFW–MCI (Kansas City), DFW–ICT (Wichita), DFW–COS (Colorado Springs), and DFW–LGB (Long Beach). With respect to the DFW–PHX (Phoenix), DFW–EWR (Newark), DFW–TPA (Tampa), and DFW–OAK (Oakland) routes, the government's experts offer no evidence that American's revenues were below any measure of costs.

Professor Hovenkamp, a consultant to the government in this matter, wrote to the Department of Justice:

The biggest advantage that the AVC test has going for it is a high degree of general acceptance (at least as a presumptive standard) by all circuits except the Eleventh. I think it will be far easier to get a court to agree to adhere to the AVC test but take some care as to how costs are classified, rather than abandon it in favor of any test that uses "failure to maximize in the short run" or average total cost as a standard. Such an AVC standard would also give the court a more manageable set of numbers to work with and limit the amount of speculation.

(Defs.' Exh. 123).

As noted above, American's decision accounting system has a measure termed FAUDNC. This was a part of a number of profitability measures intended to reflect the economic value of operating a flight, a segment, a hub or the entire system. The company expended a substantial amount of time and money investigating its accounting systems, and in developing decision FAUDNC. Since its development of FAUDNC in 1995, American has continued to modify its methodology to improve route profitability reporting.

Professor Berry states that "FAUDNC cost is conceptually close to long-run average route level variable cost." (Berry Final Report ¶ 237.) Decision FAUDNC stands for Fully–Allocated earnings plus Upline/Downline contribution Net of Costs. Decision FAUDNC is a fully allocated earnings measure. American developed FAUDNC to compare the performance of its various routes against each other using a benchmark that reflected its fully allocated earnings (and thus its fully allocated costs of operation).

Decision FAUDNC attempts to capture the upline/downline revenues generated from connecting passengers and then subtracts the costs associated with those passengers as well as an estimated incremental flight cost assigned to every connecting passenger. Beyond the upline/downline revenues generated from connecting pas-

sengers, FAUDNC does not capture the system benefits to American of operating particular routes and flights. Such benefits arise from the fact that serving certain routes can provide enhanced regional presence or origin point presence to American's route network, thereby making its entire system more attractive to travelers. But these system benefits are not captured in the performance measures for individual routes and flights because the benefits accrue on other routes and flights.

Although the percentage can change slightly from year to year, FAUDNC captures approximately 97–99% of American's total costs. The only costs excluded from FAUDNC are certain corporate general and administrative expenses, such as legal expenses and certain corporate officer salaries, long term leases for space that cannot be subleased, and certain fixed maintenance expenses. And, again although the percentage can vary slightly from year to year, expenses excluded from FAUDNC represent approximately 1–3% of American's total operating costs. Professor Maher has stated that, for 1995, the costs excluded from FAUDNC were "in the range of three percent of total costs." (Maher Final Report ¶ 47.)

In generating FAUDNC, American allocates or assigns all of the operating expenses within its decision accounting system down to the level of individual nonstop flights. American's methodology for calculating route expenses is simply to aggregate the expenses that were allocated to each flight operated on that route. While there are certain types of expenses in FAUDNC, such as fuel or landing fees, that are directly caused by a particular flight or route, there are many other costs in FAUDNC that constitute the overhead or general operating expenses incurred in running an airline, particularly one with a complex hub-and-spoke network, that are not driven (or may not be driven depend-

ing on the specific circumstances presented) by operating or not operating a particular flight or route. Examples of such expenses at American include dispatch, city ticket offices, certain station expenses, a portion of pilot pay and other labor costs, certain maintenance expenses, American's flight academy, flight simulator maintenance, investments in yield management and other computerized systems, and sales and advertising. FAUDNC includes certain costs that would not be entirely avoided if American were to abandon service on a particular DFW route, but rather all or a portion of which would be reallocated to other routes.

In generating FAUDNC, American allocates certain general operating expenses among its various flights and routes on an arbitrary basis, such as takeoffs and landings, flight hours, or passenger enplanements. The cost accounts incorporated in FAUDNC include such fixed overhead expenses as aircraft-related overhead and system-related overhead.

American's aircraft-related overhead expenses consist mainly of fixed expenses for American's maintenance facilities in Tulsa and Fort Worth, including rent (covering the retirement of long-term facility bonds), computer systems, communications and utilities. These fixed maintenance expenses are allocated to American's aircraft on the basis of either departures or flight-hours. Also included in aircraft-related overhead is the exterior cleaning of airplanes (as distinguished from the interior cabin cleaning done after each flight). Each airplane exterior is cleaned on a periodic basis and the overall expense of this activity is allocated across the fleet based on departures. American's system-related overhead expenses consist of a wide range of activities required to operate a large hub-and-spoke airline. These include management, supervision and admin-

istrative expenses associated with aircraft load and clearance (the weight and balance of aircraft), as well as flight attendant staffing. In addition, this category includes functions such as headquarters marketing and sales, capacity planning, corporate communications, pricing and yield management, flight operations and safety, cabin design and crew scheduling. Passenger advertising is also part of this category, including media advertising (newspapers, magazines, radio and television) and timetable production costs.

While American's aircraft-related and system-related overhead expenses are not driven by the operation of any particular route or flight, in order to generate FAUDNC, these expenses are allocated arbitrarily over American's entire fleet. FAUDNC includes a target return on American's capital, including imputed interest and returns to equity for flight assets, station assets and system assets. FAUDNC includes an assumed income tax on profits for both the route at issue and for all upline/downline revenues.

While American tries to include in Decision FAUDNC all cost categories that could be impacted or affected by anticipated changes in overall system capacity or traffic over an 18–month planning horizon, this means if American anticipated a downturn in its business 18 months hence and decided to scale down its operations in response, it could reduce some of the costs in its "fixed" categories over an 18–month period. Not all costs in FAUDNC could be eliminated over 18 months, or scaled down proportionately with a planned reduction in activity levels.

Although the government's expert, Professor Berry, assumes that "FAUDNC captures those costs that are avoidable over 18 months and not sunk for the route," (Berry Final Report ¶ 233), other than seeking to understand the cost assignment and allocation methodologies that underlie American's Decision measures, no government expert, including Professor Berry, has identified the actual costs in FAUDNC that are incremental or avoidable costs of serving a route or of expanding or contracting capacity on a route, whether generally or with respect to DFW–MCI, DFW–ICT, DFW–COS, DFW–LGB or any other route that American flies.

During any given month, American has many domestic routes that generate negative FAUDNC results. According to Professor Berry's calculations, 16 Americans routes (3% of all its routes) had negative FAUDNC for 12 consecutive months. There are numerous routes in American's domestic system that generate persistently negative FAUDNC results.

FAUDNC, therefore, is a fully allocated earnings measure, not a measure of the variable costs of serving a route. It includes those costs which could be affected by anticipated changes in system capacity or traffic over an 18–month planning horizon. It reflects revenues minus all categories of costs within American's decision accounting system, including decision passenger variable expense, decision direct capacity expense, cargo variable expense, variable overhead, decision fixed overhead expense, decision interest expense, decision equity expense, and decision income tax expense. FAUDNC excludes only 1 to 3 % of all of American's costs. As noted earlier, FAUDNC includes at least 97% of American's total operating costs and approaches 99% of all costs.

FAUDNC includes fixed costs. It includes $600 million in fixed overhead expenses. Only 16.5% of the fixed overhead within FAUDNC are direct costs which are proportional to activity level. Many costs in FAUDNC involve step functions, and any particular expense category in FAUDNC may be overstated or under-

stated by the average cost used in FAUDNC. Thus, not every cost in FAUDNC would be eliminated or scaled down proportionately with any particular planned reduction in activity.

FAUDNC is used as a measure to evaluate route performance. VAUDNC and VAUDNS are used to measure flight and route performance. FAUDNC establishes a long term benchmark marking at the break-even level. A negative FAUDNC reflects that, for some perhaps temporary period, American was failing to generate revenue to meet all operating costs plus a target return on capital.

FAUDNC is designed to capture the upline/downline revenues generated from connecting passengers and then subtract the costs associated with those passengers, which includes the incremental capacity cost of carrying a connecting passenger on the upline/downline flight.

A long term negative FAUDNC indicates a potential for a problem. However, a negative FAUDNC over a shorter period of time does not indicate that action on a route is necessary. American has endured long periods—sometimes over 18 months—when its system-wide average FAUDNC was negative. In June 1994, 55% of Amercian's routes were FAUDNC negative.

American's senior management met monthly to review routes and system profitability. A regular feature of such meetings was the review of the worst performing routes, as measured by FAUDNC. FAUDNC is one of the factors American uses when evaluating whether to exit a route.

American has found it too difficult to allocate system benefits to individual routes through FAUDNC. Moreover, the mere fact that American has negative FAUDNC for one month is not advanced by the United States' experts as a basis for inferring sacrifice. Rather, it is the fact that the negative FAUDNC month followed a capacity expansion that is significant, as well as the fact that such an effect on profitability from capacity additions is atypical.

Again, VAUDNS, VAUDNC and VAUDNC–AC are measures of average avoidable cost of a route. However, VAUDNC–AC overstates short run average variable cost ("SRAVC"), because it includes fixed aircraft ownership costs. VAUDNS, VAUDNC and VAUDNC–AC capture between 72% and 79% of all American's costs. The government has not shown any identifiable, non-fixed cost which is not included in VAUDNC or VAUDNS.

On the DFW–LGB route, American's VAUDNC and VAUDNS were negative for the first month or two. It is uncontroverted that airlines typically incurred losses during the start up of a new route. Throughout the entire period of alleged predation, American's VAUDNC and VAUDNS were positive.

On the DFW–Wichita route, American's VAUDNC and VAUDNS were never negative. They "approach[ed] zero" for one month (October, 1996), but then rebounded. Taken over the entire period of alleged predation, American's revenues on the route, as measured by VAUDNC and VAUDNS, covered its costs.

The United States' experts have investigated the cost assignment and allocation methodologies that underlie American's Decision measures. As part of this examination of American's decision accounting system, Professor Maher examined documents describing the detailed audit American conducted in determining which of its costs should be included in its Decision FAUDNC measure. Professor Maher also examined studies and calculations American has made with respect to the variability of the decision accounting cost catego-

ries for periods shorter than 18 months. However, the government's experts have not performed a special analysis of the expenses incurred by American as a result of its actions in DFW–MCI, DFW–ICT, DFW–COS, or DFW–LGB, but have instead relied upon American's decision accounting system.

American does not ordinarily perform special analyses of costs, rather it relies on the costs reported in its decision accounting system to understand the impact of its route decisions on costs. In addition to its decision measures, American maintains financial accounting measures of profitability. American maintains a measure of route profitability in its financial accounting system, which it refers to as "Accounting Pre–Tax Earnings." American's financial accounting route profitability measure reflects the fully allocated costs that tie to reported Airline Group financial results. American Eagle calculates fuel cost for a route by pooling station fuel expenses and then allocating them to flights based on generic burn rates for particular aircraft types.

The government contends that it is impossible to directly measure marginal cost and its expert Professor Berry has advocated a variety of alternative measures which might suggest predation. Berry's first test essentially seeks to determine whether a given activity by the alleged predator forced it to forgo the possibility of "better profit performance" elsewhere. In his proposed "Test One" for predation, Professor Berry attempts to evaluate whether the measures VAUDNC, VAUDNC–AC, or FAUDNC decline as a result of capacity changes on the DFW–MCI, DFW–ICT, DFW–LGB and DFW–COS routes. Under "Test One," if these measures so decline, the government's expert, Professor Berry, finds that American has not maximized its profits since "the incremental revenue generated by Ameri-

can's capacity addition was below the incremental cost of that capacity addition."

With respect to proposed "Test Two," Professor Berry states:

> This test considers the absolute level of American's profitability measure for the route, FAUDNC. If the effect of the capacity addition is to make FAUDNC for the route negative, this condition tells me that, following the capacity addition in question, American's price (as reflected in its average revenue) was below its long run average variable cost.

(Berry Final Report ¶ 254.) Berry Test Two examines whether revenues were below the long-run average variable cost (LRAVC) on the route. System benefits arise, in part, from the fact that serving certain routes can provide enhanced regional presence or origin point presence to American's route network, thereby making its entire system more attractive to travelers. Origin point presence, however, is also driven by marketing devices—such as its frequent flyer program, travel agency commission overrides, and corporate discounts—used by American to link its multiple route offerings in a region. Moreover, any system benefit also has associated costs.

With respect to proposed "Test Three," Professor Berry states:

> This test considers, where applicable, whether American's profitability measure for the route, FAUDNC, was persistently negative. If so, this condition shows that American's capacity addition violates a price/cost standard over a substantial period of time, i.e., its revenues over a long period were below American's own 18–month cost measure.

(Berry Final Report ¶ 255.) Berry Test Three looks toward instances where FAUDNC was negative for a period greater than 12 months.

Only 3% of American's domestic routes had a period of negative FAUDNC for 12 months and only 1.2% for a period of 18 months. However, with a shorter period of reference, it is uncontroverted that many American routes have consistently negative FAUDNC.

In his proposed "Test Four" for predation, Professor Berry tries to calculate directly incremental revenues and costs associated with capacity additions on the DFW–MCI, DFW–ICT, DFW–COS, and DFW–LGB routes by using the cost component of VAUDNC–AC and the supposed revenue from "incremental" passengers. Under "Test Four," if the government's experts find "incremental revenues" below "incremental costs," they consider this to be "evidence of sacrifice." Berry Test Four "calculates a conservative measure of the incremental cost of adding capacity in a route." It compares price with what Berry views as incremental costs of American's additions of capacity on the DFW–MCI, DFW–ICT, and DFW–COS routes. Test Four uses two methods for calculating price: a fare proxy method (average fare from incremental local passengers) and a market average fare (average fare of local passengers). The test seeks to calculate the average fare of local passengers as a proxy for average market price.

The government's expert, Professor Stiglitz, states:

> First, one must determine whether the incumbent had clear alternatives that the incumbent knew or could reasonably be expected to have known would have made it more money absent any predation profits. Importantly, it is not necessary to compare the alleged predator's actual behavior with its *most* profitable alternative. The key is whether the alleged predator clearly passed up a *more* profitable alternative.... If there is clear evidence that the predator had available one or more alternative actions

that-but for the anti-competitive effect-would have yielded higher profits, then a suspicious sacrifice has occurred.... Note that anytime we evaluate the costs and benefits of a firm's conduct in this way, we are necessarily comparing the conduct actually undertaken to *some* alternative conduct, in this case, the alternative of *not* adding capacity, *i.e.*, leaving capacity at its pre-entry level.

(Stiglitz Final Report ¶¶ 59, 61, 63 (emphasis in original)). Professor Stiglitz testified that

> Professor Berry's price cost tests focuses on the narrow question of the first part that I described before, was there a sacrifice, did the firm experience a loss relative to what it could have otherwise done in the short run.... They say in the short run today did I produce more than was profit maximizing. In the short run. Very narrow question.

(Def. Exh. 121 at 83). Professor Stiglitz concedes that his proposed "sacrifice" test would condemn output expansions that leave American's revenues above average variable cost.

In its memorandum submitted to Magistrate Judge Humphreys on May 4, 2000, the government asserted that "Airline passenger service in a city pair and nonstop airline passengers service in a city pair constitute the relevant markets for this case."

American's capacity additions lowered American's load factors and increased its costs per passenger for some periods on some routes. For example, American's entry in DFW–LGB lowered its load factors in other DFW–LAX Basin routes. American's capacity additions could have the effect of lowering the entrant's load factor and therefore decreasing profitability.

The government alleges that American sought by its DFW LCC Strategy to add

unprofitable capacity in order to deprive the LCCs of sufficient passengers to survive on the routes. The supporting documentation (Plf.Exh.132, 166, 182, 227) does not support the requested fact finding. Exhibit 132 is an American planning memorandum summarizing the company's competitive policies against two LCCs (SunJet and ValuJet), which states that American has matched the fares of LCC's and "[c]apacity has been added as necessary to accommodate increased demand." It does not suggest that the implemented strategies fell below marginal costs. Exhibit 166 is a memorandum discussing the vulnerability of American's DFW hub to LCC entry, and identifying hypothetical responses which could "make profitability more difficult to achieve for the entrant." Exhibit 182 discusses hypothetical strategies regarding SunJet (including matching fares but with no increased capacity, which would also diminish profits), but without indicating that any particular approach would be below marginal costs. Exhibit 227 discusses competition with Vanguard on the MCI–DFW route. But the author indicates profits on the route were positive and had "improved dramatically."

## 10. COMPETITIVE PRACTICES

The "capacity planning model" is a profit forecasting model used to assess how to deploy American's fleet. The logic of the capacity planning model seeks to maximize system profitability subject to fleet and operating constraints. American uses the capacity planning model as an indicator of the most profitable allocations of its fleet.

In the summer of 1997, American undertook an investigation of the incremental profitability of the additional capacity at DFW in response to LCCs. Based on data from DFW–Kansas City and DFW–Colorado Springs, American found that there was "market stimulation as AA responds with increased capacity and pricing reductions. Traffic generation, however, generally does not compensate for the loss in price premium and profitability is significantly impacted."

In response to ValuJet entry, American employed a strategy that sought to maximize revenue and profit in DFW–Atlanta in competition with ValuJet from approximately 1994 to summer 1995—a strategy that involved a conservative pricing strategy, matching fares only on a flight specific basis and employing a yield management strategy to limit availability of matching fares.

American altered its strategy against ValuJet, adding significant capacity in September and December 1995. The effect of these actions resulted in American incurring significantly reduced profitability in DFW–ATL from September 1995 to May 1996. In October, 1995, American's Vice–President of Capacity Planning stated that if American had adopted an aggressive response when ValuJet first entered DFW, it might "have left DFW with memories of a poor result."

Southwest has competed with American in the Dallas/Ft. Worth area for over 20 years. Southwest has had operating costs that were significantly lower than American's on a stage length adjusted basis. American reduced its jet capacity in DFW routes competitive with Southwest by 25.7% between May 1995 and May 1996. As a result, American's seat availability for Southwest-type traffic declined. American's capacity planning and revenue management strategies in Dallas/Ft. Worth Southwest-competitive routes had "truncated" passenger demand for its services. During the relevant time period, American "accepted a limited amount of traffic at Southwest's walk-up fares while generally rejecting their advance-purchase, very low fares." As a result of its capacity and yield management strategies in Southwest-competitive routes, American relied more

on flow traffic than on local traffic to provide profitability in those routes. Professor Berry performed a regression analysis comparing American's responses to LCCs at DFW with its responses to Southwest Airlines at DFW. Professor Berry found that capacity changes in Southwest competitive markets are generally associated with increases in profitability, in sharp contrast to the negative effect on profitability from American's changes in capacity in DFW LCC markets.

American normally uses its profit forecasting and fleet assignment model to develop its operating plan. American overrode its capacity planning model by keeping the eighth frequency in DFW–COS to "address competitive issues." American overrode its capacity planning model by increasing frequency in DFW–MCI from ten to twelve round-trips, also to "address competitive issues." American normally restricts its availability of fares in the lower buckets on popular flights and flights where there is a demand for higher fares.

The government stresses that American stationed personnel at the gates of the LCCs at DFW in order to count the number of passengers boarding the LCC's flights (which American referred to as "ramp counts.") American used these ramp counts so that it could more quickly react to competitors, including low cost carriers. Ramp counts are common in the airline industry. Monthly ramp counts were distributed to persons high-up at American who were intimately involved with American's DFW LCC Strategy. Ramp counts are expensive: American spent "nearly half a million dollars on ramp counts of approximately 20 routes" in 1998.

The airline industry is one in which the profitability of an airline's pricing, yield management or capacity initiatives often depends heavily on the anticipated response of other airlines. Analysis that tracks economic theories known as "game theory" is used in the airline industry to predict actions by competitors and gauge competitors' reactions.

As part of its planning process, American regularly constructs scenarios regarding possible competitive actions and reactions by other airlines and takes actions based on those predictions.

As part of its consulting project for American, Sabre considered possible decision-making processes for American that entailed analyzing competitors' data, including costs, scheduling practices and projected schedules, share, load factor, and profit impacts.

American believes that LCCs engage in "game-theory" analyses when determining whether to enter, expand in, or remain in, a market in competition with an incumbent. American believes that if it permits an LCC to fly one flight in a market, that LCC will increase its frequencies and become a powerful competitor, and believes that it is valuable for competitors taking note of American's actions.

A November 4, 1996 memorandum and study on Caribbean Strategy Issues notes that "American's ultimate strategy …, particularly with regard to capacity levels, is likely to send a message to our competitors about our willingness to defend our market position…. Any strategy decision should be made with this in mind."

Access Air, a Des Moines, Iowa-based LCC, sought to avoid a competitive response from the major airlines by following these rules: "stay off of elephant paths …, don't eat the elephant's food …, and keep the elephants more worried about each other than they are about you." The fundamental criterion of the Access Air business plan was to serve very large attractive destinations that no one else had

turned into a hub. Such routes were not as well-served as hub routes. Access Air sought to avoid a competitive response from major airlines generally; it did not consider American's reputation as a factor in deciding not to enter DFW.

Access Air intentionally designed its fare levels to be above the average variable costs of the major airlines so they would not consider Access Air a threat.

## 11. REPUTATION ISSUES

The government asserts that American, through its predatory conduct on the routes at issue, has earned a reputation for predation that deters competition on other DFW routes, allowing it to recoup the allegedly predatory investment it made in the Competitive Response Routes at issue by charging supra-competitive prices on those other DFW routes. Defs.' Exh. 129 lists the routes that American allegedly monopolized and/or has attempted to monopolize by virtue of its reputation for predatory conduct, according to interrogatory answers and other submissions by the government, designates whether the allegation relates to nonstop service only, and indicates whether the government asserts that American currently has monopoly power on the route. (The list also contains two routes—DFW-EWR and DFW-CHI(MDW + ORD)—in which the government does not allege that American currently has monopoly power). The government arrived at this list by combining two features: that American's market share by revenue as of the end of 1999 on the route be 60% or greater; and that no low fare airline currently be offering service on the route.

Since January 1, 1993, the government has solicited and/or received information during investigations of monopolization or attempts to monopolize any portion of the U.S. airline industry from more than 30 new entrant or small airlines, including AirTran Airways, Alaska Airlines, American Trans Air, CalJet, Frontier, Midwest Express, New Air/JetBlue, Pan American, Colgan Air, Vanguard, SunJet, Western Pacific, Private Jet Expeditions, Tower Air, UltrAir, Aloha Airlines, Air South, Air Train, Capital Air, Carnival Airlines, Commutair, Legend Airlines, Marc Air, Mesa Air, Midway Airlines, Nations Air, Reno Air, Sun Country Airlines, ValuJet (now AirTran), Kiwi International Airlines, Morris Air, Spirit Airlines, and Hawaiian Airlines; from actual or potential investors into new entrant airlines such as Smith Management, BT Alex. Brown, and Wexford Management; and from multiple travel agencies.

The government contends that American's alleged predatory conduct and reputation was a contributing factor to the abandonment of nonstop service in DFW-ICT and DFW-PHX by Vanguard; the abandonment of nonstop service in DFW-LGB, DFW-EWR, and DFW-PIE by SunJet [WTS]; the abandonment of expansion plans for DFW-COS service from between June 1995 and January 1997 by Western Pacific, and that company's ultimate abandonment of nonstop service in DFW-COS.

Professor Stiglitz testified that he could not identify any specific airline that was deterred from entry as a result of American's alleged reputation for predation.

## 12. SPECIFIC CARRIERS

### a. Air Tran Airlines

Air Tran is an LCC with a hub in Atlanta. It serves DFW-ATL. It also serves DFW-GPT with one flight per day. American does not serve DFW-GPT. Air-Tran does not provide non-stop service to any other destinations from DFW.

### b. American Trans Air

American Trans Air is an LCC based at Midway Airport in Chicago. American Trans Air serves DFW–MDW, and does not provide non-stop service to any other destinations from DFW.

### c. Big Sky Airlines

Big Sky Airlines ("Big Sky") serves Brownwood, Texas, Enid and Ponca City, Oklahoma, and Hot Springs and El Dorado, Arkansas. The United States has not alleged that American monopolizes or attempted to monopolize any of these city pair routes. Big Sky provides only turboprop service. The government contends American does not serve any of the cities that Big Sky serves. In fact, both serve DFW–Denver.

### d. Braniff Airlines

Braniff Airlines, a now bankrupt LCC, competed with American at DFW until the early 1990s.

In 1987, American considered acquiring Braniff, and conducted a study of the company for that purpose, including a revenue impact analysis. This suggested that American would make $120 million over three years by not competing with Braniff on ten DFW routes. The study included a model which assumed that other low fare carriers would enter only two of the ten markets where American competed with Braniff within the first year—and even then entry would only occur from the respective hubs of the new entrants.

After another group acquired Braniff and moved its hub from DFW to Kansas City in 1988, American's prices increased an average of 13% on the routes where it had formerly competed with Braniff.

### e. Frontier (DFW–DEN)

The government contends that American's alleged predatory conduct and reputation deterred and delayed Frontier from starting DFW–DEN (Denver) service during 1997 and 1999. The government contends that when Frontier began its DFW–DEN service in 1999, American's alleged reputation for predation caused Frontier to offer fewer flights and price its DFW–DEN service less aggressively. The government does not contend that American monopolized or attempted to monopolize DFW DEN, only that the effects of American's alleged predatory conduct in certain other alleged markets were "felt" there. (Defs.' Exh. 96). The government's expert, Professor Berry, found that American does not currently have monopoly power in DFW–DEN.

Frontier Airlines ("Frontier") is an LCC based in Denver, Colorado. Frontier began service in 1994, and does not price as aggressively as Western Pacific did. When asked if Frontier adopted this approach to avoid a strong, competitive reaction by United Airlines, a Frontier officer denied it, stating that the company used this approach "to make money," characterizing the suggested reaction (avoiding a competitive reaction) as an alternative "argument that one could make" to support a similar pricing policy. (Gov't Exh. 282 at 248).

The government notes that Frontier has lost over $40 million. It is unclear, however, when these losses occurred. The cited testimony establishes only that the company has incurred this amount of aggregate losses throughout its history. The same source indicates that Frontier has consistently had positive profits for the last 13 months.

The government further suggests that Frontier avoided competition with American on Denver–DFW route because of its reaction against Western Pacific and Vanguard. However, the cited source explicitly states that he did not know what Ameri-

can's response to Western Pacific was, or what the effect of the response was.

Frontier initiated service between its Denver hub and DFW in December 1998. It serves DFW from its Denver base of operations only.

### f. Great Plains (DFW–ICT)

Great Plains Airlines is listed by the government as an airline that has been deterred and discouraged from initiating or expanding air DFW–ICT service from April 1997 to the present by American's predatory conduct and reputation. However, Great Plains has never operated as an airline. It also does not plan to be a low cost carrier.

Great Plains Airlines ("Great Plains"), formerly known as SunWest, is a start-up airline. Great Plains had a business plan to offer service from Wichita to large cities such as New York, Washington, D.C., Los Angeles, San Francisco and eventually Dallas with non-stop service on 50–seat regional jets. Great Plains recognized that it needed to find a niche market where it could avoid a competitive response from the major airlines.

When Great Plains (then SunWest) was organized in 1997, it included in its plans service between Wichita and Love Field (not DFW). It planned to initiate ICT–Love Field service if support from investors and the City of Wichita had been forthcoming. The company asked for financial assistance and support from the City of Wichita, including a 25–year lease for space in the terminal building for $1 per year, a $2.5 million bond for a hangar and a maintenance facility, and a 50% discount on landing fees for certain flights, all in order to reduce the airline's need for capital. Ultimately, Great Plains moved from Wichita to Tulsa and Oklahoma City, Oklahoma, because the latter metropolitan areas were larger than Wichita and the State of Oklahoma was willing to provide

greater financial incentives than the City of Wichita.

Great Plains' principal owner has testified that with respect to his 1997 efforts to establish a Wichita operation with Great Plains' predecessor, "American Airlines did nothing to us as far as I'm concerned."

Great Plains does not plan to compete on any route currently served nonstop by Southwest or other majors. Great Plains attributed investor reluctance to a variety of reasons besides the perception that airlines who competed head-to-head against major airlines, like Vanguard did against American in Wichita, would lose money.

### g. JetBlue (DFW–JFK)

The government contends that American's alleged reputation for predation prevented or deterred JetBlue from initiating DFW–JFK service. The government contends that American monopolized and attempted to monopolize the airport-pair DFW–LGA (LaGuardia) and the city-pair Dallas/Fort Worth–New York Metro (LGA, JFK), but does not contend that American monopolized or attempted to monopolize the airport-pair DFW–JFK. The government's expert, Professor Berry, found that American does not currently have monopoly power in DFW–JFK.

JetBlue is an LCC based at New York's John F. Kennedy Airport ("JFK") that started flying February 1, 2000. David Neeleman is the chief executive officer of JetBlue. JetBlue anticipated a fierce competitive response to its entry into the U.S. domestic airline market. In choosing which routes to serve, JetBlue's management took into account a number of factors, including what other airline was serving the route with how many flights. JetBlue chose not to serve San Jose from JFK because American was already serving that route, and not to serve San Fran-

cisco from JFK because American and United were already serving that route.

DFW is one of a number of airports that JetBlue intends to serve out of New York. JetBlue believes its proposed service of three round-trips a day between JFK and DFW would be financially viable so long as the competitive reaction was only fare matching by the incumbents and did not include adding flights.

JetBlue will not enter DFW until it is confident of its ability to withstand what it expects would be a strong competitive response by American in the form of both fare matching and additional flights. The timing of JetBlue's entry into DFW will depend on the strength of the company and how it is doing in the other routes it serves.

### h. Legend Airlines

The government contends that American's alleged reputation for predation prevented and deterred Legend Airlines from offering service from DFW.

As noted earlier, in 1980, Congress passed the Wright Amendment. From 1980 until October, 1997, the Wright Amendment restricted commercial passenger jet operations at Love Field to service within Texas and its four contiguous states: Arkansas, New Mexico, Oklahoma, and Louisiana. The Wright Amendment created an exception for commuter air traffic outside Texas and the contiguous states for aircraft which carry no more than 56 passengers. In 1996, Dalfort Corporation, a predecessor to Legend Airlines, announced plans to take advantage of the commuter airline exemption by reconfiguring large planes to hold 56 seats. American filed an administrative challenge against this reconfiguration plan as contrary to the commuter aircraft exception. In 1997, Congress passed the Shelby Amendment, Pub.L. No. 105–66, § 337, 111 Stat. 1425, 1447 (1997). The Shelby Amendment permitted reconfigured passenger jet operations between Texas and three additional states: Alabama, Kansas, and Mississippi, as well as Arkansas, Louisiana, New Mexico, Oklahoma, and Texas. On February 1, 2000, the Fifth Circuit Court of Appeals held that any airline could offer service to any city in jet aircraft carrying 56 or fewer passengers.

Legend was created to service business travelers. It planned "to offer a premium product at attractive coach pricing." Accordingly, the company "has positioned itself as a premium service, high fare airline." (Defs.' Exh. 8, Berry Final Report ¶ 173.)

In early 2000, Legend began offering jet service between Love Field and LGA, LAX, LAS, and IAD, recognizing that American would compete by offering its own operations at Love Field. Since at least 1996, Legend's business plan has been to operate from Love Field. In December 2000, Legend Airlines filed for Chapter 11 bankruptcy protection and stopped operations.

### i. National Airlines (DFW–LAS)

The government contends that American's reputation for predation deterred or delayed National Airlines ("National") from initiating DFW–LAS (Las Vegas) service during 1995–99. The government does not contend that American monopolized or attempted to monopolize DFW–LAS. The government's expert, Professor Berry, found that American does not currently have monopoly power in DFW–LAS.

National Airlines is a Las Vegas-based LCC that started flying in May of 1999. Mike Conway is National Airlines' Chief Executive Officer. Mark Suman is National Airlines' Senior Vice President of Marketing and Strategic Planning.

National Airlines prioritized the cities it intended to serve in three phases over a five-year period. Dallas was one of the cities in the third phase, i.e., within approximately three years of National Airlines' starting flying.

National Airlines began service from Las Vegas to DFW in September of 1999. It serves DFW from its base of operations in LAS only. The company's Chief Operating Officer believes that the major airlines, including American, compete aggressively.

**j. Ryan International Air (DFW–ICT)**

The government lists Ryan International Airlines ("Ryan") as a new entrant that was deterred from serving DFW–ICT from 1999 to the present by American's reputation for predatory conduct. The government also asserts that the City of Wichita and its Air Service Task Force were deterred from making arrangements with Ryan to serve DFW–ICT from 1999 to the present by American's reputation for predatory conduct.

The Mayor of Wichita testified that the City of Wichita has no official position as to whether the government's allegations that American's alleged predatory conduct or reputation have deterred Ryan from offering DFW–ICT service are correct.

Ryan is based in Wichita, Kansas. Ryan operates passenger charter and cargo flights around the world, and is certified by the FAA to undertake scheduled passenger service. Ryan has never sold tickets directly to passengers. In August of 1999, Ryan made a proposal to the Wichita Air Service Task Force to begin a regularly scheduled airline to offer service from ICT to DFW, DEN, and CHI. The 1999 Ryan proposal was modeled after the same one it had made in 1994.

Ryan's plan called for three daily flights from Wichita to DFW, Chicago and Denver. Based upon current market conditions, Ryan believes that its plan would be profitable. However, because of its concern with competition from major airlines, including American, Ryan has stated that it would not undertake to provide service under the plan except on a cost plus fee basis. Ryan's 1999 proposal was for the City of Wichita to pay the airline's costs plus a fee, so that the city would bear the financial risks of the service.

Ron Ryan, principal owner of Ryan, believes that all the major airlines (including American, Delta, United, Northwest, Continental, TWA, and U.S. Airways) would "sit on" any new entrant airline in their routes. Mr. Ryan's concern about competing with American is the same concern he would have about competing with other established airlines.

American has never made a direct threat of predation against Ryan to prevent it from beginning service to DFW.

Had the City of Wichita accepted Ryan's proposal, Ryan would have initiated DFW–ICT service and, indeed, is still prepared to do so. As of late 2000, the City of Wichita is still considering the Ryan plan. Ryan has no documents that discuss any consideration of, or reference to, the potential or actual competitive response by an air carrier to Ryan's potential or actual entry into any route.

**k. Ozark Airlines**

Ozark Airlines ("Ozark") is a Columbia, Missouri-based airline. It has an interline agreement with American, and advertises on its web site that "Ozark can reserve your flight from Columbia to hundreds of cities served by our worldwide travel partner American Airlines" and "Fly Ozark Airlines to Dallas–Ft. Worth and connect to the world with American Airlines." Ozark serves DFW from its Columbia, MO (COU) hub only. American does provide service on the DFW–COU route except under the terms of its inter-

line relationship with Ozark. The United States has not alleged that American monopolizes or attempted to monopolize DFW–COU.

### l. Sun Country Airlines

Sun Country Airlines ("Sun Country") operates between one and three flights per day on DFW–MSP and one flight per day on DFW–LAS, and serves no other domestic destinations from DFW. Sun Country is associated with FunJet Vacations. FunJet Vacations advertises travel packages on a number of major airlines, including American.

### m. Vanguard (DFW CVG)

The government contends that American's alleged predatory conduct and reputation caused Vanguard to abandon its DFW–CVG (Cincinnati) service in the fall of 1996 and, historically but not currently, deterred Vanguard from re-entering DFW–CVG. The government does not contend that American monopolized or attempted to monopolize DFW–CVG, only that the effects of American's alleged predatory conduct in certain other alleged markets were "felt" there. The government's expert, Professor Berry, believes that American does not currently have monopoly power in DFW–CVG.

### 13. NEW ENTRY AT DFW

Despite the alleged reputation American has for responding aggressively to low fare competition, six low fare carriers have entered DFW since 1995. American Trans Air initiated DFW–MDW (Midway, Chicago) service in May, 1998. The company AirTran (re)initiated DFW–ATL (Atlanta)

service in April 1997, and began DFW–GPT (Gulfport) service in March 1999. Big Sky Airlines began nonstop service to five destinations from DFW in 1999. Ozark Airlines began nonstop DFW–Columbia, MO service in March 2000. Frontier initiated DFW–DEN (Denver) service in December 1998. National initiated DFW–LAS (Las Vegas) service on September 30, 1999. Sun Country initiated nonstop DFW–LAS (Las Vegas) and DFW–MSP (Minneapolis) service in 1999, and announced additional DFW service to several locations in Mexico in March 2000.

### 14. FACTS RELEVANT TO MEETING COMPETITION

The plaintiff has not identified any instances in which American undercut the published fare of an LCC with a published American fare during the relevant time period.

Airline products can vary in many dimensions. American's product was superior to an LCC's product because American offered higher frequencies, and (in some instances) a frequent flier program and advance seat selection. American considers its frequent flyer program the best in the industry.

It is uncontroverted that fare matching was part of American's LCC strategy. There is no evidence American actually undercut LCC fares on any of the relevant routes.

### 15. IN MARKET RECOUPMENT

Professor Berry prepared the following chart to represent his two tests for "net sacrifice" in DFW–MCI, DFW–ICT, DFW–COS and DFW–LGB:

Berry Table I

Alleged Predatory Conduct Impact on Predation Route Profitability

| | FAUDNC Margin During Base Period | | | FAUDNC Margin in Southwest Markets | | |
|---|---|---|---|---|---|---|
| | Predatory Loss | In Market Recoupment | Net Sacrifice | Predatory Loss | In Market Recoupment | Net Sacrifice |
| MCI I | − 4,811,722 | 135,744 | − 4,675,979 | − 4,821,829 | − 340,077 | 5,161,906 |
| MCI II | NA | NA | NA | − 14,126,870 | − 928,580 | − 15,055,451 |
| ICT | − 800,231 | 1,392,797 | 592,566 | − 926,754 | − 637,201 | − 1,563,955 |
| COS | − 5,343,445 | 3,266,439 | − 2,077,006 | − 7,007,899 | 1,746,760 | − 5,261,138 |
| LGB | NA | NA | NA | − 3,524,496 | 5,865,870 | 2,341,374 |

Professor Berry devised two ways to calculate the amount of "predatory loss" American allegedly incurred in DFW–MCI, DFW–ICT, DFW–COS, and DFW–LGB during the alleged periods of predation.

The first method or test that Professor Berry devised to calculate the "predatory loss" column for Table I used as a benchmark American's average FAUDNC margin on that route during a period of "legitimate competitive conditions" prior to the alleged periods of predation, which Professor Berry considers to be a natural base period.

The second method or test that Professor Berry devised to calculate the "predatory loss" column for Table I used as a benchmark American's average FAUDNC margin in "Southwest Markets," meaning those routes on which American competes with Southwest. Professor Berry's "predatory loss" columns in Table I reflect the difference between American's actual revenues during the periods of alleged predation and the revenues predicted by using the two benchmark FAUDNC margins he devised. Professor Berry's "in market recoupment" columns in Table I reflect the difference between American's actual revenues after the periods of alleged predation and the revenues predicted by using the two benchmark FAUDNC margins he devised. Professor Berry's "net sacrifice" columns in Table I are the arithmetic sum of the respective "predatory loss" columns

and "in market recoupment" columns. Where the "in market recoupment" columns of Table I are positive, Professor Berry finds that American has already achieved some market recoupment. Where the "net sacrifice" columns of Table I are positive (such as in Wichita), Professor Berry finds that American has fully recouped on that route. Where the "net sacrifice" columns of Table I are negative (such as in Colorado Springs), Professor Berry finds that American has not recouped in the alleged market.

Professor Berry testified that the first benchmark used in Table I (average FAUDNC margin during "normal" competitive conditions) is his preferred test. He has also asserted that the Southwest-competitive FAUDNC margins used for his second benchmark in Table I are a good benchmark for "competitive" returns.

The only two periods in which the government's experts allege American engaged in supra-competitive pricing on the DFW–MCI route are January–September 1996, and after May 1998. In applying his first test to the January–September 1996 period in DFW–MCI, Professor Berry finds that American earned above-competitive returns of $135,744, but that its alleged predatory loss amounted to $4,811,722, leading to a "net sacrifice" of $4,675,979. In applying his second test to the January–September 1996 period in DFW–MCI, Professor Berry calculated "net sacrifice" of $5,161,906. In applying

his second test to the January–September 1996 period in DFW–MCI, Professor Berry calculates that American lost an additional $340,077 during the in-market recoupment period.

Professor Berry testified that from January 1995 through December 1995 American did not possess monopoly power on the DFW–MCI route. He further testified that since September 1996, American has not possessed monopoly power on the DFW–MCI route. He stated that since late 1998 on the DFW–MCI route, American's prices not only have "ceased to be predatory," but actually have "become more like those that American maintains in routes where it competes with Southwest," which he considers a good benchmark for competitive pricing.

Professor Berry found his first in-market recoupment test for the period since May 1998 on the DFW–MCI route inapplicable because there is no natural period of normal competition to use for comparison. In applying his second test to the period since May 1998 in DFW–MCI, Professor Berry calculates a "net sacrifice" of $15,055,451.

According to Professor Berry's second test for the period since May 1998 in DFW–MCI, American lost an additional $928,580 during the in-market recoupment period. Berry states that the 17–month period from April 1995 to September 1996 (after Vanguard began DFW–ICT service but before American resumed jet service) was a period of "legitimate competition" and is a "natural base period."

Although Professor Berry calculates a net gain of $592,566 for American on the DFW–ICT route using his first test, he selects only July September 1996, three months out of seventeen, for the "pre-predation" base period. Recalculating the "predatory loss" and "in market recoupment" columns using Professor Berry's first test and using the entire April 1995–

September 1996 "natural base period," results in additional losses of $7,325,019 during the "recoupment" period and a "net sacrifice" of $8,941,191 in DFW–ICT.

In applying his second test for DFW–ICT, Professor Berry calculates an additional loss during the "recoupment" period of $637,201, and a total "net sacrifice" of $1,563,955 on the DFW–ICT route. In applying his first test for DFW–COS, Professor Berry calculates a "net sacrifice" of $2,077,006.

In applying his second test for DFW–COS, Professor Berry calculates a "net sacrifice" of $5,261,138.

Professor Berry's expert report does not contain any evidence of in-market recoupment by American in DFW–PHX (Phoenix), DFW–EWR (Newark), DFW–TPA (Tampa) and DFW–OAK (Oakland).

Professor Stiglitz's expert report is limited to actions taken in four routes (DFW–MCI, DFW–ICT, DFW–COS, and DFW–LGB) and he did not test for predation or put forth any evidence of in-market recoupment by American in DFW–PHX, DFW–EWR, DFW–TPA, or DFW–OAK.

Professor Berry proposes an alternative test of in-market recoupment, under which he finds that American has recouped in four of the five episodes of predation he addresses. In this alternative test of in-market recoupment, Professor Berry uses zero FAUDNC (revenues minus fully allocated costs equals zero) as a benchmark of competitive prices.

The government alleges the following barriers to entry exist at DFW: government certification of new entrants; access to gates and other airport facilities; and major airlines' marketing programs like frequent flyer plans, corporate discount contracts, and travel agent commission incentives.

Professor Berry testified that he could not identify any route on which he contends American has monopoly power where a low cost carrier has failed to enter because of American's alleged reputation for predation. Professor Berry states that "a DFW monopolist facing strong pricing competition from Love Field would find it difficult to raise prices substantially above the competitive level."

Professor Stiglitz testified that the only alleged barrier to entry that would be reduced or eliminated by the absence of American's allegedly predatory conduct would be the "barrier" constituted by American's alleged reputation for predatory response to entry. Professor Stiglitz testified that although the existence of a reputation for predation could be tested empirically through industry surveys or other indirect tests, neither he nor any other plaintiff expert has conducted any such empirical tests to determine whether American actually has the reputation for predation alleged by the plaintiff. Professor Stiglitz has testified that he relied in part on "industry folklore" for his opinion that American has a reputation for predation. Neither Stiglitz nor Berry can identify any particular airline deterred from entering service at DFW because of the alleged reputation for predation.

In Table II of his expert report, Professor Berry purports to calculate the potential additional profits American could gain if, as the result of its reputation developed through predation, there were an assumed 10% reduction in the probability of an LCC establishing a hub at DFW for five years. In fact, Berry directly states that Table II of his report "assumes a 10% reduction in the probability of an LCC establishing a DFW hub for 5 years." He testified about the source of the 10% figure used for calculations in Table II as follows:

Q: What is the basis for the 10 percent number?

A: Ten percent is an example of a moderate reduction.

Q: Why did you select 10 percent instead of 3 percent?

A: Ten percent is a nice round number.

(Berry Dec. 20, 2000 Dep. at 800).

Berry also testified about his assessment of the likelihood of an LCC building a hub at DFW as follows:

Q: Did you do any analysis to try to quantify the actual likelihood of a low-cost carrier building a hub at DFW airport?

A: No, I would say that I did a qualitative analysis.

* * * *

Q: Is there an empirical basis for your 10 percent figure?

A: A 10 percent is an example.

* * * *

Q: What is the basis for your using a five-year period for table 2?

A: Again, that's just an example. It's an example of a moderate period of time, not forever, not a short time.

(Id. at 801–803).

In Table III of his expert report, Professor Berry also purports to calculate the potential additional profits American could gain if, as the result of its reputation developed through predation, there were an assumed two-year delay in the building of a hub at DFW by an LCC.

Professor Berry's testimony regarding Table III was as follows:

Q: I guess what I'm not understanding is, are you saying that in your opinion, but for predation by American, a low-cost carrier in fact would have built a hub operation at DFW airport, and that

in fact American's predation delayed that event by two years?

A: No, no, I'm not saying that at all. That is not the intent of this exercise here at all.

(Id. at 807).

Professor Stiglitz acknowledges that a reputation for aggressive behavior can be achieved by an airline without engaging in predatory pricing and that developing a reputation for aggressiveness through non-predatory, lawful competition "by definition" is not anti-competitive. Professor Stiglitz acknowledges that supranormal (or supra-competitive) pricing is a prerequisite to recovering (or recouping) alleged predatory losses from predatory pricing.

American's expert Professor William Baumol stated in his depositions that a deserved reputation for predation can theoretically serve as a strategic entry barrier.

The government stresses that, in 1998, Atlanta, with a population of 3,541,230, was served by 25 LCC spokes of over 350 miles. In the same year, Denver, with a population of 2,125,212, was served by 10 LCC spokes of over 350 miles. And also in 1998, Dallas, with a population of 4,574,-561, was served by three LCCs on non-Wright Amendment cities. Most Wright amendment spokes are shorter than 350 miles. These figures, however, are misleading. More recent figures show that DFW has LCC service on seven spokes. More importantly, the comparison grossly distorts the situation in the Dallas area by excluding Southwest Airlines routes.

**C. CONCLUSIONS OF LAW**

**1. THE GOVERNMENT'S ALLEGATIONS**

The routes in question, and the associated alleged relevant markets, fall into four categories. First, there are allegations of predatory conduct with respect to seven "core" routes (flights between DFW airport and airports in Kansas City, Wichita, Colorado Springs, Long Beach, Phoenix, Tampa, and Oakland).[6] In addition to these core routes, the government alleges Section 2 violations with respect to American's actions in approximately 40 "reputation" routes, in which the government does not allege American committed any predatory conduct, but does allege American violated Section 2 by monopolizing or attempting to monopolize the routes by acquiring a "reputation for predation" in the core routes. In addition, there are some five routes in which American allegedly committed predatory conduct, but did not monopolize or attempt to monopolize the routes, and five routes in which American is alleged neither to have monopolized, attempted to monopolize, or engaged in predatory conduct, but in which the effects of the alleged predation elsewhere were "felt."

In each case, the essence of the government's claims is substantially similar: that American, when faced with low cost carrier competition on various routes, instituted an aggressive policy of price matching and capacity increases which unfairly "stole" customers from the low cost carrier, which was eventually forced to cease competition on the route. After the departure of the low cost carrier, American increased its

---

**6.** Of Course, these routes are "core" routes not in the sense that they form the centerpiece of either American's business, or form even a significant portion of all flights from DFW. Rather, they are denominated here as such simply because they form the vast major-ity of the government's case against American. The remaining routes are frequently treated, in the pleadings, arguments, and in the proof, as afterthoughts tacked onto the underlying claims involving LCC competition on the core routes.

prices and reduced the number of flights serving the route.

## 2. ELEMENTS OF LIABILITY

▌ The government claims that American violated the Sherman Act, 15 U.S.C. § 2, by monopolizing or attempting to monopolize various airline routes. The government's monopolization claims require proof: (1) that American has monopoly power in a properly defined relevant market; and (2) that it willfully acquired or maintained this power by means of anti-competitive conduct, as distinguished from growth or development as a consequence of a superior product, business acumen, luck or historical accident. *TV Communications Network v. Turner Network Television*, 964 F.2d 1022, 1025 (10th Cir.1992). The claims of attempted monopolization require proof of: (1) a relevant geographic and product market; (2) American's specific intent to monopolize the market; (3) anti-competitive conduct by American in furtherance of this attempt; and (4) the dangerous probability that American will succeed in this attempt. *Multistate Legal Studies v. Harcourt Brace Jovanovich Legal and Prof'l Publications*, 63 F.3d 1540, 1550 (10th Cir.1995).

 The motion before the court focuses on the element of anti-competitive behavior. American argues that the government's claims of predatory conduct in the present action are unfounded; that American's acts reflect legitimate, competitive responses to the entry of low fare carriers in various markets. Anti-competitive conduct is "conduct constituting an abnormal response to market opportunities." *Instructional Sys. Dev. Corp. v. Aetna Cas. and Sur. Co.*, 817 F.2d 639, 649 (10th Cir.1987). Anti-competitive acts violate the Sherman Act if "they impair opportunities of rivals and are not competition on the merits or are more restrictive than reasonably necessary for such compe-

tition" and they "appear reasonably capable of contributing significantly to creating or maintaining monopoly power." *Id.*

▌ Business activity is not "anti-competitive" so long as there is "a legitimate business justification for the conduct." *Multistate Legal Studies*, 63 F.3d at 1550 (citing *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 483, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992)). Specifically, the Act does not "prohibit the adoption of legal and ordinary marketing methods already used by others in the market." *Telex Corp. v. IBM Corp.*, 510 F.2d 894, 926–28 (10th Cir.1975) (per curium). *See also Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518, 524 (5th Cir.1999) (rejecting claim of plaintiff who "may feel very much aggrieved at their success, the tactics it complains of were all fairly simple attempts to generate sales"); *Trace X Chemical, Inc. v. Canadian Industries, Ltd.*, 738 F.2d 261, 266 (8th Cir.1984) ("ordinary business practices typical of those used in a competitive market do not constitute anti-competitive conduct violative of Section 2").

The anti-competitive conduct alleged in the present action is predatory pricing: that American, in the face of low fare carrier competition, shifted from its traditional strategy and adopted competitive tools which combined price reductions and capacity increases, and that the cost of these tools was greater than the revenue obtained. The government alleges that American endured these losses only because it knew, once the low fare carriers were driven out of the core markets, it could reduce service, increase prices, and recoup the losses by supra-competitive pricing. As an initial matter, the court rejects the government's attempt, after American filed its motion for summary judgment, to re-characterize the present action as one grounded, not on "predatory

pricing," but a different, separate claim of "predatory capacity," and so evade the cost analysis mandatory under *Brooke Group*. The problem is not simply that this approach differs radically from the previous positions taken by the government, which have acknowledged the integrated nature of price and capacity, as well as the requirement of cost and recoupment analysis. Rather, the government's approach is a fundamentally flawed attempt to circumvent the high standards for proof of a predatory pricing claim by semantic sleight of hand.

In reality, American's fare prices and its production level—whether characterized as "output" or "productive capacity" are two sides of the same coin.[7] American typically preferred to operate by selling (relatively) fewer seats at higher prices. When it was faced with new entrant, low cost carrier competitors, American chose to match the fares of its competitors rather than lose substantial market share to them. The uncontroverted evidence establishes that the introduction of low fare travel can stimulate passenger demand by a factor of two or three. The government's position, which would permit American to compete in price but require it to turn away new customers, would place the defendant in a competitive straight jacket. The government's expert, Professor Stiglitz, has admitted as much: without reducing its prices in the face of low fare competition, American would find it "hard ... to have sold very many of those seats." (Stiglitz 10–2–2000 Dep. at 162).

■ Productive capacity in the present action cannot be considered in isolation.

Where the evidence otherwise establishes the defendant never engaged in below-cost pricing, the defendant's changes in capacity should not be deemed anti-competitive. The Ninth Circuit's decision in *Pacific Express v. United Airlines*, 959 F.2d 814 (9th Cir.1992) is relevant. In that case, after plaintiff Pacific Express declined to enter into an agreement to feed passengers to United's hub, United expanded the number of flights on routes flown jointly by the two airlines, and entered some routes in which Pacific Express had previously flown without United competition. The court noted that there was no evidence or allegation of below-cost pricing. *Pacific Exp.*, 959 F.2d at 818 n. 1. The court then observed:

> In sum, Pacific Express has not shown that its losses were caused by anything other than increased competition. Undoubtedly, the entry of United, a large, well-known carrier, into Pacific Express' markets injured Pacific Express' business opportunities. However, Pacific Express can only recover if its loss "stems from a competition-reducing aspect or effect of the defendant's behavior." *Atlantic Richfield*, 495 U.S. at 344, 110 S.Ct. at 1894 (emphasis in original). The Sherman Act was "not designed, and has never been interpreted, to reach all business practices, unfair or otherwise, damaging to individual companies." *Cascade Cabinet Co. v. Western Cabinet & Millwork, Inc.*, 710 F.2d 1366, 1374 (9th Cir.1983).

*Id.* at 818. The court holds that the government's claims against American in the

---

7. The theory of predatory pricing *inherently* assumes not only a reduction in price, but a corresponding increase in capacity. "Predatory pricing requires the predator to increase its output during the predatory period. Simply announcing a price cut without increasing output does no good, for the predator will run out of inventory and be unable to steal sales."

3 P. Areeda & H. Hovenkamp, Antitrust Law, ¶¶ 729 and 308 (Rev. ed.1996). The government's eleventh hour suggestion that the present action is a horse of a completely different color—that it is concerned with predatory capacity, not predatory pricing—is unpersuasive. It is still the same horse.

present action must meet the standards of proof set forth in *Brooke Group:* the plaintiff must prove both that the defendant priced its product below an appropriate measure of cost, and that the defendant enjoyed a realistic prospect of recouping its losses by supra-competitive pricing. Under that standard, the government's claims fail. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

In *Brooke Group,* the Court clearly recognized the validity, in appropriate actions, of antitrust liability for predatory pricing. At the same time, however, and in light of the combined requirements of below-cost pricing and proof of recoupment, the Court noted "the general implausibility of predatory pricing" in the average case. *Brooke,* 509 U.S. at 227, 113 S.Ct. 2578 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588–90, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). In *Matsushita,* the Court stressed that "cutting prices in order to increase business often is the very essence of competition." 475 U.S. at 594, 106 S.Ct. 1348.[8] Similarly, in *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 122, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986) the Court warned that "mistaken inferences" concerning allegedly predatory prices "are especially costly, because they chill the very conduct the antitrust laws are designed to protect." *See also Northeastern Tel. Co. v. AT & T,* 651 F.2d 76, 88 (2d Cir.1981). The Supreme Court again expressed skepticism in *Brooke Group:*

> These prerequisites to recovery [proof of below-cost pricing and recoupment] are not easy to establish, but they are not artificial obstacles to recovery; rather, they are essential components of real market injury. As we have said in the Sherman Act context, predatory pricing schemes are rarely tried, and even more rarely successful, and the costs of an erroneous finding of liability are high. The mechanism by which a firm engages in predatory pricing—lowering prices—is the same mechanism by which a firm stimulates competition.... It would be ironic indeed if the standards for predatory pricing liability were so low that antitrust suits themselves became a tool for keeping prices high.

509 U.S. at 226, 113 S.Ct. 2578 (citations and internal quotations omitted).[9]

The rationale for cost-based analysis rests in the limited ability of courts to accurately separate real-world predation from vigorous but lawful competition, and the inherent threat to competition that a failure to make such a recognition creates. There has been no shortage of non-cost measures under which courts would supposedly detect and police unlawful predatory pricing.

---

**8.** The *Matsushita* Court also noted "there is a consensus among commentators that predatory pricing schemes are rarely tried, and even more rarely successful." *Id.* at 589, 106 S.Ct. 1348.

**9.** Another authority has also urged caution:

An argument that a practice is "predatory" is likely to point to exactly those things that ordinarily signify efficient conduct. A plaintiff charging predation will classify a reduction in price, an expansion in output, the building of a new plant, and so on as proof of the defendant's villainy. Unless we have some powerful tools to separate predation from its cousin, hard competition, any legal inquiry is apt to lead to more harm than good. Given the general agreement that almost all price reductions, sales increases, additions to capacity, and so on are beneficial, we need a very good ground indeed to treat a particular instance of such conduct as unlawful.

F. Easterbrook, *Predatory Strategies and Counterstrategies,* 48 U. Chi. L.Rev. 263, 266–67 (1981) (footnotes omitted).

■ The problem with all such strategies is not that we doubt their existence or even their anticompetitive consequences. Rather, identifying them in the particular case without chilling aggressive, competitive pricing is far beyond the capacity of any antitrust tribunal. Once we cross the threshold and permit prices above cost to be condemned as predatory, we throw the doors open to all kinds of speculation about the pricing strategies of large firms-speculation that judges ordinarily address by opening discovery, including evidence of presumed anticompetitive intent, and making a jury the final decision-maker. *Antitrust begins with the premise that all firms, even dominant firms, are permitted to compete aggressively, and that hard competition is a desideratum rather than an evil. Thus prices above the relevant measure of cost become an absolute safe harbor.* Dicta in the Supreme Court's *Brooke* decision commanded as much.

3 P. Areeda & H. Hovenkamp, *Antitrust Law,* ¶ 735 at p. 318 (Rev. ed.1996) (emphasis added, footnotes omitted).

### 3. AMERICAN'S COSTS

Summary judgment is appropriate because the uncontroverted evidence establishes that American did not price its fares below an appropriate measure of costs in the four core flight routes (Dallas to Kansas City, Wichita, Colorado Springs, and Long Beach). To the contrary, the evidence establishes that, throughout the relevant time periods, American consistently priced its products above its average variable costs, the only appropriate, credible measure of costs in the present action. Because the government has failed to establish below-cost pricing as to these routes, the claims relating to those routes will be dismissed. Because the claims associated with the remaining routes are either dependent upon proof of predation in the core routes, or because of other failures of proof, the claims associated with

the remaining routes must also be dismissed.

The Supreme Court in *Brooke Group* expressly concluded that one essential element of any predatory pricing claim was proof that the asserted predator priced its product "below an appropriate measure" of its costs. 509 U.S. at 222, 113 S.Ct. 2578. The court adopted this standard because, "[a]s a general rule, the exclusionary effect of prices above a relevant measure of cost either reflects the lower cost structure of the alleged predator, and so represents competition on the merits, or is beyond the practical ability of a judicial tribunal to control without courting intolerable risks of chilling legitimate price-cutting." *Id.* at 223, 113 S.Ct. 2578 (citing Areeda & Hovenkamp, ¶¶ 714.2, 714.3)

In addition, the court must note that evidence of below-cost pricing is an *essential* element of the government's claim. Under *Brooke Group,* the government must show pricing below an appropriate level of costs. This is an objective standard. Other, non-objective evidence will not transform above-cost pricing into illegal predatory conduct. Above-cost pricing, whether or not it is combined with other conduct, does not "inflict injury to competition cognizable under the antitrust laws." *Brooke Group,* 509 U.S. at 223, 113 S.Ct. 2578. Areeda and Hovenkamp also discuss the effect of this conclusion, stating: "the Supreme Court's *Brooke* holds that no matter how strong and unambiguous the evidence of the defendant's anticompetitive intent, unlawful predation cannot be established without a determination from objective market factors that predation will yield profitable recoupment. Further forceful dicta in that decision indicates that a predatory price requires objective evidence of prices that are below 'some measure of incremental cost.'" 3

Areeda & Hovenkamp, ¶ 738a at p. 359–60.[10]

Finally, the government's expert Professor Stiglitz has agreed that the cost analysis required for determining predation is an objective test, and that the results of that analysis are not affected by evidence of anti-competitive intent. (Stiglitz 12–20–2000 Dep. at 23–24).

*Brooke Group* did not expressly define what measure of cost is "appropriate," since the parties in that action expressly agreed that the relevant measure of costs was average variable costs. *Id.* at 223 n.

---

10. The objective nature of this inquiry was also stressed by the Seventh Circuit in *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1401–02 (7th Cir.1989), where the court observed that subjective measures may be inherently misleading:

> Firms "intend" to do all the business they can, to crush their rivals if they can. "'[I]ntent to harm' without more offers too vague a standard in a world where executives may think no further than 'Let's get more business,'" *Barry Wright [v. ITT Grinnell Corp.]*, 724 F.2d [227,] 232 [(1st Cir. 1983).]* Rivalry is harsh, and consumers gain the most when firms slash costs to the bone and pare price down to cost, all in pursuit of more business. Few firms cut price unaware of what they are doing; price reductions are carried out in pursuit of sales, at others' expense. Entrepreneurs who work hardest to cut their prices will do the most damage to their rivals, and they will see good in it. You cannot be a sensible business executive without understanding the link among prices, your firm's success, and other firms' distress.
> . . . .
> Almost all evidence bearing on "intent" tends to show both greed-driven desire to succeed and glee at a rival's predicament. Take, for example, the statement David Rust made to Phillip Gressell: "We are going to run you out of the egg business. Your days are numbered." Undoubtedly Rust wanted to leave Gressell scratching in the dust, but drive to succeed lies at the core of a rivalrous economy. Firms need not like their competitors; they need not cheer them on to success; a desire to extinguish one's rivals is entirely consistent with, often is the motive behind, competition. Or take Lois Rust's statement that Rose Acre's prices were unrelated to its costs. Plaintiffs treat this as a smoking gun. Far from it, such a statement reveals Rose Acre to be a price taker. In perfect competition, firms must sell at the going price, no matter what their own costs are. High costs do not translate to the ability to collect a high price; someone else will sell for less. Monopolists set price by reference to their costs (to be precise, they set quantity where marginal cost equals marginal revenue, a measure reflecting the shape of the market's demand curve, and charge the price the market will bear *at that quantity*); competitors set price by reference to the market. A predator, too, is highly sensitive to its costs of doing business; it calculates how much sacrifice it needs to make (and could bear), and uses that as the basis of its prices. *So the statement that Rose Acre does not pay attention to its own costs when setting price reveals that the firm was acting as a competitor rather than a monopolist.* Yet statements of this sort readily may be misunderstood by lawyers and jurors, whose expertise lies in fields other than economics.

The Third Circuit has expressed a similar view:

> Advo officials themselves have used aggressive-sounding language. Its CEO, Robert Kamerschen, once directed his managers "to seize the OPPORTUNITY inherent in the stumbling PROBLEMS of the newspaper industry," and quoted McDonald's founder Ray Kroc for the advice that "[w]hen [you] see the competition drowning, ... stick a water hose down their throats." App. at 459.
> The antitrust statutes do not condemn, without more, such colorful, vigorous hyperbole; there is nothing to gain by using the law to mandate "commercially correct" speech within corporate memoranda and business plans. Isolated and unrelated snippets of such language "provide no help in deciding whether a defendant has crossed the elusive line separating aggressive competition from unfair competition." *Morgan v. Ponder*, 892 F.2d 1355, 1359 (8th Cir.1989).

*Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191, 1199 (3rd Cir.1995).

1, 113 S.Ct. 2578. Similarly, the Tenth Circuit has not adopted a definitive standard for appropriate costs. *Multistate Legal Studies*, 63 F.3d at 1549 n. 5.

However, the authority for the use of marginal costs or average variable costs to determine the existence-or absence-of predation is ample. Without formally adopting a particular cost standard, the *Brooke Group* Court stated, in dicta, that the alleged predator's prices must be shown to have fallen beneath some measure of "incremental" cost:

> Although *Cargill* and *Matsushita* reserved as a formal matter the question "whether recovery should *ever* be available ... when the pricing in question is above some measure of incremental cost," the reasoning in both opinions suggests that only below-cost prices should suffice, and we have rejected elsewhere the notion that above-cost prices that are below general market levels or the costs of a firm's competitors inflict injury to competition cognizable under the antitrust laws.

509 U.S. at 223, 113 S.Ct. 2578 (citations omitted).

Following *Brooke Group*, the marginal[11] or average variable costs test advocated by Professors Areeda and Turner has found widespread acceptance. *See Tri–State Rubbish, Inc. v. Waste Management, Inc.*, 998 F.2d 1073, 1080 (1st Cir.1993); *Northeastern Tel. Co. v. AT & T*, 651 F.2d 76, 88 (2nd Cir.1981); *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 51 F.3d 1191 (3rd Cir. 1995); *Stearns Airport Equip. Co. v. FMC Corp.*, 170 F.3d 518 (5th Cir.1999); *Arthur S. Langenderfer, Inc. v. S.E. Johnson Co.*,

729 F.2d 1050 (6th Cir.1984); *MCI Communications Corp. v. AT & T*, 708 F.2d 1081, 1115–16 (7th Cir.1983); *International Travel Arrangers v. NWA, Inc.*, 991 F.2d 1389, 1396 (8th Cir.1993); *Janich Bros., Inc. v. American Distilling Co.*, 570 F.2d 848, 857 (9th Cir.1977).[12] As the current version of the Areeda and Turner treatise notes:

> The quoted passage [from *Brooke Group*] also suggest[s] that predatory prices must be below some measure of "incremental" cost. Because this is essentially a marginal cost test, and since average variable cost is used principally as a surrogate for marginal cost, which is difficult to measure, *Brooke* might be read as endorsing average variable as well as marginal cost predatory pricing tests.

Areeda & Hovenkamp, ¶ 723d2, at 231–32.

The Tenth Circuit has observed that "evidence of marginal cost or average variable cost is extremely beneficial in establishing a case of monopolization through predatory pricing [since the] relationship of a firm's price and its marginal cost is regarded as the best indicator of the competitive health of an industry." *Pacific Eng'g & Prod. Co. of Nevada v. Kerr–McGee Corp.*, 551 F.2d 790, 797 (10th Cir. 1977). Any sales above average variable costs help to cover a firm's fixed costs. Sales at such prices are "rational, competitive behavior" since they "contribute to the company's cash flow". *Id.*

Further, this court has previously made use of a marginal cost test in a Section 2 Sherman Act claim. In granting summary

---

**11.** Marginal cost is the increment to total cost arising from an additional unit of output. Because "marginal cost is extremely difficult to measure" in the real world, Areeda and Turner advocate analysis based on average variable cost, that is, "all costs properly classified as variable, including use depreciation, divid-

ed by relevant output." Areeda & Hovenkamp, ¶ 740a, at 378, 379.

**12.** The Tenth Circuit's decision in *Instructional Sys. Dev. Corp. v. Aetna Cas. & Sur. Co.*, 817 F.2d 639, 648 (10th Cir.1987), applying a total cost standard to a predation claim, was decided prior to *Brooke Group*.

judgment on plaintiff's claims alleging, among other things, that the defendant committed "predatory hiring" by hiring away staff physicians with allegedly inflated salaries, the court in *Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp.*, 45 F.Supp.2d 1164, 1196 (D.Kan.1999) observed the absence of

> any basis for concluding that the salaries paid to the physicians are so "excessive" that they reflect predatory conduct under the antitrust laws. First, as noted above, in the context of the overall economic picture, the hiring of the physicians did not produce any losses. There is no evidence Wesley will not recover its marginal costs in employing the physicians.

Similarly, Judge Lungstrum, citing Tenth Circuit decisions such as *Pacific Engineering* has concluded: "It is clear, however, that the Tenth Circuit leans heavily in favor of using marginal or average variable cost in evaluating predatory pricing claims." *Bushnell Corp. v. ITT Corp.*, 175 F.R.D. 584, 588 (D.Kan.1997).

The court concludes that the plaintiff's claims of predatory pricing must be tested against American's average variable costs. Average variable cost, as a measure of predatory pricing, enjoys not only the weight of authority, it is also most congruent with the goal of the Sherman Act: prohibiting unfair competitive practices while simultaneously encouraging open, indeed vigorous price competition. That is, "prices at or above marginal cost, even though . they are not profit-maximizing, should not be considered predatory." Phillip Areeda & Donald F. Turner, *Predatory Pricing and Related Practices Under Section 2 of the Sherman Act*, 88 Harv. L.Rev. 697, 711 (1975).

The uncontroverted facts establish that, in the relevant periods on the core routes, American did not price fares below its average variable costs. As indicted above, American instituted and maintained a number of "decision measures" which it used to evaluate route performance. These measures are used for general flight and route performance; they are not used for the purposes of financial reporting. There are two main categories of decision measures in American's system: a fully allocated earnings measure (FAUDNC) and a series of variable earnings measures (VAUDNC and VAUDNS). The fully allocated earnings measure reflects American's revenues less all categories of costs within American's decision accounting system, while the variable earnings measures reflect revenues minus the variable expense categories of costs in that system. Collectively, VAUDNS and VAUDNC represent over 72% of total costs in American's decision accounting system.

In the course of discovery, the government has proposed an alternative or modification to the variable earnings measures: VAUDNC–AC, which includes all of the costs within VAUDNC and the adjusted pre-tax costs of aircraft ownership. The effect of adding these costs, of course, is to reduce the apparent profitability of American's routes. Collectively, VAUDNC–AC represents approximately 80% of American's total costs. The government's experts concede that VAUDNC–AC measures American's short run average variable costs on the route level.[13]

---

**13.** The court does not view such long-term ownership cost as truly variable with the addition of capacity on the core routes. At least under the circumstances of this case, where American shifted existing aircraft to the new routes, such costs are more appropriately viewed as fixed. However, since American's marginal revenues exceeded its costs even when measured by "VAUDNC–AC," this conclusion is not essential to the court's holding.

The facts also establish that, under each of the variable cost measures, VAUDNC, VAUDNS, and the government's VAUDNC–AC, American's revenues exceeded its average variable costs at the route level over the alleged predation periods for the only four core routes on which there is any expert evidence (DFW–MCI, DFW–ICT, DFW–COS, and DFW–LGB). In addition, there is *no* evidence that American's revenues failed to meet its variable costs *however measured* on the remaining four core routes (DFW–PHX, DFW–EWR, DFW–TPA, and DFW–OAK).

As a result, the government can preserve its claims of predation as to these core routes only by advocating a marked departure from the average variable cost test which is the explicit preference of the recent weight of authority, the leading commentators, and the guidance implicitly provided by the Supreme Court in *Brooke Group*.[14]

The government advocates precisely such a departure, offering a variety of cost measures through its expert professor Berry. Such alternative measures, which appear to have been created solely for the purpose of rescuing the government's claims in the present action, lack merit.

The government initially suggests that average variable costs should be discarded because in the present action "there is direct evidence of marginal, or incremental, cost." (Resp. at 27). However, the government lacks direct evidence of marginal cost, which as noted earlier, is extremely difficult to measure in real world conditions. Indeed, the government's experts have explicitly conceded that they did not—and could not—directly measure American's marginal costs. What the government offers instead is not direct evidence of marginal costs, but simply another proxy for measuring such costs.[15]

The government asks the court, in its first and fourth proposed tests, to determine that American predated because its competitive actions reduced its effective profitability. In Test One, the government offers evidence evaluating whether certain of American's performance measures experienced a decline after capacity changes on the core routes, seeking to determine whether the "incremental revenue generated by American's capacity addition was below the incremental cost of that capacity addition." Berry Rep't. at ¶ 252. In Test Four, the government claims to measure directly incremental costs and revenues by the use of VAUDNC–AC and additional revenue calculations. According to this

---

**14.** Professor Hovenkamp in a letter to the Department of Justice has warned that alternative measures of costs (beyond average variable costs) "are problematic in that (1) they represent severe departures from existing case law; and (2) will be hazardous to administer in court." (Def. Exh. 123, at 4). The opinion letter was inadvertently delivered by Justice Department to American, and the court has previously determined that under the circumstances of the case the plaintiff has waived any claim of privilege associated with the letter. Mem. Order, September 28, 2000 (Dkt. No. 347).

**15.** The government also rationalizes such an incremental cost measure on the grounds that

the standard approach (using average variable costs) is inappropriate where average variable costs are significantly below marginal costs. The court rejects such an approach for three reasons. First, there is no evidence to support it. Second, existing authority is to the contrary. *See Continental Airlines, Inc. v. American Airlines, Inc.*, 824 F.Supp. 689, 698 (S.D.Tex.1993) (noting that in the airline industry "variable costs change very little, AVC is close to MC (marginal cost) at all levels of output"). Finally, such an approach is also contrary to the previously stated position of the United States, which has observed: "In general, airlines' average variable costs exceed their marginal costs." (Def.Exh.144).

test, predatory sacrifice is demonstrated if "incremental revenues" are below incremental costs. In its second and third proposed tests, the government compares revenues and costs at the route level, but utilizes a measure of fully-allocated, rather than variable, costs that is equivalent to total cost for all practical purposes.

The court rejects the use of the government's Test One and Test Four, since it is plain that both tests are indeed short-run tests for profit-maximization. Such an approach, focusing on whether a company has sacrificed some level of profit to compete more effectively against another business, has been rightly rejected by the courts.

A rule of predation based on the failure to maximize profits would rob consumers of the benefits of any price reductions by dominant firms facing new competition. Such a rule would tend to freeze the prices of dominant firms at their monopoly levels and would prevent many pro-competitive price cuts beneficial to consumers and other purchasers. In addition, a "profit maximization" rule would require extensive knowledge of *demand* characteristics— thus adding to its complexity and uncertainty. Another, and related, effect of adopting the "profit maximization" theory advocated by [plaintiff] would be to thrust the courts into the unseemly role of monitoring industrial prices to detect, on a long term basis, an elusive absence of "profit maximization." Such supervision is incompatible with the functioning of private markets.

*MCI Communications,* 708 F.2d at 1114 (footnotes omitted). *See also Stearns Airport Equipment,* 170 F.3d at 533, n. 14 (theories of predation based upon the failure of the defendant to maximize profits is "no longer tenable in the wake of *Brooke Group* "); *In re IBM Peripheral EDP Devices Antitrust Litig'n,* 459 F.Supp. 626, 632 (N.D.Cal.1978) (finding that profit

maximizing tests "would be unmanageable, preclude a firm with monopoly power from competing on the merits, and harm consumers").

The commentators also reject such an approach:

Judicial queries about whether a price is below the short-run profit-maximizing level face formidable obstacles. As a practical matter, the price that actually maximizes a defendant's profits in the circumstances will seldom be knowable. It depends not only on the defendant's costs at the moment but also on projections of what those costs would be at higher and lower levels of output. It depends not only on current sales volume but also on projections of what demand would be for the defendant's product at higher and lower prices. Furthermore, we cannot assume that a price reduction by the defendant fails to maximize its short-run profits, for expansion or entry by others brings new production that will itself force lower market prices. In those circumstances, the defendant's lower price may well maximize short-run profits or minimize losses. Nor can we assume that a subsequent price rise indicates that the previous price was not profit maximizing. Just as additional supply from others forces a market price to fall, the withdrawal or contraction of others' output will naturally lead to a price rise.

3 Areeda & Hovenkamp, at ¶ 736c2, at 335. Similarly, in an opinion letter to the government, Professor Hovenkamp has expressed the view that application of proposed Department of Transportation rules (which would condemn as unfair practices acts which would cause a carrier to forgo more revenue than it otherwise might have made) "would be a litigation nightmare if applied as a general Sherman Act standard, and would invite the excessive speculation about reasonable alternative strate-

gies and the like. If adopted as a general Sherman Act rule of law—which is necessarily capable of being enforced by private plaintiffs—such a rule would have completely unacceptable consequences." (Def. Exh. 123, at 5).

The government concedes that short-run profit maximization tests are improper under established law, but seeks to avoid recognizing that its proffered tests have precisely this effect. To that end, the government argues in its response that Professor Berry's tests may be legitimately employed because they "do not involve a search for some hypothetical point of profit maximization." (Resp. at 32). The court disagrees with what is essentially a kind of semantic evasion. The tests advocated by the government would effectively condemn as illegal any pricing or capacity decision which would reduce the "predator's" profits. That is, the only way a company could protect itself from claims of predation would be to *maximize profits.* Indeed, the government's own expert, Professor Stiglitz, expressly concedes that Professor Berry's Tests One and Four focus on precisely on whether there was a "sacrifice, did the firm experience a loss relative to what it could have otherwise done in the short run [?]" Stiglitz 12–21–00 dep. at 83. That is, according to Stiglitz, these tests ask "in the short run today did I produce more than was profit maximizing." *Id.*

Further, even if they were not invalid as a matter of law, the court finds that Tests One and Four are incurably flawed in their application to the facts of this case. Both tests focus on route performance before and after American's capacity increases on the relevant routes. But the tests do not attempt the impossible task of measuring how American would have performed on the relevant routes without the capacity increases, that is, if it had adhered, in the face of vigorous price-cutting competition, to its earlier strategy of continuing to offer relatively fewer seats. A firm reacting to

new entrant, low price competition will always be worse off in reacting to such competition.

Tests One and Four fail to reliably measure costs. Test One supposedly measures declines in VAUDNC, VAUDNC–AC, and FAUDNC in conjunction with capacity changes. Test Four measures the increase in VAUDNC–AC costs in comparison to what Professor Berry deems elements of incremental revenue. In neither case has the government attempted to identify the actual costs associated with the capacity additions. Moreover, both tests assume a static environment as to underlying expenses and the number of passengers flying a given route. Without such identification of costs, the approach suggested by the government would attribute an increase in fuel or labor costs (with the associated decrease in route profitability) solely to the capacity addition. These tests thus require the dubious assumption that each passenger on a route would have paid the same price, for both periods selected by the government, regardless of the typical seasonal variations in the airline industry. The tests advocated by the government simply do not permit the court to reliably assess American's costs for the relevant period on the routes in question.

The court rejects Tests One and Four for the additional reason that both tests address only the incremental costs and revenues *and those costs and revenues only from the added capacity.* They do not measure the costs and revenue obtained from service to the entire relevant market—which the government in this case has previously defined as the entire route, rather than a mere subset of one carrier's flights on that given route. Given the government's relevant market definition, its claim requires proof that American underpriced its services on the entire

market/route, not just one particular fraction of those services. *See, e.g., Bushnell Corp.*, 175 F.R.D. at 588. Liability under the Sherman Act requires proof that "the full product line was sold at below the relevant cost measure, not simply one or a small subset of products." Areeda & Hovenkamp, ¶742c at pp. 418. By requiring that the focus be on the entire product line or relevant market, these authorities necessarily reject the approach implicit in Tests One and Four-that predatory conduct can be determined solely by focusing on one fraction of the market in an attempt to determine whether the predator might have increased its profits by avoiding the increase in capacity.

The court finds that, in reality, the government's two proposed incremental cost tests focus on whether the defendant, in the short run, failed to maximize its profits. Such tests are inappropriate as a matter of law to determine the existence of predatory conduct in the present case.

As an alternative measure of predation, the government also advocates Tests Two and Three. Both measures are based on American's Decision FAUDNC. In Test Two, the government considers whether FAUDNC became negative after American's additions in flight capacity and reductions in prices. Test Three seeks to determine whether, following price reductions and capacity increase, FAUDNC on a route was "persistently" negative.

As discussed above FAUDNC includes essentially all (at least 97% and upwards of 99%) of American's total costs. It includes variable expenses, the costs of aircraft ownership, fixed overhead, interest, return on equity and income taxes. The court finds that the use of FAUDNC implicit in the government's second and third tests is the functional equivalent of applying an average total cost test to access predation. Such an approach clearly is against prevailing law. See 3 Areeda & Hovenkamp, ¶741c at p. 398 ("Average total cost tests appear to be ruled out by forceful dicta in the Supreme Court's *Brooke* opinion that a price must be shown to be lower than some measure of 'incremental' cost.").[16] Accordingly, the court finds that tests of alleged predation based on FAUDNC are legally insufficient because such tests ultimately rest on American's total costs.

Moreover, FAUDNC must be rejected as an "appropriate measure of costs" for present purposes, since the uncontroverted facts establish that FAUDNC is a *fully allocated earnings measure* reflecting *fully allocated costs*.[17]

16. The government also urges the court to adopt FAUDNC as a measure of average total cost, and argues that such a standard is permissible in light of *Instructional Systems Dev. Corp. v. Aetna Cas. & Sur. Co.*, 817 F.2d 639 (10th Cir.1987). As the court notes above, average total cost is not an appropriate measure of costs to determine predation under *Brooke Group*. The court rejects the government's suggestion that *Instructional Systems* compels a different result. First, as the Tenth Circuit stated in a case decided after *Instructional Systems*, it had not expressed any definitive ruling on the issue of appropriate costs. *Multistate Legal Studies*, 63 F.3d at 1549 n. 5. Moreover, *Instructional Systems* was decided prior to *Brooke Group*, and the Supreme Court's observation there that "appropriate costs" are to be determined in light of incremental, not total costs. As Judge Lungstrum has observed, citing *Pacific Eng'g & Prod. Co. of Nevada v. Kerr–McGee Corp.*, 551 F.2d 790 (10th Cir.1977), the Tenth Circuit has indicated that "marginal or average variable cost, as opposed to total cost, is the best indicator regarding predatory pricing." *Bushnell Corp.*, 175 F.R.D. at 588.

17. "An average cost figure is said to be *fully allocated* when it includes all costs that are encountered in a single firm or plant, whether or not they are incurred in the production of the product or service under analysis." 3 Areeda & Hovenkamp, ¶741f at pp. 409–10. (emphasis in original.)

It includes costs beyond those involved in individual flights or routes, costs such as general operating and overhead expenses. FAUDNC includes fixed overhead expenses such as aircraft overhead (involving fixed expenses for maintenance facilities in Dallas and Fort Worth, rent, computer systems, communications and utilities) and system overhead (administration of flight attendant staffing, headquarters marketing and sales, capacity planning, corporate communications, pricing and yield management, flight operations and safety, cabin design, and crew scheduling). These general operating expenses are arbitrarily allocated by American's decision accounting system to the flight level; they do not represent the costs associated with a particular flight.

Because the measure reflects American's allocated costs, FAUDNC is inappropriate for determining potential predation. Such costs are an "arbitrary allocation of costs among different classes of service," and "cannot purport to identify those costs which are *caused* by a product or service, and this is fundamental to economic cost determination." *MCI Communications*, 708 F.2d at 1116. (emphasis in original) "Average total cost measures of predation degenerate into nonsense when costs are measured by fully allocated rather than incremental methods." 3 Areeda & Hovenkamp, ¶ 741f at pp. 409. Accordingly, "the proper measure of fixed costs is not fully allocated costs, but rather incremental costs." *Id.* at 410.

There is no admissible evidence that the various elements of FAUDNC are in fact avoidable over any relevant period of time. It is uncontroverted that the government's experts have not attempted to identify which of the various costs contained within FAUDNC are incremental or avoidable. FAUDNC is not an appropriate cost measure for purposes of determining whether

American engaged in predatory conduct in violation of the Sherman Act.

In sum, the court finds that American did not engage in below-cost pricing, as measured by the only appropriate measures of costs offered in the present action (VAUDNC, VAUDNS, or VAUDNC–AC). Since the government's claims fail to meet this essential element of proof, summary judgment is appropriate.

## 4. MEETING COMPETITION

In addition, the court finds that American is entitled to summary judgment, since it is uncontroverted that American's prices only matched, and never undercut, the fares of the new entrant, low cost carriers on the four core routes. The United States has failed to identify any instance in which American undercut the price of any rival on the DFW–ICT, DFW–MCI, DFW–COS, or DFW–LGB routes with any published fare during the relevant time period. The government's claim of predatory pricing therefore fails, since the evidence establishes that American's conduct—meeting the competition's prices—is precisely the sort of activity the antitrust laws are intended to encourage.

The meeting competition defense to Section 2 liability is predicated on a similar statutory defense to price discrimination claims under the Robinson–Patman Act (15 U.S.C. § 13(b)). "If we begin with the premise that antitrust forces no firm to yield market share to rivals, this reason justifies in principle a 'meeting competition' defense—namely, that the alleged predator cuts its price only to match a rival's price." 3 Areeda & Hovenkamp, ¶ 748a at p. 461. This authority holds that the defense would apply even if the alleged predatory competitor reduces prices below its average variable costs, so long as "the cut merely matches the smaller firm's cut and is no longer in duration." *Id.*, ¶ 748 at

p. 462. "[A]ccusations of predation are apt to be misplaced [unless] the supposed predator is quite clearly responsible for initiating the price cuts rather than responding to the moves of others or to general conditions." *Lormar, Inc. v. Kroger Co.*, 1979–1 Trade Cas. (CCH) ¶ 62,498, at 76,913 (S.D.Ohio 1979). The essence of the defense was summarized in *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F.Supp. 423 (N.D.Cal.1978), *aff'd sub nom. Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir.1980), where the court directed a verdict in favor of a defendant on a Section 2 claim. The court explicitly agreed with the defendant IBM's argument that its price reductions were protected since those reductions were merely to meet its competitor's prices. The court wrote:

> The "meeting competition" defense is similar to a statutorily recognized defense to a price discrimination charge under the Robinson–Patman Act. See 15 U.S.C. § 13(b). A company should not be guilty of predatory pricing, regardless of its costs, when it reduces prices to meet lower prices already being charged by its competitors. To force a company to maintain non-competitive prices would be to turn the antitrust laws on their head. Such a price cut cannot create the kind of market position that the prohibition of predatory pricing was meant to preclude. The evidence in this case indicates that IBM's prices ... were set at a level established by Memorex and the other plug compatible manufacturers. In fact, IBM's prices were higher in most instances even after the reductions. Memorex will not be heard to complain that they should have been still higher so that it could take even more business away from IBM.

458 F.Supp. at 433.

"It is not anticompetitive for a company to reduce prices to meet lower prices already being charged by competitors."

*Richter Concrete Corp. v. Hilltop Concrete Corp.*, 691 F.2d 818, 826 (6th Cir.1982) (affirming directed verdict in Section 2 Sherman Act action). The Sixth Circuit later reiterated this holding in *D.E. Rogers Assoc's v. Gardner–Denver Co.*, 718 F.2d 1431, 1438 (6th Cir.1983), *cert. denied*, 467 U.S. 1242, 104 S.Ct. 3513, 82 L.Ed.2d 822 (1984). Similarly, the defense was discussed in *Knuth v. Erie–Crawford Dairy Coop. Ass'n*, 326 F.Supp. 48 (W.D.Pa. 1971), *aff'd in pertinent part, rev'd in part*, 463 F.2d 470 (3d Cir.1972). The court noted that the evidence established that the defendant cooperative had not undercut its rivals' prices, but had been "content to meet the competition on equal grounds." 326 F.Supp. at 52. The court then concluded:

> In a fact situation like this, to hold that a seller is helpless and must stand by watching its business being destroyed would be a perversion of the result sought to be obtained by the Sherman Act. The antitrust laws were designed to encourage competition and to prevent predatory action. To outlaw the action of the Co–Op in defending its markets by the time-honored and legally sanctioned method of meeting competition would be to turn the shelter of the antitrust legislation into a weapon which would kill free enterprise instead of protecting and promoting it.

Id. at 52–53 (footnote omitted).

Although the Tenth Circuit has not explicitly applied the meeting competition defense in a Section 2 predatory pricing case, there is strong inferential support for the idea that the defense may be appropriate in a given case. In *Multistate Legal Studies*, 63 F.3d at 1550, the court noted that the defendant bar review study course advocated, inter alia, a defense that their provision of free supplemental review courses in Colorado was not illegal preda-

tory conduct, since their action was simply designed "to meet their competitors' prices, even if those prices were predatory." The Tenth Circuit rejected the argument on purely factual grounds, noting that the plaintiff's similar supplemental workshops were offered only *in other markets*. Thus, the court wondered why defendants "should be allowed to price ... below cost in Colorado in order to meet [plaintiff's] prices in California, Alabama, Tennessee, and Georgia." *Id.* For present purposes, it is sufficient to note that the court did *not* rule that the meeting competition defense was invalid. Indeed, the court held only that "[d]etermining when the meeting-competition defense properly applies to a predatory pricing claim can require substantial analysis," and then concluding that the defendants in that action had failed to provide factual support for the defense. *Id.*

The government responds to American's assertion of the meeting competition defense by advancing several arguments: first, that the defense has never been applied in a Sherman Act case; second, that decisions such as *ILC Peripherals* are distinguishable; and third, that the defense is inapplicable in the present action. None of these arguments is persuasive. First, the defense has clearly been applied to a Sherman Act claim. The Sixth Circuit applied the defense to precisely such a claim in *Richter Concrete*, 691 F.2d 818 (6th Cir.1982). Second, the court finds that *ILC Peripherals* is directly applicable. In that case, the evidence established that the defendant matched the prices of its competitors, and that the defendant's revenues still exceeded its average variable costs. It is uncontroverted in the present action that American at most matched the fares of its competitors, and its resulting revenues always covered its average variable costs.

In the view of the court, the meeting competition defense has particular application where, as here, the alleged predator's revenue still exceeds its variable costs. In *Chillicothe Sand & Gravel Co. v. Martin Marietta Corp.*, 615 F.2d 427, 433 (7th Cir.1980), the plaintiff alleged that defendant priced its CA–6 grade gravel at or near that of the plaintiff. The court held that the meeting competition defense applied:

It should come as no surprise to CS & G that Martin Marietta would respond by pricing in a similar manner. Indeed, a failure by Martin Marietta to so price soon would have left it with no CA–6 sales. Martin Marietta's bidding practices were the essence of competition and contributed to the highly competitive market for CA–6 sales.

*Id.* Similarly, in *California Computer Products, Inc. v. IBM Corp.*, 613 F.2d 727, 741–42 (9th Cir.1979), the court wrote:

The test of the reasonableness of the foregoing pricing actions, and the principal question facing us in this case, is whether IBM which was the inventor and dominant supplier of the disk products in question had the right to respond to the lower prices of its competitors with reduced, but still substantially profitable, prices on its own products. We conclude that it did.

CalComp's principal damages claim is for lost revenues as a result of price reductions it made following IBM's 2319B and FTP announcements. But since these price reductions admittedly resulted from competition by IBM and since, as both CalComp's and IBM's evidence clearly demonstrates, IBM's stimulus to price competition was in turn competition from peripheral equipment manufacturers such as CalComp it is impossible to say that CalComp's losses represent compensable "injury" from

acts of IBM unnecessarily Excluding or Restricting competition. Rather, IBM's price cuts were a part of the very competitive process the Sherman Act was designed to promote. To accept Cal-Comp's position would be to hold that IBM could not compete if competition would result in injury to its competitors, an ill-advised reversal of the Supreme Court's pronouncement that the Sherman Act is meant to protect the competitive process, not competitors.

(citations and footnote omitted). *See also Hillside Dairy Co. v. Fairmont Foods Co.,* 1980–2 Trade Cas. ¶ 63,313 (N.D.Ohio 1980) (considering meeting competition defense where evidence established that defendant had inadvertently beaten rather than met its competitor's dairy prices, and holding that the defense would still apply if defendant had made substantial efforts to verify its competitor's prices and covered its average variable costs).

The government's suggestion that the meeting competition defense itself should be rejected or deemed somehow inapplicable in the present Sherman Act action is also without merit. "[A]s a general proposition a meeting competition defense [should] be permitted in a Sherman Act predatory pricing case [where the defendant] merely matches the smaller firm's cut and is no longer in duration." 3 Areeda & Hovenkamp, ¶ 748a at p. 462. In the present action, the uncontroverted facts fail to establish any exception to the defense, for example, that the larger competitor began the price cutting, or that its price reductions exceeded those of its smaller competitor either in amount or in duration. Here, it is clearly established that American at most matched the prices of its competitors. American responded to, rather than initiated, non-promotional price reductions by low cost carriers. In many instances, American's low fares matched those of the competition at face value, but were accompanied by greater restrictions and were offered on fewer flights.

To buttress its suggestion that the defense of meeting competition should be excluded in Sherman Act claims, the government cites to the previous (1994) supplementary edition of Areeda and Hovenkamp. The current edition, cited earlier, explicitly states that "as a general proposition a meeting competition defense [should] be permitted in a Sherman Act predatory pricing case." *Id.* (Rev. ed.1996).

The government also suggests that American is not entitled to the recognized meeting competition defense, because the defense is not available when the larger competitor matches the lower promotional price of a new entrant. Areeda & Hovenkamp, ¶ 748b at p. 463. But the facts establish, and the government's expert concedes, that the low cost carriers in the present action were not offering promotional prices. To the contrary, these airlines were founded on the idea of offering consistent low fares as a permanent part of their marketing strategy. Moreover, the cited authority explicitly limits the exception for "promotional prices" to the period before the new entrant acquires substantial market presence, defined as a 10 percent market share. *Id.* at p. 463. Here, each of the new entrant low cost carriers achieved substantial market presence prior to the period of alleged predation.

The government next attempts to avoid application of the defense by the argument, yet again, that in the present action American not only reduced its fares, it increased the number of flights and therefore the number of seats available on the core routes. The argument is no more valid here, regarding the meeting competition defense, than it was in the government's earlier attempt to avoid the clear

rules regarding the elements of its predatory pricing claim.

First, the government cites no authority for the proposition that the defense is somehow nullified by the allegation that a defendant not only reduced prices, but increased capacity. More importantly, the court concludes that the meeting competition defense applies even if American increased its product output. Price reductions stimulate demand. The evidence in the present action establishes that low cost carriers expect, indeed count on, the fact that the introduction of such service stimulates dramatically (doubling or tripling) the number of passengers on a route.

The ability to match prices implicitly but necessarily requires the ability to increase sales capacity. Granting an established competitor the "right" to reduce its prices in the face of new entrant competition, but simultaneously locking it into its current sales volume, prohibiting it from increasing its capacity to satisfy increased demand and indeed requiring it to turn away new, willing customers, drains all real meaning from the supposed "right" to match prices. Price matching inherently assumes a corresponding increase in output to compensate for the lower market price.

The United States next suggests that, even if the meeting competition defense were applicable generally, it would not protect American here, since there is, according to the agreement, some evidence of American "potentially" pricing its fares below those of its competitors through use of corporate contracts. (Resp. at 70). Potential undercutting is insufficient to create a triable question of fact. Moreover, the evidence cited by the United States does not relate to any of the four core routes allegedly subject to American's "predation." As noted earlier, the uncontroverted evidence establishes that American's published fares for air travel on the

four core routes at most matched and frequently exceeded the published fares of its competitors.

Finally, the United States argues that American "effectively undercut" its competitors because it not only reduced prices, it also offered a better product at a matching price. Clearly the alternative—requiring American to charge a premium for its allegedly superior quality—would require courts to engage in a series of subjective price comparisons based on intangible values. The government asserts that this is not a manageable rule of law, and that the court should refuse to consider any meeting competition defense. This is not the correct approach, and has been recognized and rejected in the leading treatise authority.

An established firm may have established buyer loyalty, favored distribution channels, or other product differentiation advantages. If so, a new entrant may have to charge less to induce buyers to try its product. In this situation, for the established firm to meet that nominal price is really to undercut it. But how is a court to decide the requisite premium necessary to equate demand for two somewhat different products? Because the task cannot be performed with anything approaching precision, courts applying the meeting competition defense of the Robinson–Patman Act have not limited it to meeting the price of identical goods. Nor should courts applying the Sherman Act.

Areeda & Hovenkamp, ¶ 748 at pp. 462–63 (citation omitted).

## 5. RECOUPMENT

Even assuming American engaged in below-cost pricing on relevant routes, the government must prove a dangerous likelihood that American would subsequently recoup its losses by supra-competitive pricing. *Brooke Group,* 509 U.S. at 224–25,

113 S.Ct. 2578. This burden is not small. In *Brooke Group,* the Court noted the "general implausibility" of predatory pricing and the underlying notion of recoupment. *Id.* at 227, 113 S.Ct. 2578. Accordingly, the Court set forth a standard of proof which is expressly "not easy to establish." *Id.* at 226, 113 S.Ct. 2578. In setting this high standard, the Supreme Court "cleared the way for summary rejection of most predatory pricing claims." Areeda & Hovenkamp, ¶ 726d2 at p. 267. That is also the appropriate result in this case.

The government must prove on the basis of objective evidence that a dangerous probability of recoupment exists. This is because predatory pricing recoupment analysis "requires an estimate of the cost of the alleged predation and a close analysis of both the scheme alleged by the plaintiff and the structure and conditions of the relevant market." *Brooke Group,* 509 U.S. at 226, 113 S.Ct. 2578. Subjective evidence of alleged intent to recoup is insufficient where objective evidence fails to indicate the dangerous probability of recoupment. Such subjective evidence in *Brooke Group*—internal comments by the defendant's executives anticipating eventual profits—was rejected by the Supreme Court as a basis for finding defendant would likely recoup its losses, since there was "no objective evidence ... it had any real prospect of actually recouping." *See Id.* at 241, 113 S.Ct. 2578.

This court has previously noted that a high market share cannot be inferred as creating actual or potential monopoly power where a given market has low entry barriers and other market factors rendering monopoly power unlikely. *Wichita Clinic v. Columbia/HCA Healthcare,* No. 96–1336–JTM, 1997 WL 225966 at *4–6 (D.Kan. April 8, 1997). Thus, where barriers to new market entry are limited, "market circumstances or deficiencies in proof would bar a reasonable jury from finding that the scheme alleged would likely result in sustained supracompetitive pricing, [and thus] summary disposition of the case [would be] appropriate." *Brooke Group,* 509 U.S. at 226, 113 S.Ct. 2578. As Professors Areeda and Hovenkamp comment, the most conclusive evidence of the lack of significant barriers to entry is actual entry. 2A Areeda & Hovenkamp, ¶ 420b at p. 58,

Here, summary judgment is appropriate because the uncontroverted evidence establishes that DFW routes are not structurally susceptible to the supra-competitive prices which is a prerequisite to a successful predatory pricing scheme. That is, the nature of the relevant DFW airline routes demonstrates that recoupment is not a dangerous likelihood. No hub airport in the country is served by more LCCs than DFW. Low fare airlines, including AirTran (formerly ValuJet), Frontier, American Trans Air (ATA), Sun Country, Ozark, Vanguard, and National, have recently entered and currently serve DFW. Five of these low cost carriers (ATA, Frontier, National, Sun Country and Ozark) have started service at DFW in the last three years.

These carriers serve 31 of DFW's top 50 destinations on either a nonstop or connecting basis. It is uncontroverted that, because of this recent entry to DFW of several LCCs and other major airlines, the passenger share of low fare carriers at DFW has increased significantly, while American's share has decreased. According to the evidence before the court, new entrant airlines "continue to thrive" at DFW. The evidence of actual entry by low cost carriers during the period of alleged predation demonstrates the absence of strategic barriers to support the government's claims of predation.

The evidence also establishes that there are no structural barriers to entry at DFW, which can accommodate any domestic carrier that seeks to establish or expand service. Gates, ticket counters and other physical assets at DFW are readily available. DFW has even implemented a Carrier Support Program, which provides cooperative advertising funds to new entrants when they enter DFW.

Not only do the uncontroverted facts fail to show any strategic barriers to entry by new entrant carriers, supra-competitive pricing on DFW routes is also disproven by the active presence of other strong competitors in the Dallas–Fort Worth market. Delta currently operates a hub at DFW, offering scheduled nonstop service by 209 daily flights to 62 destinations. The Dallas–Fort Worth area is also served by Dallas' Love Field, where Southwest Airlines serves 13 nonstop destinations with 139 daily flights. According to the government's own expert, "a DFW monopolist facing strong pricing competition from Love Field would find it difficult to raise prices substantially above the competitive level." Berry Rep't. at ¶ 47.

In sum, the government's evidence establishes only that, after decreasing during a period of low fare carrier competition, fares on four of the core routes (DFW–Kansas City, DFW–Wichita, DFW–Colorado Springs and DFW–Long Beach) returned to approximately the same levels as before. *But there is no evidence that the prior fares were in fact supra-competitive.*

The mere fact of a temporary reduction in prices is not itself an indication of predation. As Professors Areeda and Hovenkamp observe, regarding temporary price reductions while a new entrant is in the market: "But that reduction is absolutely consistent with competition on the merits. Any time a significant new firm's output is added to those of incumbents the result must be either (1) that the market price goes down, or (2) that the incumbents reduce their own output so that total market output does not increase." Areeda & Hovenkamp, ¶ 736 at pp. 332 (Rev. ed.1996). The same authority offers another rationale for restricting any inference from temporary price reductions by dominant firms-the prohibitive nature of the judicial oversight necessary to police such rules:

> Even if this analysis is not fully convincing, we would still conclude that temporary price reductions in response to rivalry or threatened rivalry should not be judged unlawfully exclusionary under the Sherman Act because of formidable administrative problems in controlling such temporary price reductions adequately, efficiently, and without interfering unduly with desirable pricing behavior. A general injunction forbidding a dominant firm from cutting price in response to new entry could be fatal to the dominant firm and undermine post-entry competition among incumbents. Rather, a more particularized injunction would have to be fashioned that forbad the incumbent firm from cutting its price below the new entrant's costs or, perhaps, that forbad it from increasing output in response to new entry. In any event, the amount of ongoing judicial supervision would once again become quite substantial.

*Id.*

Faced with the entry of low price competition, an established competitor's reduction of prices may be a simple necessity. "[I]t is simply good business practice, not a use of monopoly power, to lower prices only where the competition is stiff." *D.E. Rogers Assocs., Inc. v. Gardner–Denver Co.,* 718 F.2d 1431, 1435 (6th Cir.1983) (citation omitted). Moreover, based on the government's data, prices on the four routes after LCC exit were comparable to what they were before LCC entry.

The government offers evidence of supposed recoupment only in the form of calculations by one of its experts, Professor Berry. Berry's recoupment calculations apply to only four of the core routes (DFW–MCI, DFW–ICT, DFW–COS, and DFW–LGB). The calculations take two approaches, both based on changes in revenue, as measured by FAUDNC, before, during, and after the alleged predation. The calculations purport to establish a benchmark for American's "normal" earnings on a route (first by selecting a period prior to the alleged predation in which legitimate "competitive conditions exist," in Professor Berry's opinion, second by finding American's FAUDNC margin on routes in which it competes with Southwest). These "normal" earnings are then compared to FAUDNC margin losses during the period of alleged predation to determine the supposed amount of American's "predatory losses." Next, the same approach is used to determine the existence of any "in market recoupment" on the respective routes after the period of alleged predation. Professor Berry then subtracts the former ("predatory losses") from the latter ("recoupment"). If the result is positive, this is taken as evidence of recoupment. Berry's calculations may be expressed graphically, as in the following table.

Benchmark: FAUDNC Margin during Base Period FAUDNC in Southwest Markets

| | Predatory Loss | Recoupment | Net Sacrifice | Predatory Loss | Recoupment | Net Sacrifice |
|---|---|---|---|---|---|---|
| MCI I | −4,811,722 | 135,744 | −4,675,979 | −4,821,829 | −340,077 | −5,161,906 |
| MCI II | NA | NA | NA | −14,126,870 | −928,580 | −15,055,451 |
| ICT (Berry) | −800,231 | 1,392,797 | 592,566 | −926,754 | −637,201 | −1,563,955 |
| ICT (Full Base) | −1,616,172 | −7,325,019 | −8,941,191 | −926,754 | −637,201 | −1,563,955 |
| COS | −5,343,445 | 3,266,439 | −2,077,006 | −7,007,899 | 1,746,760 | −5,261,138 |
| LGB | NA | NA | NA | −3,524,496 | 5,865,870 | 2,341,374 |

As an initial matter, the court makes two observations. First, the government does not attempt to show recoupment on the other three core routes (DFW–PHX, DFW–TPA, DFW–OAK) in which predatory pricing allegedly occurred. The court therefore independently grants summary judgment as to these claims. The uncontested facts demonstrate the government has failed to offer any evidence that American's actions on the remaining core routes (DFW–TPA (Tampa), DFW–OAK (Oakland), and DFW–PHX (Phoenix)) were unlawful under Section 2. There is no evidence that American's pricing/capacity responses on these routes were below any measure of appropriate costs. With respect to Tampa, there is no evidence that American ever added capacity to its existing flights, or that it reduced prices below those of its competition. Rather, the evidence establishes only that American matched some fares on a limited basis. With respect to Oakland, the evidence again establishes simply that American offered a matching (but restricted) fare. With respect to Phoenix, the evidence establishes only that, after Vanguard announced it would begin new service on this route, American advanced by one month the start dates of additional flights it had

already planned to introduce, and instituted limited matching of Vanguard's fares. Again there is no evidence that American's revenues on any of these routes fell below an appropriate measure of costs.[18]

More importantly, the claims involving the core routes are premised solely on the government's calculations *which are entirely generated by American's Decision FAUDNC revenue figures.* As discussed earlier, FAUDNC, as a fully allocated calculation of American's total costs, is an inappropriate basis for determining predation. Accordingly, the court finds that the supposed "recoupment" calculations are invalid as a matter of law.

However, wholly apart from this conclusion, even if the court were to consider the evidence of alleged in-market recoupment based upon Professor Berry's calculations, those calculations fail to establish the recoupment element specified in *Brooke Group.* In fact, they demonstrate that no substantial recoupment has occurred. Coupled with the absence of other evidence rendering recoupment probable, summary judgment would in any event be appropriate.

The government alleges two instances of predation followed by supra-competitive pricing on the Dallas–Kansas City route: first, a period of predation (MCI I, in the above table) from June to December of 1995, followed by supra-competitive pricing in January to September of 1996; and second, a period of predation (MCI II) from October 1996 to May 1998, and supra-competitive pricing afterwards. Yet even applying Berry's formula, recoupment is unlikely. In the first period (MCI

I), using the first proposed test, American recouped but a small amount, only a fraction of what it supposedly "lost" during the period of predation. Using the second test, American in fact has not recouped anything; rather lost ground during the supposed recoupment period. In the second instance (MCI II), using Professor Berry's second test,[19] American again failed to generate sufficient "recoupment" to satisfy the "losses" it supposedly incurred. Indeed, it again lost money during the supposed recoupment period.

Recoupment is not likely under the uncontroverted facts. It is uncontroverted that by June of 1998, American failed to acquire monopoly power on the route. Further, it is conceded that by the end of 1998, American's prices ceased being "predatory" and had become comparable to fares charged on routes where American competes with Southwest—one of Professor Berry's benchmarks for normality.

Turning to the Dallas–Wichita route, Professor Berry's second recoupment test (using Southwest fares as a benchmark) also shows that American again failed to recoup anything during the post-predation period, and instead suffered further losses. Only Professor Berry's first test (the "base period" calculation) purports to show recoupment. However, further analysis demonstrates again the absence of the likelihood of any recoupment.

As indicated earlier, Professor Berry's first recoupment test is predicated on the identification of a natural "base period" prior to the supposed predation in which American would have been faced with "legitimate competitive conditions." Profes-

---

**18.** There is evidence that, after commencing the additional flights on the Phoenix route, American's Decision FAUDNC experienced a one month *decline.* But it is uncontroverted that the FAUDNC did not *become negative,* and, as noted above, there is no evidence that

American's revenues were below an appropriate measure of cost.

**19.** Professor Berry did not find any appropriate "base period" of "normal" competition for MCI II, and so could not generate an analysis under his first test.

sor Berry has previously stated that such natural base period of normal competition would have been April 1995 to September 1996: that is, the period after Vanguard commenced service in the market but before American returned jets to the route. However, in his calculation of this portion of his recoupment test, Professor Berry uses only a small (and artificial) fraction of this natural base period (July to September 1996). If the court uses the entire 17-month base period—which Professor Berry has stated is a natural base period—Professor Berry's first test of recoupment would show the results listed ICT (Full Base) in the table above. That is, American in fact would have suffered greater losses during the period of predation, and then lost a further $7,325,019 during the "recoupment period." This view (additional losses during the recoupment period) is again consistent with the results of Professor Berry's second test as applied to the DFW–ICT route.

Professor Berry's recoupment analysis as to the DFW–COS route is consistent under both tests. Both show that American has failed to recoup its supposed losses, even with the passage of more than three years after Western Pacific left the route.

Professor Berry's second test suggests possible recoupment on the DFW–LGB route, a lonely sentinel in support of the government's quest to find some indication of recoupment.[20] However, the court concludes that, while Professor Berry's tests have at last produced an indication of positive net sacrifice ("recoupment" in excess of "losses"), their application to this route cannot be reliably applied. The DFW–LGB route is fundamentally unlike the other routes under examination in that American was the new entrant, competing against an established competitor. It is uncontroverted that new entrants generate substantial losses while initiating service on a route.

In short, the results of Professor Berry's various tests as to individual core routes provides strong support for the conclusion that supra-competitive pricing is not a dangerous probability. Moreover, the court notes that the government has routinely characterized American's alleged predatory pricing on individual routes as part of a larger scheme involving competition against low cost carriers generally. Yet, Professor Berry's analysis focuses only on individual core routes. If one adds the supposed gains and losses for the supposed predation the four core routes in question, the claim of such an overall predatory scheme is further undermined. According to Professor Berry's own tests, American incurred predatory losses of some $41 million on the four routes. Yet, after years of supposed supra-competitive pricing, it has earned back about a quarter of this amount, with a current negative "net sacrifice" still in excess of $30 million. This is not predation as defined by *Brooke Group*.

Perhaps realizing the paucity of evidence to support claims of predation in the four core markets, the government falls back to the argument that, even if there is no dangerous probability of recoupment *within those markets*, it nonetheless may reasonably anticipate recoupment based upon a "reputation for predation" in *other* markets. However, this approach suffers from a number of significant problems, and the court finds it to be fundamentally misguided, contrary to law, and unsupported by the uncontroverted facts.[21]

**20.** Professor Berry also did not calculate an analysis of net sacrifice on DFW–LGB using his first test.

**21.** American contends that an underlying contradiction exists between the government's claims on the one hand, that there are high strategic barriers to entry at DFW, and

The "reputation for predation" approach is inconsistent with the law because, under *Brooke Group,* the court's recoupment analysis must be focused on "an estimate of the cost of the alleged predation and a close analysis of both the scheme alleged by the plaintiff and the structure and conditions *of the relevant market.*" 509 U.S. at 226, 113 S.Ct. 2578 (emphasis added). Here, the government has specifically alleged that each separate city-pair route is a separate relevant market.[22]

The government's approach, which relies on the subjective impressions of American by a number of its competitors in other markets, is not only inconsistent with the letter of *Brooke Group,* it clearly violates the spirit as well. As noted earlier, the clear purpose and effect of *Brooke Group* has been to render most claims of predation subject to dismissal by the court due to the absence of objective evidence of predation and recoupment. Finding "recoupment" based upon the subjective assertions of other-market competitors would reverse this approach. It would be the exceptional plaintiff who, even lacking any objective evidence of in-market recoupment, could not cobble together complaints about a given defendant by other competitors, in other markets, based upon "reputation." The Third Circuit reached

precisely this conclusion in *Advo, Inc. v. Philadelphia Newspapers, Inc.,* 51 F.3d 1191 (3rd Cir.1995). There, the plaintiff argued that a reputation for predatory pricing could create "strategic entry deterrence" which would serve as a barrier to entry by new competitors. The court wrote:

> The idea behind "strategic entry deterrence" is that a monopolist who pursues predatory pricing with sufficient zeal and frequency will earn a reputation formidable enough to scare off all potential entrants indefinitely. The firm then can charge monopolistic prices long enough to recoup its investment in predation. Like Advo's arguments that know-how and reputation create barriers to entry, its strategic entry deterrence theory sweeps too broadly. Without some limiting principle, it would bar summary judgment in every predatory pricing case, a result at odds with *Matsushita* and *Brooke Group.*

*Id.* at 1202. The government's speculative reputation theory provides no limiting principle in the present action. *See also Los Angeles Land Co. v. Brunswick Corp.,* 6 F.3d 1422, 1427 (9th Cir.1993) (rejecting claim of entry barrier based on alleged intimidation, since "[e]vidence of threat-

---

the government's contention (or assumption) on the other that, but for American's alleged reputation for predation, LCCs would have initiated service at DFW. The court agrees there exists a potential conflict in these arguments, which could present a matter for substantial consideration should the present action have proceeded to trial. However, the court decides the present motion on the grounds that uncontroverted facts fail to demonstrate both the existence of substantial structural entry barriers at DFW and/or existence of a well-founded reputation for illegal predation.

**22.** In *Multistate Legal Studies,* 63 F.3d at 1549 n. 6, the court noted the existence of the question of "whether a defendant with a mo-

nopoly in one market would have any plausible reason to use its monopoly profits in that market to subsidize predation in a second market." The court also noted the Supreme Court's language in *Matsushita* that "a conspiracy to increase profits in one market does not tend to show a conspiracy to sustain losses in another." 475 U.S. at 596, 106 S.Ct. 1348. The court concluded, in light of the specific evidence in that case, that it could not conclude as a matter of law there might not be some larger cross-market scheme. At the same time, the court concluded independently that there was independent evidence to support a material question of recoupment in the main (supplemental workshop) market. 63 F.3d at 1555–56.

ened competition can not rationally support an inference of power to exclude competition").

It is clear that a reputation for aggressive, but wholly legal competition may also intimidate would-be competitors. (There is evidence in the present case, for example, that some low cost carriers try to avoid routes served by Southwest, not because it is a "predator," but simply because it competes vigorously for its market share.) The government's broad-based claims of predation by (subjectively-felt) reputation offer no principled basis for distinguishing between a reputation for predation, and a reputation for lawfully vigorous competition. The government has explicitly conceded that such reputational predation concerns are not valid if the underlying conduct (American's pricing) in fact was not objectively below cost within the meaning of *Brooke Group*.[23]

Accordingly, the court rejects the government's theory of "reputational recoupment." Such an approach was explicitly rejected by the district court in *Advo, Inc. v. Philadelphia Newspapers, Inc.*, 854 F.Supp. 367, 376 (E.D.Pa.1994) *aff'd*, 51 F.Supp. 1191 (3d Cir.1995). In that case, the court was also presented with the theory that the alleged predator had engaged in below-cost pricing in one market (advertising circulars), and that it sought to recoup its losses through its reputation in another market (run-of-press advertisements). The court rightly rejected such a contention. *See also Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F.Supp. 1544, 1552 (S.D.Tex.1991) (granting summary judgment on predatory pricing claim based on theory of predatory pricing in one market (secondary drilling bits) and recoupment in another (premium drilling bits)).

Independently, the court also rejects the government's reputational recoupment argument since it is simply unsupported by the facts.[24]

The government's expert, Professor Stiglitz, admits that the existence of a reputation for predation can be tested empirically by means of industry surveys. Yet, it is uncontroverted that neither Professor Stiglitz nor any other government expert has attempted to conduct such research. Rather, the government offers only indirect, second hand references to "industry folklore." The government's experts have not identified a single low cost, new entrant airline that refused to enter a DFW route on the grounds of American's "reputation for predation."

## 6. MONOPOLIZATION BY REPUTATION

■ In addition to claims of predatory pricing on four of the core routes, the government also offers a new theory of liability against American on the grounds that the defendant monopolized or attempted to monopolize some 48 markets (the 7 core markets plus 40 others) by its

---

**23.** Professor Stiglitz has admitted that an airline can acquire a reputation for aggressive behavior without engaging in predatory pricing, and that such a reputation for aggressiveness (by non-predatory, lawful competition) is "by definition" not anti-competitive. (Stiglitz 10–3–00 dep. at 284–85).

**24.** There is some speculative evidence from Professor Berry about assumed additional profits American could gain if its reputation caused a 10% reduction in the probability of an low fare carrier hub at DFW for five years,

or a two-year delay by an LCC in building a hub at DFW. But there is no foundation for this hypothetical. Berry testified that these calculations are "examples" and "exercises," and he was not stating as an opinion that a low fare carrier would actually have built a DFW hub but for American's reputation. He has not attempted to quantify the likelihood of such a carrier creating a hub at DFW. He assumed a 10% reduction in the probability of a low fare carrier at DFW because "Ten percent is a nice round number." (Berry 12–20–00 dep. at 800).

supposed "reputation for predation." Thus, the government seeks to use this supposed reputation not only as a basis for finding recoupment (see Section . C.5, above) in core markets, it also attempts to use reputation as an independent basis for liability in additional markets.

The court rejects this proposed basis for liability on several grounds. First, the theory is wholly dependent on underlying actual predatory pricing by American. Absent evidence of below-cost pricing on the core routes, the government cannot, and does not, contend that "reputation" should be a basis for Section 2 liability. That is, if the supposed entry-deterring reputation was created not by a well-founded perception of *illegal* pricing conduct, by instead by a general perception of vigorous but legal pricing by American to protect its hub, liability should not ensue. As the court discussed above, the government's claims of predatory pricing in the core routes fail for multiple reasons. Accordingly, the court also grants summary judgment on the "monopolization by reputation" routes.

Second, even if one assumes predatory conduct in the core markets for purposes of argument, the court finds that the government's theory of reputational liability must be rejected as contrary to law. No court has adopted such a theory, which would represent a marked departure from existing law.[25] The court can find no case authority, and none has been cited by the government, imposing Section 2 liability on the basis of a reputation for predation created in a separate market.

The government's theory offers no principled basis for the court to distinguish between a general reputation for aggressive but lawful conduct on the one hand, and illegal predatory conduct. Such theories would inherently tend to degenerate, as the government's does, into self-serving complaints about reputation by a defendant's competitors. There are no grounds within the theory advanced by the government to reliably identify the true reason for a nonevent (that it was a competitor's other-market reputation which caused a company to avoid entry into a market, rather than some other reason). Moreover, the potential effect on competition is deeply troubling. For example, the effect of the government's reputation theory in the present cause would be to expand potential liability twelve-fold (from supposed predatory conduct in four core markets to liability in 48 markets). Faced with such an exponential increase in the already significant consequences of Sherman Act liability, many firms may be rationally tempted to forgo aggressive but lawful price competition.

Finally, the government's theory of monopolization by reputation must be rejected for the same reason that its recoupment by reputation argument must be rejected: a complete absence of proof. It is important to note that the 48 reputation routes were not selected by the government on the basis of careful market research. The government's experts have conceded that industry reputation may be objectively measured by independent empirical mar-

---

**25.** In fact, the government comes close to abandoning this theory in the small portion of its Response devoted to the issue, agreeing that it has "no 'backup' theory for a finding of monopolization solely as a result of reputation," suggesting instead that "reputation is only one mechanism" which caused American's acts in core markets to be felt elsewhere. (Resp. at 65). It is not clear how this saves the government's claims, since it fails to provide specific evidence how additional mechanisms combined with reputation resulted in monopolization or attempted monopolization of specific routes. As noted above, the government's claims of reputational liability suffer from a complete lack of supporting evidence.

ket surveys. It conducted none. Rather, it simply identified those routes in which American has a market share of 60% or more, and in which there was no current LCC competitor. There is no evidence that, as to any given route, a specific low-cost carrier was prepared to enter the route, but refused to do so after acquiring a well-founded understanding that American had engaged in illegal predatory conduct on the core routes.

Instead, the evidence as to reputation relates either to core routes[26] or routes which American is not alleged to have monopolized or attempted to monopolize.[27] With respect to the latter, liability under the Sherman Act cannot exist in the absence of monopolization or attempted monopolization. With respect to the former, most of the government's claims simply repeat the underlying predatory pricing allegations: claims that a given airline was driven from a market by predatory pricing are repeated by stating that these airlines were then deterred from re-entering by a reputation from predation. Having determined earlier that the government's claims as to predatory pricing on these routes are without merit, the court is compelled to reach the same conclusion as to the translation of these same claims into "reputation claims."

This leaves claims by the government as to the supposed deterrence of Great Plains and Ryan International Airlines, two airlines which have never carried a single fare-paying passenger, from entering the DFW–Wichita market. In neither instance does the evidence support reputational liability. As a Great Plains executive testified, "American Airlines did nothing to us as far as I'm concerned." Ryan International's Ronald Ryan has complained of vigorous competition from major airlines—without singling out American in particular—as a concern in adding passenger service to the company's existing charter and freight service. As a result, Ryan has sought financial guarantees from the City of Wichita prior to offering passenger service. This proposal, which Ryan remains willing to implement, is essentially the same now as it was in 1994, before the period of alleged predation on the Wichita route. Ryan admitted he has no knowledge as to whether American's vigorous competition against Vanguard involved illegal below-cost pricing. In short, there simply is no evidence that either Great Plains or Ryan International would be serving DFW–ICT but for American's supposed reputation for predation.

### 7. ADDITIONAL ROUTES

The government also advances various claims as to other routes: (A) five routes (DFW–CLT (Charlotte), DFW–DTW (Detroit), DFW–MCO (Orlando), DFW–MEM (Memphis), and DFW–PIT (Pittsburgh)) in which the government does not claim American directly committed any anti-competitive conduct, or that American monopolized or attempted monopolize the route, but in which the effects of American's supposed reputation were "felt;" and (B) five routes (DFW–ATL (Atlanta), DFW–CVG (Cincinnati), DFW–DEN (Denver), DFW–EWR (Newark), and DFW–MDW (Midway Airport, Chicago))

---

26. The government claims that Vanguard was deterred from entering DFW–ICT and DFW–PHX, SunJet was deterred from entering DFW–LGB, Western Pacific from entering was deterred from entering DFW–COS, Great Plains was deterred from entering DFW–ICT, and Ryan Airlines was deterred from entering DFW–ICT.

27. Specifically, the government suggests that JetBlue was deterred from entering DFW–JFK, National was deterred from entering DFW–LAS, Frontier was deterred from entering DFW–DEN, and Vanguard was deterred from entering DFW–CVG.

in which American engaged in anti-competitive acts as part of its alleged scheme of predation, but, again, without having monopolized or attempted monopolize the route.

Liability under Section 2 requires proof that a defendant monopolized, or had a dangerous probability of succeeding in monopolizing, a relevant market. *See Spectrum Sports, Inc. v. McQuillan,* 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). The government, however, makes no attempt to contend or prove that American actually held or attempted to gain monopoly power in these markets. Accordingly, the court grants summary judgment as to claims associated with these markets.[28]

## 8. CONCLUSION

The government's claims in the present case fail because American did not price below an appropriate measure of cost, because it at most matched the prices of its competitors, and because there is no dangerous probability (even assuming below-cost pricing) of recoupment of American's supposed profits by means of supra-competitive pricing. With respect to costs, the evidence shows that American priced its fares consistently above its average variable costs. Alternative, creative measures of costs proposed by the government are inconsistent with existing law, and inconsistent with an antitrust regime which seeks to nurture rather than throttle vig-

orous price competition. With respect to the question of recoupment, the government's claims suffer from a pervasive failure of proof. The evidence shows that, following the period of low fare competition, American's fares roughly returned to their previous level. Actual or likely recoupment by supra-competitive pricing finds no basis in the evidence.

The government has virtually abandoned its expansionist claims of liability with respect to over 50 airline flight markets, providing no evidence or allegation that American monopolized or sought to monopolize these markets by specific anti-competitive acts. The government's theory of liability by reputation is not the law, and should not be. A fundamental principle of antitrust law is that it be capable of effective and accurate administration, and not chill the competition it seeks to foster. The government's reputational liability approach would violate this principle, permitting claims of predation based solely upon the subjective and unverifiable complaints of a defendant's competitors.

The low fare carriers in question entered the core markets seeking to play a new sort of ball game. The government's theory—that an established competitor should not, and indeed, cannot deviate from its existing market strategy in the face of aggressive price cutting by a new entrant—represents a whole new mid-game spin on time-honored rules. Here

---

28. The government cannot rescue these unfounded claims based upon a general allegation of a "scheme." *See Continental Ore Co. v. Union Carbide and Carbon Corp.,* 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962) (reviewing court should avoid "tightly compartmentalizing the various factual components" of plaintiff's claim "and wiping the slate clean after scrutiny of each"). Here, whether considered individually or collectively, the government's claims of predation fail to meet established legal standards and minimal standards of proof. A violation of Sec-

tion 2 is not established merely by showing that there "is a fraction of validity to each of the basic claims and the sum of the fractions is one or more." *City of Groton v. Connecticut Light & Power,* 662 F.2d 921, 928–29 (2d Cir.1981). Therefore, where claims of anti-competitive conduct are individually shown "in numerous critical respects [to be] utterly lacking" the plaintiff's claims then "collectively cannot have any synergistic effect" rescuing their validity. *Northeastern Tel. Co. v. American Tel. & Tel. Co.,* 651 F.2d 76, 94–95 n. 28 (2d Cir.1981).

American played by the traditional rules. It competed with the low fare carriers on their own terms. It did not price its fares below cost; it did not undercut the other carriers' fares. There is no doubt that American may be a difficult, vigorous, even brutal competitor. But here, it engaged only in bare, but not brass, knuckle competition. Summary judgment is appropriate.

IT IS ACCORDINGLY ORDERED this 27th day of April, 2001, that the defendant American's Motion for Summary Judgment (Dkt. No. 382) is hereby granted.

## APPENDIX
### AIRPORT CODES USED IN THE OPINION

| | |
|---|---|
| ATL | Atlanta |
| BDL | Hartford |
| BHM | Birmingham |
| BNA | Nashville |
| BOS | Boston |
| BWT | Baltimore |
| CLE | Cleveland |
| CLT | Charlotte, NC |
| CMH | Columbus |
| COS | Colorado Springs |
| COU | Coumbia, MO |
| CVG | Cincinnati |
| DCA | DC Reagan |
| DEN | Denver |
| DFW | Dallas–Ft. Worth |
| DSM | Des Moines |
| DTW | Detroit |
| EWR | Newark |
| FLL | Ft. Lauderdale |
| GPT | Gulfport |
| HSV | Huntsville, AL |
| IAD | DC Dulles |
| ICT | Wichita |
| IND | Indianapolis |
| JFK | N.Y. Kennedy |
| LAS | Las Vegas |
| LAX | Los Angeles |
| LGA | N.Y. LaGuardia |
| LGB | Long Beach |
| MCI | Kansas City |
| MCO | Orlando |
| MDW | Chicago Midway |
| MEM | Memphis |
| MIA | Miami |
| MSP | Minneapolis/St. Paul |
| OAK | Oakland |
| OMA | Omaha |
| ONT | Ontario, CA |
| ORD | Chicago O'Hare |
| PDX | Portland |
| PHL | Philadelphia |
| PHX | Phoenix |
| PIE | St.Petersburg/Clearwater |
| PIT | Pittsburgh |
| RDU | Raleigh Durham, NC |
| SAN | San Diego |
| SEA | Seattle |
| SFO | San Francisco |
| SGF | Springfield, MO |
| SJC | San Jose |
| SJU | San Juan, PR |
| SLC | Salt Lake City |
| SNA | Santa Ana |
| TPA | Tampa |
| TUS | Tucson |